## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

UNITED STATES OF AMERICA,

                *Plaintiff*,

v.

SABRE CORPORATION,
SABRE GLBL INC.,
FARELOGIX, INC., and
SANDLER CAPITAL PARTNERS V, L.P.,

                *Defendants*.

Civil Action No.:

## <u>COMPLAINT</u>

Sabre's proposed acquisition of Farelogix is a dominant firm's attempt to eliminate a disruptive competitor after years of trying to stamp it out.  Sabre, the largest global distribution system in the United States, and Farelogix, an innovative technology firm, compete to provide booking services to airlines.  Sabre is the dominant provider of booking services in the United States, and Farelogix represents a significant and growing threat to Sabre's dominance.  Farelogix has spurred innovation and brought more competitive pricing to an industry that has for decades been plagued by tepid competition and outdated technology.  As Farelogix explains on its website:  "The airline industry is undergoing core disruption," and "Farelogix and its technology solutions are at the center of this disruption."  The proposed acquisition would wipe out this competition and innovation, harming airlines and American travelers.

## I.   INTRODUCTION

1.      Airlines sell tickets to travelers directly through their websites and call centers
and indirectly through traditional brick-and-mortar and online travel agencies.  Travel agencies
are a crucial distribution channel for airlines because many travelers, especially business
travelers, rely on travel agencies to book and manage their travel.  Nearly 50 percent of airline
bookings in the United States are made through travel agencies.  To sell tickets through travel
agencies, airlines require booking services.  Booking services are IT solutions that enable airlines
to deliver their offers to travel agencies and to process resulting orders.

2.      Historically, airlines have relied on booking services provided by Sabre and the
other two global distribution systems ("GDSs") to sell their tickets through travel agencies in the
United States.  Sabre's GDS is a computerized system that helps travel suppliers, such as
airlines, market and distribute their fares and scheduling information to travel agencies and the
traveling public.  Sabre and the other two GDSs have resisted innovation, while charging airlines
high booking fees for services that lack the functionality airlines and travelers demand.  The
GDSs' outdated technology has limited airlines' ability to sell—and travelers' ability to choose
from—airlines' entire suite of offerings.

3.      For well over a decade, the GDSs have thwarted attempts by new, innovative
competitors such as Farelogix to inject much-needed competition into this industry.  As
Farelogix's CEO told the European antitrust authorities in early 2018, the "GDSs continue to
leverage significant market power to preserve their market position and stifle innovation."

4.      Farelogix has emerged as an innovator that threatens to erode Sabre's dominance
in booking services for air travel.  Farelogix offers an alternative booking services solution, Open
Connect, that allows airlines to bypass the GDSs and connect directly to travel agencies.  By

offering airlines an alternative, Farelogix has given them leverage to negotiate lower GDS booking fees and to reduce their reliance on the GDSs for booking services.

5.      Farelogix has also pioneered a next-generation technology standard called "New Distribution Capability," or NDC.  NDC technology, which powers Farelogix's Open Connect, is poised to transform airline distribution.  Unlike the legacy GDS technology, NDC empowers airlines to make a broader, more personalized range of offers to travelers booking through travel agencies.  For example, NDC could allow an airline to offer a traveler a bundled fare including priority boarding, in-flight internet, and a morning snack for her weekly flight from Philadelphia to Chicago.

6.      Sabre has resisted innovation and opposed adoption of NDC.  Sabre was so threatened by NDC that in 2013 it urged the Department of Transportation to block approval of the standard.  Farelogix called out Sabre's "ulterior motive" for opposing NDC, stating that "today's battle is one of old vs. new, with the dominant players in the old technology trying to prevent, or at the very least delay, the implementation of the new standard in order to retain artificial control of the distribution marketplace."  Sabre now claims to have accepted NDC, but just last year Farelogix described to European antitrust authorities some of the tactics Sabre and the other major GDSs have deployed in what Farelogix characterized as their "decade of resistance" to innovation.  These tactics include what Farelogix described as the GDSs' strategy to "Undermine and delay NDC even if embracing it on the surface."

7.      Recognizing the competitive threat posed by Farelogix, Sabre for years has tried to box Farelogix out of the industry.  According to its own internal documents, Sabre took steps to "shut down" Farelogix after it began gaining customers.  Farelogix itself has complained that Sabre pressured airlines not to use Farelogix's booking services and retaliated against airlines

that did.  Indeed, in 2018, Farelogix's CEO told another potential purchaser of the company that for Farelogix's booking services solution, "the slow adoption was solely and inarguably due to the blocking and pressure the GDSs put on Farelogix, airlines, and travel agents not to adopt."

8.      Additionally, Sabre's and the other GDSs' contracts with airlines and travel agencies restrict airlines' ability to avail themselves of cheaper, more advanced booking services solutions.  As recently as 2018, Farelogix denounced these restrictions, complaining that airlines' GDS contracts "effectively prohibit working with third parties or make doing so cost prohibitive."  In January 2019, a Sabre senior vice president acknowledged that airlines view Sabre's restrictions as "abusive but there's nothing they can do because they need the distribution and they are tied with a contract."

9.      Notwithstanding these tactics, Farelogix—thanks to its innovative technology and competitive pricing—has managed to grow its booking services customer base from one airline in the mid-2000s to over 15 today.  As airlines and travel agencies continue to demand and adopt its industry-leading NDC technology, Farelogix is a greater threat to Sabre than ever before.

10.      Sabre now seeks to eliminate its disruptive competitor once and for all.  Sabre executives have acknowledged that acquiring Farelogix would eliminate a competitive threat and allow Sabre to charge higher prices.  In a presentation to Sabre's CEO, Sabre executives emphasized that buying Farelogix would "Mitigate risk from potential GDS bypass."  And on the day Sabre announced its proposed acquisition of Farelogix, a Sabre sales executive texted a colleague that one major U.S. airline would "hate" it.  The colleague replied, "Why, because it entrenches us more?"  The Sabre sales executive responded that Farelogix has been that airline's "Trojan horse to f*** us" and observed that the airline's "FLX [Farelogix] bill is going up big time."

11.     If allowed to proceed, Sabre's acquisition of Farelogix would likely result in increased prices, reduced quality, and less innovation for booking services, causing substantial harm to airlines and American travelers.

12.     The proposed transaction is likely to substantially lessen competition in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.  The Court, therefore, should enjoin this transaction.

## II.     DEFENDANTS AND THE PROPOSED TRANSACTION

13.     Sabre, a travel technology company based in Southlake, Texas, operates the largest GDS in the United States.  All major U.S. airlines distribute offers to travel agencies through the Sabre GDS.  Sabre's 2018 revenues were approximately $3.9 billion.  Sabre is the ultimate parent entity of Sabre GLBL Inc., Sabre's principal operating subsidiary and its signatory to the merger agreement with Farelogix.

14.     Farelogix, a travel technology company based in Miami, Florida, sells airlines a next-generation booking services solution called Open Connect, as well as other IT solutions. Open Connect provides low-cost booking services for airlines selling tickets through travel agencies.  Farelogix earned approximately $42 million in revenues in 2018.  Farelogix is owned by Sandler Capital Partners V, L.P. ("Sandler"), a private equity fund and a signatory to Sabre's merger agreement with Farelogix.

15.     Sandler conducted a limited sale process in seeking a buyer for Farelogix.  At least one other potential buyer—not a competitor—was seriously interested and offered a substantial price.  But Sabre—a competitor—ultimately offered a higher price.

16.     On November 14, 2018, Sabre agreed to acquire Farelogix in a transaction valued at approximately $360 million.

### III.    JURISDICTION AND VENUE

17.    The United States brings this action, and this Court has subject-matter jurisdiction, under Section 15 of the Clayton Act, 15 U.S.C. § 25, to prevent and restrain Defendants from violating Section 7 of the Clayton Act, 15 U.S.C. § 18.

18.    Defendants are engaged in, and their activities substantially affect, interstate commerce.  Sabre and Farelogix both provide booking services to airlines that serve travelers throughout the United States.

19.    Venue is proper under Section 12 of the Clayton Act, 15 U.S.C. § 22, and under 28 U.S.C. §§ 1391(b) and (c).

20.    This Court has personal jurisdiction over each Defendant.  Sabre, Sabre GLBL Inc., and Farelogix are incorporated in the State of Delaware and are inhabitants of this District. Sandler is a Delaware limited partnership and is an inhabitant of this District.  Sabre, Farelogix, and Sandler have consented to personal jurisdiction in this District for purposes of this lawsuit. The proposed acquisition would have effects throughout the United States, including in this District.

### IV.    INDUSTRY BACKGROUND

#### A.    Sabre Dominates Airline Bookings through Travel Agencies

21.    For many airlines, travel agencies are an essential sales channel.  Many travelers, especially business travelers, book their flights through travel agencies because they have specific needs or their employer requires them to do so.  Sales to these travelers account for a substantial portion of revenue for many airlines.

22.    The GDSs—Sabre, Amadeus, and Travelport—operate computerized systems that allow travel agencies to search for and book flights across multiple airlines.  In response to a

query from a travel agent, a GDS pulls fare and schedule information from multiple data sources to construct an airline offer, consisting of a fare on a specific flight. The GDS then aggregates offers from multiple airlines so that the travel agent can compare travel options and book the traveler's chosen itinerary. Thus, the GDSs provide three main functions: they help airlines construct the initial offer (offer creation); they aggregate offers across multiple airlines (offer aggregation); and they enable airlines to deliver their offers to travel agencies and to process resulting orders (booking services). Farelogix and Sabre compete to provide booking services to airlines.

23.     Under the traditional GDS payment model, a GDS charges an airline a "booking fee" for each flight segment a travel agency books through the GDS. The GDS then pays an incentive to the travel agency as an inducement to book through the GDS.

24.     Airlines sell tickets to travelers through two main types of travel agencies: traditional travel agencies and online travel agencies. Traditional travel agencies consist of travel management companies, which serve business travelers, and other brick-and-mortar travel agencies, which serve a mix of travelers, including leisure travelers with complex travel itineraries, such as tour groups. Traditional travel agencies are an important distribution channel for airlines, representing approximately 25 percent of airlines' bookings made in the United States.

25.     Business travelers book flights through travel management companies because they provide the extensive customer support and reporting functionality that business travelers typically require. Business travelers are the most profitable traveler segment for large, full-service airlines. Business travelers are particularly lucrative customers because they tend to

travel more often and spend more than leisure travelers on purchases such as last-minute flights, refundable tickets, and premium seats.

26.     Many traditional travel agencies use a single GDS to book air travel.  Some use more than one GDS, but will still use a single GDS to serve a particular corporate client. Traditional travel agencies cannot readily switch between GDSs because of contractual and technical restrictions.  A traditional agency typically enters into a long-term contract with a GDS that includes financial incentives committing the agency to book through that GDS and penalizing the agency for shifting bookings to alternative channels.  Some traditional agencies also rely on other lines of Sabre's business for IT products.  For example, many travel management companies in Sabre's network use mid- or back-office software supplied by Sabre to perform monitoring or reporting for their corporate clients.  To ensure consistent support and reporting for their travelers, corporations typically rely on only one travel management company. Since traditional agencies cannot easily switch between GDSs, each GDS effectively controls access to a distinct set of travelers.  Thus, airlines must distribute through all three GDSs to reach all travelers who book their travel through traditional travel agencies.

27.     Sabre controls over 50 percent of bookings through traditional travel agencies in the United States, so airlines must sell tickets through Sabre to reach a broad set of U.S. travelers.  Sabre has even greater control over airline bookings through travel management companies in the United States.  For instance, on August 1, 2019, Sabre reported to investors that it has "over 80% share within large travel management companies" in North America.

28.     The second type of travel agency, online travel agencies, primarily serves cost-conscious leisure travelers.  Leisure travelers book flights through online travel agencies like Expedia or Priceline because they can comparison shop and book flights, hotels, and car rentals

on the same website.  Online travel agencies are an important distribution channel for airlines, representing about 20 percent of airline bookings made in the United States.  Sabre accounts for approximately 50 percent of airlines' online travel agency bookings in the United States.  Thus, airlines risk losing a significant amount of revenue if they forgo using the Sabre GDS to sell tickets through online travel agencies in the United States.

**B.     Farelogix Is a Competitive Threat to Sabre**

29.     Over the years, a number of firms, such as ITA Software and G2 Switchworks, have tried and failed to introduce viable alternatives to Sabre and the other GDSs.  Farelogix has succeeded where others have failed through persistence and a commitment to innovation.  In 2005, Farelogix began working with American Airlines to develop a way to reach travel agencies directly without going through a GDS.  Farelogix's "direct connect" solution (the forerunner to Open Connect) gave American and other airlines a lower-cost way to sell tickets through travel agents and avoid paying the GDSs' high booking fees.

30.     Farelogix has led the development of NDC, a next-generation data transmission standard that facilitates advanced communications between airlines and travel agents.  NDC enables airlines to distribute more complex offers than the legacy GDS technology can support.  Consequently, NDC is widely expected to address many of the current limitations of airline distribution, to the benefit of airlines, travel agents, and travelers.  Farelogix's Open Connect is powered by NDC technology.  Open Connect offers airlines an alternative to booking through a GDS and greater ability to offer ancillary products and services, such as in-flight WiFi or lounge

access, through travel agencies.  Farelogix charges airlines a flat subscription fee and a small fee for each booking enabled by Open Connect.

31.     With NDC, the airline, rather than the GDS, controls the content of the airline's offers, and the airline selects the IT solution used for booking services.  An airline can use a booking services solution such as Farelogix's Open Connect to reach a travel agency directly, or it can distribute its offers through Open Connect to a third-party aggregator or a GDS to perform the aggregation function for the travel agency.

32.     For over a decade, Farelogix's airline customers have successfully used the threat of switching to Farelogix's booking services solutions to negotiate better rates and terms with Sabre and the other GDSs for bookings through both traditional and online travel agencies.

### C.     Sabre Has Impeded Farelogix's Ability to Compete

33.     Shortly after Farelogix began gaining airline customers, Sabre launched an initiative to "shut down" Farelogix.  Sabre took steps to prevent travel agencies from using Farelogix's solution in conjunction with Sabre's GDS, pressured travel agencies not to use Farelogix's services, and retaliated against airlines that worked with Farelogix.  For example, in 2011, Sabre retaliated against American Airlines for working with Farelogix by burying American's flight options in the search results it distributed to travel agencies to make them less visible to travel agents.  Farelogix accused Sabre of seeking to "punish" American for adopting Farelogix's technology.

34.     Sabre has continued to use a broad range of contractual and technical barriers to prevent entry or expansion by suppliers that could threaten its control over bookings through travel agencies.  For instance, Sabre's contracts include provisions that inhibit airlines' use of an alternative supplier like Farelogix, even when doing so would be less expensive for airlines.

Sabre's contracts prevent airlines from offering special fares through cheaper distribution channels (such as Farelogix's Open Connect or an airline's own website) and require airlines to provide Sabre with the same content on as favorable terms as they provide the other GDSs. Sabre's contracts also restrict airlines from rewarding travel agencies for using alternative distribution options, making it difficult for airlines to encourage travel agencies to use Farelogix. Although these provisions limit airlines' ability to shift bookings to alternative distribution channels, many airlines accept them because Sabre controls access to a large number of travel agencies, and those travel agencies' customers are a critical source of the airlines' revenues.

35.     Sabre's practices have hampered Farelogix's growth, prompting Farelogix to complain to the federal government in 2013 that "Sabre has wielded its monopoly power in an attempt to destroy Farelogix and prevent competition . . . ."

### D.     Competition from Farelogix Has Loosened the GDSs' Grip on Bookings through Online Travel Agencies

36.     While Sabre's practices have limited Farelogix's ability to work with traditional travel agencies, Farelogix has been more successful in gaining a foothold in bookings through online travel agencies.  Notably, two of the largest U.S. airlines use Farelogix to connect directly to one of the largest online travel agencies in the United States.  As Sabre acknowledged less than a year ago, "Large OTAs [online travel agencies] are the most likely agency segment to disintermediate our GDS."  Both Sabre and Farelogix expect that airlines will choose to use Farelogix for bookings through other online travel agencies, including the largest in the United States.  According to one Sabre document, if this agency "strategically shifts volume out of the GDS channel," Sabre anticipates that "Other large OTAs [online travel agencies] will likely be fast followers to this strategy and build out their own connections" to airlines.

37.     Having Farelogix as an alternative to the GDSs has given airlines leverage to chip away at the traditional GDS payment model.  Traditionally, GDSs charged airlines a fee for each flight segment a traveler booked through an online travel agency, just as they do for a traditional agency.  Some airlines, however, have successfully used the threat of shifting bookings to Farelogix to move the GDSs to a "wholesale" payment model for certain online travel agencies.  Under the wholesale approach, an airline does not pay the GDS a booking fee.  Instead, the airline compensates the online travel agency directly and the online travel agency pays a technology fee to the GDS for each booking.  This change, resulting from competition, has saved at least one U.S. airline millions of dollars per year.

**E.      Competition from Farelogix Pushed Sabre to Update Its Own Booking Services Technology**

38.     Competition from Farelogix's next-generation technology also has driven Sabre to finally begin improving its own outdated technology.  For years, Sabre and the other GDSs vehemently opposed the transition to NDC.  As airlines and travel agencies began demanding the new capabilities pioneered by Farelogix, however, Sabre eventually started developing its own NDC booking services technology.

39.     In 2017, recognizing that Farelogix was the leader in NDC technology, Sabre began developing a strategy to catch up.  As airlines and travel agencies increasingly demanded next-generation technology, Sabre recognized that Farelogix was among the "most relevant threats" to its business.  (Likewise, Farelogix identifies Sabre as one of its "key competitors" in next-generation distribution.)  Faced with this threat, Sabre developed its own plan to surpass Farelogix's next-generation distribution capabilities by 2020.  Indeed, the Sabre vice president leading the acquisition negotiations told Farelogix's investment banker that if Farelogix declined to sell itself to Sabre, Sabre would be "too far down the path in our own plan" and "then we

[Sabre] will be a really tough competitor for them [Farelogix]."  Today, Sabre bids on NDC business in direct competition with Farelogix.

### F.    Farelogix Is Poised to Compete Even More Intensely with Sabre

40.    In spite of Sabre's efforts to hobble it, Farelogix has steadily built a sizeable base of major airline customers, including some of the largest airlines in the United States.  Farelogix already processes more NDC transactions than any other airline technology company.

41.    As the industry continues to shift to NDC, Farelogix is poised to grow significantly.  In April 2018, IATA, the airline industry trade association responsible for the standardization of NDC, launched a "leaderboard" of airlines that have committed to making 20 percent of their bookings through an NDC-enabled connection by 2020.  Nearly half of the airlines on the leaderboard have chosen Farelogix's Open Connect as their NDC booking services solution.  Farelogix and Sabre both project that Farelogix revenues will grow as the adoption of NDC technology expands.  Indeed, Sabre conservatively projected that airline tickets booked using Farelogix's technology will nearly triple between 2018 and 2020.

42.    As demand for NDC grows, the industry is approaching a tipping point that threatens Sabre's business model.  A Sabre document from late 2018 recognizes that airlines view NDC as a "pivot point for model change, threatening the GDS."  In May 2019, Farelogix's CEO stated that NDC is "past the inflection point" and "it now just becomes kind of the downhill slope of adoption."

43.    Sabre's proposal to buy Farelogix threatens to forestall this evolution.  Instead of innovating to compete with Farelogix, Sabre has resorted to eliminating the competitive threat by acquiring Farelogix.

## V.    RELEVANT MARKETS

44.    If not enjoined, the proposed transaction would result in anticompetitive effects in two relevant product markets:  booking services for airline tickets sold through traditional travel agencies and booking services for airline tickets sold through online travel agencies.

### A.    Product Markets

#### 1.    Booking Services for Airline Tickets Sold through Traditional Travel Agencies

45.    Booking services for airline tickets sold through traditional travel agencies is a relevant product market.  Traditional travel agencies are an important distribution channel for airlines because they serve the most lucrative travel segment, corporate travelers.  Most airlines have no reasonable substitutes for the booking services that enable distribution through traditional travel agencies because these agencies control access to the vast majority of corporate travelers.  Airlines and online travel agencies are not equipped to provide many of the services required by customers of traditional agencies; thus, airlines generally would be unable to convince these customers to book through alternate channels.  A hypothetical monopolist likely would impose at least a small but significant and non-transitory price increase on booking services for airline tickets sold through traditional travel agencies.  Accordingly, booking services for airline tickets sold through traditional travel agencies constitutes a relevant product market and line of commerce under Section 7 of the Clayton Act.

#### 2.    Booking Services for Airline Tickets Sold through Online Travel Agencies

46.    Booking services for airline tickets sold through online travel agencies is a relevant product market.  Online travel agencies are an important distribution channel for airlines.  Online travel agencies, such as Priceline and Expedia, cater primarily to cost-conscious

leisure travelers. Distribution through online travel agencies represents about 20 percent of airlines' bookings in the United States. Airlines would be willing to pay more than they pay today for booking services rather than lose the opportunity to sell tickets through online travel agencies. A hypothetical monopolist likely would impose at least a small but significant and non-transitory price increase on booking services for airline tickets sold through online travel agencies. Accordingly, booking services for airline tickets sold through online travel agencies constitutes a relevant product market and line of commerce under Section 7 of the Clayton Act.

### B.     Geographic Market

47.     The geographic market is the United States. A hypothetical monopolist of booking services for airline tickets sold through traditional travel agencies or online travel agencies in the United States would impose at least a small but significant and non-transitory increase in price for booking services. Accordingly, the markets for booking services for airline tickets sold through traditional travel agencies in the United States and booking services for airline tickets sold through online travel agencies in the United States are relevant markets.

### C.     The Acquisition Is Unlawful in Both Relevant Markets

48.     The Supreme Court has held that mergers that significantly increase concentration in already concentrated markets are presumptively anticompetitive and therefore presumptively unlawful. To measure market concentration, courts often use the Herfindahl-Hirschman Index ("HHI"). HHIs range from 0 in markets with no concentration to 10,000 in markets where one firm has 100 percent market share. Courts have found that mergers that increase the HHI by more than 200 and result in an HHI above 2,500 in any relevant market or line of commerce are presumed to be anticompetitive.

49.     Sabre's acquisition of Farelogix would significantly increase concentration in the already highly concentrated market for booking services for airline tickets sold through online travel agencies in the United States.  The proposed acquisition would result in more than a 350-point increase in HHI and a post-transaction HHI of more than 4,000 in this market.  Thus, the proposed acquisition is presumptively unlawful.

50.     Sabre's acquisition of Farelogix is also unlawful in the market for booking services for airline tickets sold through traditional travel agencies in the United States.  This market is also highly concentrated today, with an HHI of over 3,500.  While Farelogix's current share in this market is small, largely due to the GDSs' efforts to freeze it out, Farelogix has been a disruptive and uniquely important constraint on the GDSs in this market.  As a result, the elimination of Farelogix as an independent competitor in this highly concentrated market is also likely to substantially lessen competition.

51.     In both relevant markets, Farelogix's market share substantially understates its competitive significance in at least two respects.  First, by offering airlines an alternative booking services solution to the GDSs, Farelogix has empowered airlines to negotiate lower prices and more favorable terms, even if the airline ultimately uses the GDS instead of Farelogix for booking services.  Farelogix's competitive significance is therefore not fully reflected in its current market share.  Second, Farelogix's current market share understates its competitive significance going forward.  As the industry transitions from legacy to NDC technology, Farelogix is poised to grow significantly.  Defendants' internal projections reflect this.  In short, by eliminating a disruptive entrant with significant potential to grow and compete, the acquisition would substantially lessen competition in both relevant markets, to the detriment of airlines and travelers.

16

## VI.   THE PROPOSED ACQUISITION IS LIKELY TO SUBSTANTIALLY LESSEN COMPETITION IN THE RELEVANT MARKETS

### A.   The Acquisition Would Eliminate Head-to-Head Competition between Sabre and Farelogix and Likely Lead to Higher Prices and Reduced Quality

52.    Airlines have successfully used the threat of shifting bookings to Farelogix to obtain better pricing in their GDS contracts on bookings made through traditional and online travel agencies.  As Sabre recognized in its 2018 Annual Report, the expansion of "direct connect initiatives" (e.g., Farelogix) enables airlines "to apply pricing pressure on intermediaries [e.g., GDSs] and negotiate travel distribution arrangements that are less favorable to intermediaries."

53.    Senior executives of both Sabre and Farelogix have recognized that the acquisition is likely to result in higher prices.  Farelogix's CFO highlighted in August 2018 that if Sabre acquired Farelogix, it would be "taking out a strong competitor vs. continued competition and price pressure in market."  He had previously noted that any GDS that acquired Farelogix "would increase control over airlines who are now using FLX [Farelogix] as a negotiation tool during contract renewals."  Similarly, a Sabre sales executive, in a text to a colleague after this proposed acquisition was announced, observed that Farelogix's prices for one major U.S. airline would go up "big time" as a result of the deal.

54.    The transaction will likely tighten Sabre's grip on the online travel agency market, where airlines have been most successful using competition from Farelogix to erode Sabre's market position.  Farelogix has demonstrated that it is a credible alternative to Sabre by enabling major U.S. airlines to connect directly with online travel agencies and helping change the payment model in the online travel agency market.  After acquiring Farelogix, Sabre's incentive to continue to offer these options on competitive prices and terms likely would be diminished.

17

55.     U.S. full-service airlines are particularly likely to be harmed by the transaction. Distribution through traditional and online travel agencies located in the United States represents an especially significant portion of their revenue.  These airlines' booking services needs are more complex than those of most other airlines that sell tickets in the United States due to their extensive hub-and-spoke networks, the nature of their business models, and the volume of transactions they process.  In addition, these airlines cater to business travelers and hence are especially dependent on distribution through traditional travel agencies.  For these reasons, U.S. full-service airlines face a different set of competitive constraints than other airlines.  Because Sabre controls most of these airlines' bookings through U.S. travel agencies, Sabre has significant leverage in negotiating with these airlines.  By eliminating Farelogix, Sabre would gain additional negotiating leverage and could target these customers for price increases.

**B.     The Acquisition Would Lessen Innovation**

56.     The proposed acquisition also would likely reduce innovation, to the detriment of airlines, travel agencies, and travelers.  Farelogix has been the driving force behind the industry's adoption of the NDC standard and the leader in developing new technology.  With Farelogix's technology, airlines can make offers tailored to the needs of individual travelers booking through a travel agency—functionality Sabre's outdated GDS technology lacks.

57.     Competition from Farelogix pushed Sabre to finally adopt NDC and develop next-generation booking services solutions.  After fighting against the adoption of NDC for years, Sabre began investing in next-generation technology only after Farelogix began gaining traction.

58.     Competition between Farelogix and Sabre to develop and sell next-generation booking services is already fierce.  As the head of Sabre's deal team warned Farelogix's

investment banker, if Sabre does not acquire Farelogix, Sabre would be "a really tough competitor" to Farelogix. Indeed, if the acquisition is enjoined, Farelogix would continue to act as a disruptor, developing new, innovative solutions in competition with Sabre. Farelogix has a strong incentive to innovate in order to reap the gains of its innovation. In contrast, Sabre's incentive to innovate is tempered by the threat innovative solutions pose to its traditional business model and aging technology. Without competition from an independent Farelogix, Sabre's incentive to invest and innovate in next-generation technology would be diminished.

### C. No Countervailing Factors Would Prevent or Remedy the Acquisition's Likely Anticompetitive Effects

59. New entry or expansion by existing competitors is unlikely to prevent or remedy the transaction's likely anticompetitive effects in the relevant markets. There are high barriers to building out a next-generation booking services solution comparable to Farelogix's Open Connect, including the difficulty and time required to integrate customized NDC connections into complex, unique IT systems like those of Farelogix's airline customers. Beyond these technical impediments, the GDSs' contracting practices—particularly provisions that inhibit airlines' use of alternative booking services providers—further heighten the barriers to entry. Despite these significant barriers, Farelogix has persisted for over 15 years, investing more than $100 million in developing its innovative solutions. Through these efforts, Farelogix has emerged as a significant threat to Sabre. In-house airline solutions, sponsored entrants, and alternative next-generation booking services providers are unlikely to replace the competitive constraint posed by Farelogix in a timely and sufficient manner.

60. The proposed transaction will not result in verifiable, transaction-specific efficiencies in the relevant markets sufficient to outweigh the transaction's likely anticompetitive effects.

## VII.   VIOLATION ALLEGED

61.   The United States alleges and incorporates paragraphs 1 through 60 as if set forth fully herein.

62.   Unless enjoined, Sabre's proposed acquisition of Farelogix is likely to substantially lessen competition in the relevant markets, in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

63.   Among other things, the proposed acquisition would:

(a)   eliminate present and future competition between Sabre and Farelogix;

(b)   likely cause prices for booking services to be higher than they would be otherwise; and

(c)   likely reduce quality, service, choice, and innovation.

## VIII.   REQUEST FOR RELIEF

64.   The United States requests that the Court:

(a)   adjudge Sabre's acquisition of Farelogix to violate Section 7 of the Clayton Act, 15 U.S.C. § 18;

(b)   permanently enjoin Defendants from consummating Sabre's proposed acquisition of Farelogix or from entering into or carrying out any other transaction by which control of the assets or businesses of Sabre and Farelogix would be combined;

(c)   award the United States its costs of this action; and

(d)   grant the United States such other relief as the Court deems just and proper.

Dated this 20th day of August, 2019.

Respectfully submitted,

**FOR PLAINTIFF UNITED STATES OF AMERICA:**

MAKAN DELRAHIM
Assistant Attorney General for Antitrust

BERNARD A. NIGRO JR.
Deputy Assistant Attorney General

KATHLEEN S. O'NEILL
Senior Director of Investigations and Litigation

CRAIG W. CONRATH
Director of Litigation

PATRICIA A. BRINK
Director of Civil Enforcement

KATHERINE CELESTE
Acting Assistant Chief
Transportation, Energy & Agriculture Section

DAVID C. WEISS
United States Attorney

LAURA HATCHER (#5098)
Chief, Civil Division
United States Attorney's Office
District of Delaware
1313 N. Market Street, Suite 400
Wilmington, Delaware 19801
Tel.: (302) 573-6205
E-mail: laura.hatcher@usdoj.gov

JULIE S. ELMER
VITTORIO E. COTTAFAVI
RACHEL A. FLIPSE
JOHN A. HOLLER

Attorneys for the United States

U.S. Department of Justice
Antitrust Division
450 5th Street, NW, Suite 8000
Washington, DC 20530
Tel.: (202) 598-8332
Fax: (202) 616-2441
E-mail: julie.elmer@usdoj.gov

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law,  except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a)  PLAINTIFFS

## DEFENDANTS

**(b)**  County of Residence of First Listed Plaintiff
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF
            THE TRACT OF LAND INVOLVED.

**(c)**  Attorneys *(Firm Name, Address, and Telephone Number)*

Attorneys *(If Known)*

## II.  BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

❏ 1  U.S. Government
        Plaintiff

❏ 3  Federal Question
        *(U.S. Government Not a Party)*

❏ 2  U.S. Government
        Defendant

❏ 4  Diversity
        *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                                    *and One Box for Defendant)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ❏ 1 | ❏ 1 | Incorporated *or* Principal Place of Business In This State | ❏ 4 | ❏ 4 |
| Citizen of Another State | ❏ 2 | ❏ 2 | Incorporated *and* Principal Place of Business In Another State | ❏ 5 | ❏ 5 |
| Citizen or Subject of a Foreign Country | ❏ 3 | ❏ 3 | Foreign Nation | ❏ 6 | ❏ 6 |

## IV.  NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ❏ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ❏ 625 Drug Related Seizure of Property 21 USC 881 | ❏ 422 Appeal 28 USC 158 | ❏ 375 False Claims Act |
| ❏ 120 Marine | ❏ 310 Airplane | ❏ 365 Personal Injury - Product Liability | ❏ 690 Other | ❏ 423 Withdrawal 28 USC 157 | ❏ 376 Qui Tam (31 USC 3729(a)) |
| ❏ 130 Miller Act | ❏ 315 Airplane Product Liability | ❏ 367 Health Care/ | | | ❏ 400 State Reapportionment |
| ❏ 140 Negotiable Instrument | ❏ 320 Assault, Libel & Slander | Pharmaceutical Personal Injury | | **PROPERTY RIGHTS** | ❏ 410 Antitrust |
| ❏ 150 Recovery of Overpayment & Enforcement of Judgment | ❏ 330 Federal Employers' Liability | Product Liability | | ❏ 820 Copyrights | ❏ 430 Banks and Banking |
| ❏ 151 Medicare Act | ❏ 340 Marine | ❏ 368 Asbestos Personal Injury Product Liability | | ❏ 830 Patent | ❏ 450 Commerce |
| ❏ 152 Recovery of Defaulted Student Loans | ❏ 345 Marine Product Liability | **PERSONAL PROPERTY** | | ❏ 835 Patent - Abbreviated New Drug Application | ❏ 460 Deportation |
| (Excludes Veterans) | ❏ 350 Motor Vehicle | ❏ 370 Other Fraud | | ❏ 840 Trademark | ❏ 470 Racketeer Influenced and Corrupt Organizations |
| ❏ 153 Recovery of Overpayment of Veteran's Benefits | ❏ 355 Motor Vehicle Product Liability | ❏ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ❏ 480 Consumer Credit |
| ❏ 160 Stockholders' Suits | ❏ 360 Other Personal Injury | ❏ 380 Other Personal Property Damage | ❏ 710 Fair Labor Standards Act | ❏ 861 HIA (1395ff) | ❏ 490 Cable/Sat TV |
| ❏ 190 Other Contract | ❏ 362 Personal Injury - Medical Malpractice | ❏ 385 Property Damage Product Liability | ❏ 720 Labor/Management Relations | ❏ 862 Black Lung (923) | ❏ 850 Securities/Commodities/ Exchange |
| ❏ 195 Contract Product Liability | | | ❏ 740 Railway Labor Act | ❏ 863 DIWC/DIWW (405(g)) | ❏ 890 Other Statutory Actions |
| ❏ 196 Franchise | | | ❏ 751 Family and Medical Leave Act | ❏ 864 SSID Title XVI | ❏ 891 Agricultural Acts |
| | | | | ❏ 865 RSI (405(g)) | ❏ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ❏ 790 Other Labor Litigation | | ❏ 895 Freedom of Information Act |
| ❏ 210 Land Condemnation | ❏ 440 Other Civil Rights | **Habeas Corpus:** | ❏ 791 Employee Retirement Income Security Act | **FEDERAL TAX SUITS** | ❏ 896 Arbitration |
| ❏ 220 Foreclosure | ❏ 441 Voting | ❏ 463 Alien Detainee | | ❏ 870 Taxes (U.S. Plaintiff or Defendant) | ❏ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ❏ 230 Rent Lease & Ejectment | ❏ 442 Employment | ❏ 510 Motions to Vacate Sentence | | ❏ 871 IRS—Third Party 26 USC 7609 | |
| ❏ 240 Torts to Land | ❏ 443 Housing/ Accommodations | ❏ 530 General | | | ❏ 950 Constitutionality of State Statutes |
| ❏ 245 Tort Product Liability | ❏ 445 Amer. w/Disabilities - Employment | ❏ 535 Death Penalty | **IMMIGRATION** | | |
| ❏ 290 All Other Real Property | ❏ 446 Amer. w/Disabilities - Other | **Other:** | ❏ 462 Naturalization Application | | |
| | ❏ 448 Education | ❏ 540 Mandamus & Other | ❏ 465 Other Immigration Actions | | |
| | | ❏ 550 Civil Rights | | | |
| | | ❏ 555 Prison Condition | | | |
| | | ❏ 560 Civil Detainee - Conditions of Confinement | | | |

## V.  ORIGIN *(Place an "X" in One Box Only)*

❏ 1  Original
        Proceeding

❏ 2  Removed from
        State Court

❏ 3  Remanded from
        Appellate Court

❏ 4  Reinstated or
        Reopened

❏ 5  Transferred from
        Another District
        *(specify)*

❏ 6  Multidistrict
        Litigation -
        Transfer

❏ 8  Multidistrict
        Litigation -
        Direct File

## VI.  CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:

Brief description of cause:

## VII.  REQUESTED IN COMPLAINT:

❏  CHECK IF THIS IS A **CLASS ACTION**
     UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:        ❏ Yes    ❏ No

## VIII.  RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE

DOCKET NUMBER

DATE

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #          AMOUNT          APPLYING IFP          JUDGE          MAG. JUDGE