**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | Civil Action No. 19-cv-01548-LPS |
| SABRE CORPORATION, SABRE GLBL INC., FARELOGIX, INC., and SANDLER CAPITAL PARTNERS V, L.P., | |
| Defendants. | |

## ANSWER OF DEFENDANTS FARELOGIX, INC. AND SANDLER CAPITAL PARTNERS V, L.P.

Defendants Farelogix, Inc. and Sandler Capital Partners V, LP (hereinafter, "Farelogix"), by their attorneys, hereby serve this Answer to the Complaint filed August 20, 2019 ("Complaint") by Plaintiff United States ("Plaintiff"). Farelogix objects to the preliminary language on the first page of the Complaint and to all headings in the Complaint as not constituting proper allegations or fit matter for a pleading and therefore denies them. Except for those allegations expressly admitted herein, Farelogix denies each and every allegation in the Complaint. Except as noted herein, Farelogix lacks knowledge or information sufficient to form a belief as to the truth of the allegations regarding statements made in internal documents of companies other than Farelogix, or any other allegations regarding non-public statements, commercial plans, or intentions of companies other than Farelogix's. By responding to allegations that incorporate terms Plaintiff has used in the Complaint, Farelogix is not accepting Plaintiff's proposed definitions of those terms as valid, nor is Farelogix suggesting that those terms are recognized or defined terms in the travel industry. Farelogix expressly denies that

1

Plaintiff is entitled to the relief requested or any other relief.  Farelogix reserves the right to

amend this Answer.  Farelogix answers the numbered Paragraphs 1 through 64 in the Complaint

as follows:

**SPECIFIC RESPONSES TO PLAINTIFF'S ALLEGATIONS**

**I.   INTRODUCTION**

Paragraph No. 1:

    Airlines sell tickets to travelers directly through their websites and call centers and indirectly through traditional brick-and-mortar and online travel agencies. Travel agencies are a crucial distribution channel for airlines because many travelers, especially business travelers, rely on travel agencies to book and manage their travel. Nearly 50 percent of airline bookings in the United States are made through travel agencies. To sell tickets through travel agencies, airlines require booking services. Booking services are IT solutions that enable airlines to deliver their offers to travel agencies and to process resulting orders.

Response to Paragraph No. 1:

    Farelogix denies the first sentence of Paragraph No. 1, except that Farelogix admits that

certain airlines may elect to sell tickets to travelers using one or more of several potential

strategies, including through their websites, through call centers, through brick-and-mortar and

online travel agencies, and/or through other avenues not listed in the Complaint.  Farelogix lacks

knowledge or information sufficient to form a belief as to the truth of the allegations in the

second, third, fourth and fifth sentences of Paragraph No. 1, and therefore denies these

allegations.

Paragraph No. 2:

    Historically, airlines have relied on booking services provided by Sabre and the other two global distribution systems ("GDSs") to sell their tickets through travel agencies in the United States. Sabre's GDS is a computerized system that helps travel suppliers, such as airlines, market and distribute their fares and scheduling information to travel agencies and the traveling public. Sabre and the other two GDSs have resisted innovation, while charging airlines high booking fees for services that lack the functionality airlines and travelers demand. The GDSs'

outdated technology has limited airlines' ability to sell—and travelers' ability to choose from—airlines' entire suite of offerings.

Response to Paragraph No. 2:

The allegations in Paragraph No. 2 concern parties other than Farelogix, thus, Farelogix is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph No. 2 and, on that basis, denies them.

Paragraph No. 3:

For well over a decade, the GDSs have thwarted attempts by new, innovative competitors such as Farelogix to inject much-needed competition into this industry. As Farelogix's CEO told the European antitrust authorities in early 2018, the "GDSs continue to leverage significant market power to preserve their market position and stifle innovation."

Response to Paragraph No. 3:

To the extent that the allegations in the first sentence of Paragraph No. 3 of the Complaint concern Farelogix, Farelogix denies them, except that Farelogix admits that it has, in certain circumstances and at certain times, been regarded by some sources as innovative.  To the extent that the allegations in the first sentence of Paragraph No. 3 concern parties other than Farelogix, Farelogix is without knowledge or information sufficient to form a belief as to the truth of those allegations and, on that basis, denies them.  To the extent that the second sentence in Paragraph No. 3 quotes from Farelogix documents, Farelogix respectfully refers the Court to the documents and/or testimony cited therein in their entirety for a complete and accurate description of their contents and otherwise denies the allegations relating to such documents.

Paragraph No. 4:

Farelogix has emerged as an innovator that threatens to erode Sabre's dominance in booking services for air travel. Farelogix offers an alternative booking services solution, Open Connect, that allows airlines to bypass the GDSs and connect directly to travel agencies. By offering airlines an alternative, Farelogix has given them leverage to negotiate lower GDS booking fees and to reduce their reliance on the GDSs for booking services.

<u>Response to Paragraph No. 4</u>:

To the extent that the allegations in the first sentence of Paragraph No. 4 of the

Complaint concern Farelogix, Farelogix denies them, except that Farelogix admits that it has, in

certain circumstances and at certain times, been regarded by some sources as innovative.  To the

extent that the allegations in the first sentence of Paragraph No. 4 concern others, Farelogix is

without knowledge or information sufficient to form a belief as to the truth of those allegations

and, on that basis, denies them.  Farelogix lacks knowledge or information sufficient to form a

belief as to what constitutes a "booking services solution," and therefore denies the allegations in

the second sentence of Paragraph No. 4, except that Farelogix admits that it offers a product

called "Open Connect" that provides technology and support services to certain airline

customers.  The allegations in the third sentence of Paragraph No. 4 concern parties other than

Farelogix, thus, Farelogix is without knowledge or information sufficient to form a belief as to

the truth of those allegations and, on that basis, denies them.

<u>Paragraph No. 5</u>:

Farelogix has also pioneered a next-generation technology standard called "New
Distribution Capability," or NDC. NDC technology, which powers Farelogix's Open Connect, is
poised to transform airline distribution. Unlike the legacy GDS technology, NDC empowers
airlines to make a broader, more personalized range of offers to travelers booking through travel
agencies. For example, NDC could allow an airline to offer a traveler a bundled fare including
priority boarding, in-flight internet, and a morning snack for her weekly flight from Philadelphia
to Chicago.

<u>Response to Paragraph No. 5</u>:

Farelogix denies the allegations in the first sentence of Paragraph No. 5, except that

Farelogix admits that it played a role in the beginning stages of developing the New Distribution

Capability ("NDC") standard.  To the extent that the allegations in the second and third sentences

of Paragraph No. 5 of the Complaint concern Farelogix, Farelogix denies them, except Farelogix

admits that one of NDC's potential functions is to enable airlines to deliver personalized offers and fares that may account for certain ancillary services. To the extent that the remaining allegations in the second and third sentences of Paragraph No. 5 concern parties other than Farelogix, Farelogix is without knowledge or information sufficient to form a belief as to the truth of those allegations and, on that basis, denies them. Farelogix denies the allegations in the fourth sentence of Paragraph No. 5, except Farelogix admits that—depending on the capabilities and service offerings of an airline—an airline could choose to utilize NDC as a standard for transmitting an offer for a bundled fare that includes "priority boarding, in-flight internet, and a morning snack."

Paragraph No. 6:

Sabre has resisted innovation and opposed adoption of NDC. Sabre was so threatened by NDC that in 2013 it urged the Department of Transportation to block approval of the standard. Farelogix called out Sabre's "ulterior motive" for opposing NDC, stating that "today's battle is one of old vs. new, with the dominant players in the old technology trying to prevent, or at the very least delay, the implementation of the new standard in order to retain artificial control of the distribution marketplace." Sabre now claims to have accepted NDC, but just last year Farelogix described to European antitrust authorities some of the tactics Sabre and the other major GDSs have deployed in what Farelogix characterized as their "decade of resistance" to innovation. These tactics include what Farelogix described as the GDSs' strategy to "Undermine and delay NDC even if embracing it on the surface."

Response to Paragraph No. 6:

The allegations in the first and second sentences of Paragraph No. 6 concern parties other than Farelogix, thus, Farelogix is without knowledge or information sufficient to form a belief as to the truth of those allegations and, on that basis, denies them. To the extent that the third, fourth and fifth sentences of Paragraph No. 6 purport to quote from Farelogix documents, Farelogix respectfully refers the Court to the documents and/or testimony cited therein in their entirety for a complete and accurate description of their contents and otherwise denies the allegations relating to such documents. To the extent that the allegations in the third, fourth and

fifth sentences of Paragraph No. 6 concern parties other than Farelogix, Farelogix is without

knowledge or information sufficient to form a belief as to the truth of those allegations and, on

that basis, denies them.

Paragraph No. 7:

Recognizing the competitive threat posed by Farelogix, Sabre for years has tried to box Farelogix out of the industry. According to its own internal documents, Sabre took steps to "shut down" Farelogix after it began gaining customers. Farelogix itself has complained that Sabre pressured airlines not to use Farelogix's booking services and retaliated against airlines that did. Indeed, in 2018, Farelogix's CEO told another potential purchaser of the company that for Farelogix's booking services solution, "the slow adoption was solely and inarguably due to the blocking and pressure the GDSs put on Farelogix, airlines, and travel agents not to adopt."

Response to Paragraph No. 7:

To the extent that the allegations in the first, second and third sentences of Paragraph No.

7 concern parties other than Farelogix, Farelogix is without knowledge or information sufficient

to form a belief as to the truth of those allegations and, on that basis, denies them.  To the extent

that the allegations in the third and fourth sentences of Paragraph No. 7 concern Farelogix,

Farelogix denies them, except that Farelogix admits that certain Farelogix employees have

historically made statements concerning the dynamic between airlines and GDSs in relation to

industry developments.  To the extent that the third and fourth sentences of Paragraph No. 7

purport to quote from Farelogix documents, Farelogix respectfully refers the Court to the

documents and/or testimony cited therein in their entirety for a complete and accurate description

of their contents and otherwise denies the allegations relating to such documents.


Paragraph No. 8:

Additionally, Sabre's and the other GDSs' contracts with airlines and travel agencies restrict airlines' ability to avail themselves of cheaper, more advanced booking services solutions. As recently as 2018, Farelogix denounced these restrictions, complaining that airlines' GDS contracts "effectively prohibit working with third parties or make doing so cost

prohibitive." In January 2019, a Sabre senior vice president acknowledged that airlines view Sabre's restrictions as "abusive but there's nothing they can do because they need the distribution and they are tied with a contract."

Response to Paragraph No. 8:

The allegations in the first and third sentences of Paragraph No. 8 concern parties other than Farelogix, thus, Farelogix is without knowledge or information sufficient to form a belief as to the truth of those allegations and, on that basis, denies them.  To the extent that the allegations in the second sentence of Paragraph No. 8 concern Farelogix, Farelogix denies them.  To the extent that the second sentence of Paragraph No. 8 purports to quote from Farelogix documents, Farelogix respectfully refers the Court to the documents and/or testimony cited therein in their entirety for a complete and accurate description of their contents and otherwise denies the allegations relating to such documents.

Paragraph No. 9:

Notwithstanding these tactics, Farelogix—thanks to its innovative technology and competitive pricing—has managed to grow its booking services customer base from one airline in the mid-2000s to over 15 today. As airlines and travel agencies continue to demand and adopt its industry-leading NDC technology, Farelogix is a greater threat to Sabre than ever before.

Response to Paragraph No. 9:

To the extent that the allegations in the first sentence of Paragraph No. 9 of the Complaint concern Farelogix, Farelogix denies them, except that Farelogix admits that it has, in certain circumstances and at certain times, been regarded by some sources as innovative. Farelogix further admits that it has over 15 airline customers today across its suite of business offerings, but not all Farelogix customers purchase the "Open Connect" product, and only two U.S.-based airlines currently purchase the "Open Connect" product.  To the extent that the allegations in the first and second sentences of Paragraph No. 9 concern parties other than

Farelogix, Farelogix is without knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph No. 9 and, on that basis, denies them.

Paragraph No. 10:

Sabre now seeks to eliminate its disruptive competitor once and for all. Sabre executives have acknowledged that acquiring Farelogix would eliminate a competitive threat and allow Sabre to charge higher prices. In a presentation to Sabre's CEO, Sabre executives emphasized that buying Farelogix would "Mitigate risk from potential GDS bypass." And on the day Sabre announced its proposed acquisition of Farelogix, a Sabre sales executive texted a colleague that one major U.S. airline would "hate" it. The colleague replied, "Why, because it entrenches us more?" The Sabre sales executive responded that Farelogix has been that airline's "Trojan horse to f*** us" and observed that the airline's "FLX [Farelogix] bill is going up big time."

Response to Paragraph No. 10:

To the extent that the allegations in Paragraph No. 10 of the Complaint concern

Farelogix, Farelogix denies them. To the extent that the allegations in Paragraph No. 10 of the

Complaint concern parties other than Farelogix, Farelogix is without knowledge or information

sufficient to form a belief as to the truth of those allegations and, on that basis, denies them.

Paragraph No. 11:

If allowed to proceed, Sabre's acquisition of Farelogix would likely result in increased prices, reduced quality, and less innovation for booking services, causing substantial harm to airlines and American travelers.

Response to Paragraph No. 11:

Farelogix denies the allegations in Paragraph No. 11 of the Complaint.

Paragraph No. 12:

The proposed transaction is likely to substantially lessen competition in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18. The Court, therefore, should enjoin this transaction.

Response to Paragraph No. 12:

The allegations in Paragraph No. 12 consist of Plaintiff's conclusions of law and

characterization of its claims, to which no response is required.  To the extent that the allegations

in Paragraph No. 12 are deemed to require a response, Farelogix denies those allegations.

## II.   DEFENDANTS AND THE PROPOSED TRANSACTION

Paragraph No. 13:

Sabre, a travel technology company based in Southlake, Texas, operates the largest GDS in the United States. All major U.S. airlines distribute offers to travel agencies through the Sabre GDS. Sabre's 2018 revenues were approximately $3.9 billion. Sabre is the ultimate parent entity of Sabre GLBL Inc., Sabre's principal operating subsidiary and its signatory to the merger agreement with Farelogix.

Response to Paragraph No. 13:

The allegations in Paragraph No. 13 concern parties other than Farelogix, thus, Farelogix

is without knowledge or information sufficient to form a belief as to the truth of those allegations

and, on that basis, denies them, except that Farelogix admits that Sabre is the ultimate parent

entity of Sabre GLBL Inc., which is Sabre's signatory to the merger agreement with Farelogix.

Paragraph No. 14:

Farelogix, a travel technology company based in Miami, Florida, sells airlines a next-generation booking services solution called Open Connect, as well as other IT solutions. Open Connect provides low-cost booking services for airlines selling tickets through travel agencies. Farelogix earned approximately $42 million in revenues in 2018. Farelogix is owned by Sandler Capital Partners V, L.P. ("Sandler"), a private equity fund and a signatory to Sabre's merger agreement with Farelogix.

Response to Paragraph No. 14:

Farelogix lacks knowledge or information sufficient to form a belief as to what

constitutes "a next-generation booking services solution" or "low-cost booking services" and on

that basis denies the allegations in the first and second sentences of Paragraph No. 14, except that

Farelogix admits that it is a technology company based in Miami, Florida that offers various

products to certain airline customers, including a product called "Open Connect."  Farelogix

admits the allegations in the third sentence of Paragraph No. 14.  Farelogix denies the allegations

in the fourth sentence of Paragraph No. 14, except that Farelogix admits that Sandler owns a

majority interest in Farelogix and is a signatory to Sabre's merger agreement with Farelogix.

Paragraph No. 15:

   Sandler conducted a limited sale process in seeking a buyer for Farelogix. At least one
other potential buyer—not a competitor—was seriously interested and offered a substantial price.
But Sabre—a competitor—ultimately offered a higher price.

Response to Paragraph No. 15:

   To the extent that the allegations in Paragraph No. 15 of the Complaint concern

Farelogix, Farelogix denies them, except that Farelogix admits that Sandler Capital Partners V,

L.P. ("Sandler") undertook efforts to seek a buyer for the Farelogix business and received bids

from buyers, among which Sabre offered the highest bid.  Farelogix denies the remaining

allegations in Paragraph No. 15.

Paragraph No. 16:

   On November 14, 2018, Sabre agreed to acquire Farelogix in a transaction valued at
approximately $360 million.

Response to Paragraph No. 16:

   Farelogix admits the allegations in Paragraph No. 16.

### III.    JURISDICTION AND VENUE

Paragraph No. 17:

   The United States brings this action, and this Court has subject-matter jurisdiction, under
Section 15 of the Clayton Act, 15 U.S.C. § 25, to prevent and restrain Defendants from violating
Section 7 of the Clayton Act, 15 U.S.C. § 18.

Response to Paragraph No. 17:

The allegations in Paragraph No. 17 are legal conclusions and therefore do not require a response.  However, Farelogix does not contest that this Court has subject-matter jurisdiction over this dispute and on that basis admits that the Court has jurisdiction in this matter, but denies that Sabre's acquisition of Farelogix violates Section 7 of the Clayton Act.

Paragraph No. 18:

Defendants are engaged in, and their activities substantially affect, interstate commerce. Sabre and Farelogix both provide booking services to airlines that serve travelers throughout the United States.

Response to Paragraph No. 18:

The allegations in the first sentence of Paragraph No. 18 are legal conclusions and therefore do not require a response.  To the extent a response is required, Farelogix admits that some of its business is part of interstate commerce.  Farelogix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence of Paragraph No. 18 and on that basis denies those allegations.

Paragraph No. 19:

Venue is proper under Section 12 of the Clayton Act, 15 U.S.C. § 22, and under 28 U.S.C. §§ 1391(b) and (c).

Response to Paragraph No. 19:

The allegations in Paragraph No. 19 are legal conclusions and therefore do not require a response.  However, Farelogix does not contest that venue is proper in this district and on that basis admits Paragraph No. 19.

Paragraph No. 20:

This Court has personal jurisdiction over each Defendant. Sabre, Sabre GLBL Inc., and Farelogix are incorporated in the State of Delaware and are inhabitants of this District. Sandler is a Delaware limited partnership and is an inhabitant of this District. Sabre, Farelogix, and Sandler

have consented to personal jurisdiction in this District for purposes of this lawsuit. The proposed acquisition would have effects throughout the United States, including in this District.

Response to Paragraph No. 20:

The allegation in the first sentence of Paragraph No. 20 is a legal conclusion and therefore does not require a response.  However, Farelogix does not contest that the Court has personal jurisdiction as to it, and on that basis admits to the allegations in the first and fourth sentences of Paragraph No. 20 only to the extent they are directed to Farelogix.  Farelogix otherwise lacks knowledge or information sufficient to form a belief as to the truth of these allegations, and therefore denies them.  Farelogix admits the second and third sentences of Paragraph No. 20.  Farelogix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the fifth sentence of Paragraph No. 20 and on that basis denies those allegations.

## IV.    INDUSTRY BACKGROUND

### A.  Sabre Dominates Airline Bookings through Travel Agencies

Paragraph No. 21:

For many airlines, travel agencies are an essential sales channel. Many travelers, especially business travelers, book their flights through travel agencies because they have specific needs or their employer requires them to do so. Sales to these travelers account for a substantial portion of revenue for many airlines.

Response to Paragraph No. 21:

Farelogix lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph No. 21 and on that basis denies those allegations.

Paragraph No. 22:

The GDSs—Sabre, Amadeus, and Travelport—operate computerized systems that allow travel agencies to search for and book flights across multiple airlines.  In response to a query from a travel agent, a GDS pulls fare and schedule information from multiple data sources to construct an airline offer, consisting of a fare on a specific flight.  The GDS then aggregates

offers from multiple airlines so that the travel agent can compare travel options and book the traveler's chosen itinerary.  Thus, the GDSs provide three main functions:  they help airlines construct the initial offer (offer creation); they aggregate offers across multiple airlines (offer aggregation); and they enable airlines to deliver their offers to travel agencies and to process resulting orders (booking services).  Farelogix and Sabre compete to provide booking services to airlines.

Response to Paragraph No. 22:

The allegations in the first, second, third and fourth sentences of Paragraph No. 22

concern parties other than Farelogix, thus, Farelogix is without knowledge or information

sufficient to form a belief as to the truth of those allegations and, on that basis, denies them.

Farelogix also lacks knowledge or information sufficient to form a belief as to the truth of the

allegations in the fifth sentence of Paragraph No. 22 and on that basis denies the allegation.

Paragraph No. 23:

Under the traditional GDS payment model, a GDS charges an airline a "booking fee" for each flight segment a travel agency books through the GDS. The GDS then pays an incentive to the travel agency as an inducement to book through the GDS.

Response to Paragraph No. 23:

Farelogix is without knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph No. 23 and, on that basis, denies them.

Paragraph No. 24:

Airlines sell tickets to travelers through two main types of travel agencies: traditional travel agencies and online travel agencies. Traditional travel agencies consist of travel management companies, which serve business travelers, and other brick-and-mortar travel agencies, which serve a mix of travelers, including leisure travelers with complex travel itineraries, such as tour groups. Traditional travel agencies are an important distribution channel for airlines, representing approximately 25 percent of airlines' bookings made in the United States.

Response to Paragraph No. 24:

Farelogix lacks knowledge or information sufficient to form a belief as to the truth of the

allegations in Paragraph No. 24 and, on that basis, denies those allegations, except that Farelogix

admits that many airlines sell tickets to travelers through travel agencies.

Paragraph No. 25:

Business travelers book flights through travel management companies because they
provide the extensive customer support and reporting functionality that business travelers
typically require. Business travelers are the most profitable traveler segment for large, full-service
airlines. Business travelers are particularly lucrative customers because they tend to travel more
often and spend more than leisure travelers on purchases such as last-minute flights, refundable
tickets, and premium seats.

Response to Paragraph No. 25:

Farelogix lacks knowledge or information sufficient to form a belief as to the truth of the

allegations in Paragraph No. 25 and, on that basis, denies those allegations, except that Farelogix

admits that some business travelers book flights through certain travel management companies.

Paragraph No. 26:

Many traditional travel agencies use a single GDS to book air travel. Some use more than
one GDS, but will still use a single GDS to serve a particular corporate client. Traditional travel
agencies cannot readily switch between GDSs because of contractual and technical restrictions.
A traditional agency typically enters into a long-term contract with a GDS that includes financial
incentives committing the agency to book through that GDS and penalizing the agency for
shifting bookings to alternative channels. Some traditional agencies also rely on other lines of
Sabre's business for IT products. For example, many travel management companies in Sabre's
network use mid- or back-office software supplied by Sabre to perform monitoring or reporting
for their corporate clients. To ensure consistent support and reporting for their travelers,
corporations typically rely on only one travel management company. Since traditional agencies
cannot easily switch between GDSs, each GDS effectively controls access to a distinct set of
travelers. Thus, airlines must distribute through all three GDSs to reach all travelers who book
their travel through traditional travel agencies.

Response to Paragraph No. 26:

Farelogix lacks knowledge or information sufficient to form a belief about the truth of the

allegations in Paragraph No. 26 and, on that basis, denies those allegations.

14

Paragraph No. 27:

     Sabre controls over 50 percent of bookings through traditional travel agencies in the United States, so airlines must sell tickets through Sabre to reach a broad set of U.S. travelers. Sabre has even greater control over airline bookings through travel management companies in the United States. For instance, on August 1, 2019, Sabre reported to investors that it has "over 80% share within large travel management companies" in North America.

Response to Paragraph No. 27:

     Farelogix lacks knowledge or information sufficient to form a belief about the allegations

in Paragraph No. 27 and, on that basis, denies those allegations.

Paragraph No. 28:

     The second type of travel agency, online travel agencies, primarily serves cost-conscious leisure travelers. Leisure travelers book flights through online travel agencies like Expedia or Priceline because they can comparison shop and book flights, hotels, and car rentals on the same website. Online travel agencies are an important distribution channel for airlines, representing about 20 percent of airline bookings made in the United States. Sabre accounts for approximately 50 percent of airlines' online travel agency bookings in the United States. Thus, airlines risk losing a significant amount of revenue if they forgo using the Sabre GDS to sell tickets through online travel agencies in the United States.

Response to Paragraph No. 28:

     Farelogix is without knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph No. 28 and, on that basis, denies them.

### B.  Farelogix Is a Competitive Threat to Sabre

Paragraph No. 29:

     Over the years, a number of firms, such as ITA Software and G2 Switchworks, have tried and failed to introduce viable alternatives to Sabre and the other GDSs. Farelogix has succeeded where others have failed through persistence and a commitment to innovation. In 2005, Farelogix began working with American Airlines to develop a way to reach travel agencies directly without going through a GDS. Farelogix's "direct connect" solution (the forerunner to Open Connect) gave American and other airlines a lower-cost way to sell tickets through travel agents and avoid paying the GDSs' high booking fees.

Response to Paragraph No. 29:

The allegations in the first sentence of Paragraph No. 29 concern parties other than

Farelogix, thus, Farelogix is without knowledge or information sufficient to form a belief as to

the truth of those allegations and, on that basis, denies them.  Farelogix denies the allegations in

the second sentence of Paragraph No. 29.  Farelogix denies the allegations in the third sentence

of Paragraph No. 29, except that Farelogix admits that it has historically provided technology

services to American Airlines in connection with its efforts to deploy various travel distribution

technologies.  Farelogix denies the allegations in the fourth sentence of Paragraph No. 29, except

that Farelogix admits that it has provided services to American Airlines through its former

"direct connect" product offering and currently through its "Open Connect" product offering.

Paragraph No. 30:

Farelogix has led the development of NDC, a next-generation data transmission standard
that facilitates advanced communications between airlines and travel agents. NDC enables airlines
to distribute more complex offers than the legacy GDS technology can support. Consequently,
NDC is widely expected to address many of the current limitations of airline distribution, to the
benefit of airlines, travel agents, and travelers. Farelogix's Open Connect is powered by NDC
technology. Open Connect offers airlines an alternative to booking through a GDS and greater
ability to offer ancillary products and services, such as in-flight WiFi or lounge access, through
travel agencies. Farelogix charges airlines a flat subscription fee and a small fee for each booking
enabled by Open Connect.

Response to Paragraph No. 30:

Farelogix denies the allegations in the first sentence of Paragraph No. 30, except that

Farelogix admits that it played a role in the beginning stages of developing the NDC standard.

Farelogix denies the allegations in the second sentence of Paragraph No. 30, except that

Farelogix admits that NDC will enable airlines to create offers that incorporate ancillary products

and enhanced personalization.  Farelogix is without knowledge or information sufficient to form

a belief as to the truth of the allegations in the third sentence of Paragraph No. 30 and, on that

basis, denies them.  Farelogix denies the allegations in the fourth and fifth sentences of

Paragraph No. 30, except that Farelogix admits that it offers a product called "Open Connect,"

one of the capabilities of which is to provide an avenue for airlines to distribute content using an

NDC API, which could include content relating to ancillary products, if an airline elects to do so.

Farelogix denies the allegations in the fifth sentence of Paragraph No. 30, except that Farelogix

admits it charges subscription fees and booking fees at times for its "Open Connect" product.

Paragraph No. 31:

     With NDC, the airline, rather than the GDS, controls the content of the airline's offers, and the airline selects the IT solution used for booking services. An airline can use a booking services solution such as Farelogix's Open Connect to reach a travel agency directly, or it can distribute its offers through Open Connect to a third-party aggregator or a GDS to perform the aggregation function for the travel agency.

Response to Paragraph No. 31:

     Farelogix lacks knowledge or information sufficient to form a belief as to the truth of the

allegations in the first sentence of Paragraph No. 31 and, on that basis, denies those allegations.

To the extent that the allegations in the second sentence of Paragraph No. 31 of the Complaint

concern Farelogix, Farelogix denies them, except that Farelogix admits that it offers a product

called "Open Connect" that may connect to different types of third parties.  To the extent that the

allegations in the second sentence of Paragraph No. 31 concern parties other than Farelogix,

Farelogix is without knowledge or information sufficient to form a belief as to the truth of those

allegations and, on that basis, denies them.


Paragraph No. 32:

     For over a decade, Farelogix's airline customers have successfully used the threat of switching to Farelogix's booking services solutions to negotiate better rates and terms with Sabre and the other GDSs for bookings through both traditional and online travel agencies.

Response to Paragraph No. 32:

Farelogix is without knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph No. 32 and, on that basis, denies them.

### C.    Sabre Has Impeded Farelogix's Ability to Compete

Paragraph No. 33:

Shortly after Farelogix began gaining airline customers, Sabre launched an initiative to "shut down" Farelogix. Sabre took steps to prevent travel agencies from using Farelogix's solution in conjunction with Sabre's GDS, pressured travel agencies not to use Farelogix's services, and retaliated against airlines that worked with Farelogix. For example, in 2011, Sabre retaliated against American Airlines for working with Farelogix by burying American's flight options in the search results it distributed to travel agencies to make them less visible to travel agents. Farelogix accused Sabre of seeking to "punish" American for adopting Farelogix's technology.

Response to Paragraph No. 33:

The allegations in the first, second and third sentences of Paragraph No. 33 concern

parties other than Farelogix, thus, Farelogix is without knowledge or information sufficient to

form a belief as to the truth of those allegations and, on that basis, denies them.  To the extent

that the fourth sentence of Paragraph No. 33 purports to quote from Farelogix documents,

Farelogix respectfully refers the Court to the documents and/or testimony cited therein in their

entirety for a complete and accurate description of their contents and otherwise denies the

allegations relating to such documents.

Paragraph No. 34:

Sabre has continued to use a broad range of contractual and technical barriers to prevent entry or expansion by suppliers that could threaten its control over bookings through travel agencies. For instance, Sabre's contracts include provisions that inhibit airlines' use of an alternative supplier like Farelogix, even when doing so would be less expensive for airlines. Sabre's contracts prevent airlines from offering special fares through cheaper distribution channels (such as Farelogix's Open Connect or an airline's own website) and require airlines to provide Sabre with the same content on as favorable terms as they provide the other GDSs. Sabre's contracts also restrict airlines from rewarding travel agencies for using alternative distribution options, making it difficult for airlines to encourage travel agencies to use Farelogix. Although

18

these provisions limit airlines' ability to shift bookings to alternative distribution channels, many airlines accept them because Sabre controls access to a large number of travel agencies, and those travel agencies' customers are a critical source of the airlines' revenues.

Response to Paragraph No. 34:

Farelogix is without knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph No. 34 and, on that basis, denies them.

Paragraph No. 35:

Sabre's practices have hampered Farelogix's growth, prompting Farelogix to complain to the federal government in 2013 that "Sabre has wielded its monopoly power in an attempt to destroy Farelogix and prevent competition . . . ."

Response to Paragraph No. 35:

To the extent that the allegations in Paragraph No. 35 concern Farelogix, Farelogix

denies them, except Farelogix admits that it spoke with representatives of the U.S. federal

government in 2013 to discuss the industry at the time, including activities of GDSs.  To the

extent that the allegations in Paragraph No. 35 concern parties other than Farelogix, Farelogix is

without knowledge or information sufficient to form a belief as to the truth of those allegations

and, on that basis, denies them.  To the extent that Paragraph No. 35 purports to quote Farelogix

documents, Farelogix respectfully refers the Court to the documents and/or testimony cited

therein in their entirety for a complete and accurate description of their contents and otherwise

denies the allegations relating to such documents.

### D. Competition from Farelogix Has Loosened the GDSs' Grip on Bookings through Online Travel Agencies

Paragraph No. 36:

While Sabre's practices have limited Farelogix's ability to work with traditional travel agencies, Farelogix has been more successful in gaining a foothold in bookings through online travel agencies. Notably, two of the largest U.S. airlines use Farelogix to connect directly to one of the largest online travel agencies in the United States. As Sabre acknowledged less than a year ago, "Large OTAs [online travel agencies] are the most likely agency segment to disintermediate

our GDS." Both Sabre and Farelogix expect that airlines will choose to use Farelogix for bookings through other online travel agencies, including the largest in the United States. According to one Sabre document, if this agency "strategically shifts volume out of the GDS channel," Sabre anticipates that "Other large OTAs [online travel agencies] will likely be fast followers to this strategy and build out their own connections" to airlines.

Response to Paragraph No. 36:

Farelogix denies the allegations in the first and second sentences of Paragraph No. 36,

except that Farelogix admits that two U.S. airlines use Farelogix to connect to certain online

travel agencies in the United States.  Farelogix denies the remaining allegations in Paragraph No.

36.

Paragraph No. 37:

Having Farelogix as an alternative to the GDSs has given airlines leverage to chip away at the traditional GDS payment model. Traditionally, GDSs charged airlines a fee for each flight segment a traveler booked through an online travel agency, just as they do for a traditional agency. Some airlines, however, have successfully used the threat of shifting bookings to Farelogix to move the GDSs to a "wholesale" payment model for certain online travel agencies. Under the wholesale approach, an airline does not pay the GDS a booking fee. Instead, the airline compensates the online travel agency directly and the online travel agency pays a technology fee to the GDS for each booking. This change, resulting from competition, has saved at least one U.S. airline millions of dollars per year.

Response to Paragraph No. 37:

The allegations in Paragraph No. 37 concern parties other than Farelogix, thus, Farelogix

is without knowledge or information sufficient to form a belief as to the truth of the allegations

in Paragraph No. 37 and, on that basis, denies them.

> **E.    Competition from Farelogix Pushed Sabre to Update Its Own Booking Services Technology**

Paragraph No. 38:

Competition from Farelogix's next-generation technology also has driven Sabre to finally begin improving its own outdated technology. For years, Sabre and the other GDSs vehemently opposed the transition to NDC. As airlines and travel agencies began demanding the new capabilities pioneered by Farelogix, however, Sabre eventually started developing its own NDC booking services technology.

Response to Paragraph No. 38:

The allegations in Paragraph No. 38 concern parties other than Farelogix, thus, Farelogix

is without knowledge or information sufficient to form a belief as to the truth of the allegations

in Paragraph No. 38 and, on that basis, denies them.

Paragraph No. 39:

In 2017, recognizing that Farelogix was the leader in NDC technology, Sabre began
developing a strategy to catch up. As airlines and travel agencies increasingly demanded next-
generation technology, Sabre recognized that Farelogix was among the "most relevant threats" to
its business. (Likewise, Farelogix identifies Sabre as one of its "key competitors" in next-
generation distribution.) Faced with this threat, Sabre developed its own plan to surpass
Farelogix's next-generation distribution capabilities by 2020. Indeed, the Sabre vice president
leading the acquisition negotiations told Farelogix's investment banker that if Farelogix declined
to sell itself to Sabre, Sabre would be "too far down the path in our own plan" and "then we
[Sabre] will be a really tough competitor for them [Farelogix]." Today, Sabre bids on NDC
business in direct competition with Farelogix.

Response to Paragraph No. 39:

Farelogix is without knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph No. 39 and, on that basis, denies them.  To the extent that the

allegations in Paragraph No. 39 purport to quote documents and/or statements, Farelogix

respectfully refers the Court to those documents and/or statements in their entirety for a complete

and accurate description of their contents and otherwise denies the allegations relating to such

documents.

**F.      Farelogix Is Poised to Compete Even More Intensely with Sabre**

Paragraph No. 40:

In spite of Sabre's efforts to hobble it, Farelogix has steadily built a sizeable base of major
airline customers, including some of the largest airlines in the United States. Farelogix already
processes more NDC transactions than any other airline technology company.

21

Response to Paragraph No. 40:

Farelogix denies the allegations in Paragraph No. 40, except that Farelogix admits that it

serves airline customers and processes NDC transactions for those customers.  To the extent that

the allegations in Paragraph No. 40 concern parties other than Farelogix, Farelogix is without

knowledge or information sufficient to form a belief as to the truth of the allegations in

Paragraph No. 40 and, on that basis, denies them.

Paragraph No. 41:

As the industry continues to shift to NDC, Farelogix is poised to grow significantly. In
April 2018, IATA, the airline industry trade association responsible for the standardization of
NDC, launched a "leaderboard" of airlines that have committed to making 20 percent of their
bookings through an NDC-enabled connection by 2020. Nearly half of the airlines on the
leaderboard have chosen Farelogix's Open Connect as their NDC booking services solution.
Farelogix and Sabre both project that Farelogix revenues will grow as the adoption of NDC
technology expands. Indeed, Sabre conservatively projected that airline tickets booked using
Farelogix's technology will nearly triple between 2018 and 2020.

Response to Paragraph No. 41:

Farelogix denies the allegations in the first sentence of Paragraph No. 41, except that

Farelogix admits that its internal projections relating to its "Open Connect" product reflect some

growth.  Farelogix denies the allegations in the second sentence of Paragraph No. 41, except

Farelogix admits that IATA launched a "leaderboard" of certain airlines that have committed to

making 20 percent of their bookings through NDC-enabled connection by 2020.  Farelogix

denies the allegations in the third sentence of Paragraph No. 41.  Farelogix lacks knowledge or

information sufficient to form a belief as to the truth of the remaining allegations in Paragraph

No. 41 and, on that basis, denies those allegations.

Paragraph No. 42:

As demand for NDC grows, the industry is approaching a tipping point that threatens
Sabre's business model. A Sabre document from late 2018 recognizes that airlines view NDC as
a "pivot point for model change, threatening the GDS." In May 2019, Farelogix's CEO stated

22

that NDC is "past the inflection point" and "it now just becomes kind of the downhill slope of adoption."

Response to Paragraph No. 42:

Farelogix lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph No. 42. Farelogix denies the remaining allegations in Paragraph No. 42 and, to the extent those allegations purport to quote documents and/or statements, respectfully refers the Court to those documents and/or statements in their entirety for a complete and accurate description of their contents and otherwise denies the allegations relating to such documents.

Paragraph No. 43:

Sabre's proposal to buy Farelogix threatens to forestall this evolution. Instead of innovating to compete with Farelogix, Sabre has resorted to eliminating the competitive threat by acquiring Farelogix.

Response to Paragraph No. 43:

Farelogix denies the allegations in Paragraph No. 43.

## V.    RELEVANT MARKETS

Paragraph No. 44:

If not enjoined, the proposed transaction would result in anticompetitive effects in two relevant product markets: booking services for airline tickets sold through traditional travel agencies and booking services for airline tickets sold through online travel agencies.

Response to Paragraph No. 44:

The allegations in Paragraph No. 44 are legal conclusions and therefore do not require a response. To the extent a response is required, Farelogix denies the allegations in Paragraph No. 44.

A.      **Product Markets**

1.      **Booking Services for Airline Tickets Sold through Traditional Travel Agencies**

Paragraph No. 45:

Booking services for airline tickets sold through traditional travel agencies is a relevant product market. Traditional travel agencies are an important distribution channel for airlines because they serve the most lucrative travel segment, corporate travelers. Most airlines have no reasonable substitutes for the booking services that enable distribution through traditional travel agencies because these agencies control access to the vast majority of corporate travelers. Airlines and online travel agencies are not equipped to provide many of the services required by customers of traditional agencies; thus, airlines generally would be unable to convince these customers to book through alternate channels. A hypothetical monopolist likely would impose at least a small but significant and non-transitory price increase on booking services for airline tickets sold through traditional travel agencies. Accordingly, booking services for airline tickets sold through traditional travel agencies constitutes a relevant product market and line of commerce under Section 7 of the Clayton Act.

Response to Paragraph No. 45:

Farelogix denies the allegations in the first sentence of Paragraph No. 45.  Farelogix

denies the allegations in the second, third and fourth sentences of Paragraph No. 45, except

Farelogix admits that travel agencies are a distribution channel for many airlines and that some

travel agencies serve corporate travelers.  The allegations in the fifth and sixth sentences of

Paragraph No. 45 are legal conclusions and therefore do not require a response.  To the extent a

response is required, Farelogix denies the allegations in the fifth and sixth sentences of

Paragraph No. 45.

2.      **Booking Services for Airline Tickets Sold through Online Travel Agencies**

Paragraph No. 46:

Booking services for airline tickets sold through online travel agencies is a relevant product market. Online travel agencies are an important distribution channel for airlines. Online travel agencies, such as Priceline and Expedia, cater primarily to cost-conscious leisure travelers. Distribution through online travel agencies represents about 20 percent of airlines' bookings in the United States. Airlines would be willing to pay more than they pay today for booking services

24

rather than lose the opportunity to sell tickets through online travel agencies. A hypothetical monopolist likely would impose at least a small but significant and non-transitory price increase on booking services for airline tickets sold through online travel agencies. Accordingly, booking services for airline tickets sold through online travel agencies constitutes a relevant product market and line of commerce under Section 7 of the Clayton Act.

Response to Paragraph No. 46:

Farelogix denies the allegations in the first sentence of Paragraph No. 46.  Farelogix denies the allegations in the second sentence of Paragraph No. 46, except Farelogix admits that OTAs are a distribution channel for some airlines.  Farelogix lacks knowledge or information sufficient to form a belief as to the allegations in the third, fourth and fifth sentences of Paragraph No. 46 and, on that basis, denies those allegations.  The allegations in the sixth and seventh sentences of Paragraph No. 46 are legal conclusions and therefore do not require a response.  To the extent a response is required, Farelogix denies the allegations in the sixth and seventh sentences of Paragraph No. 46.

## B.    Geographic Market

Paragraph No. 47:

The geographic market is the United States. A hypothetical monopolist of booking services for airline tickets sold through traditional travel agencies or online travel agencies in the United States would impose at least a small but significant and non-transitory increase in price for booking services. Accordingly, the markets for booking services for airline tickets sold through traditional travel agencies in the United States and booking services for airline tickets sold through online travel agencies in the United States are relevant markets.

Response to Paragraph No. 47:

Farelogix denies the allegation in the first sentence in Paragraph No. 47.  The remaining allegations in Paragraph No. 47 are legal conclusions and therefore do not require a response.  To the extent a response is required, Farelogix denies the remaining allegations in Paragraph No. 47.

### C.  The Acquisition Is Unlawful in Both Relevant Markets

Paragraph No. 48:

The Supreme Court has held that mergers that significantly increase concentration in already concentrated markets are presumptively anticompetitive and therefore presumptively unlawful. To measure market concentration, courts often use the Herfindahl-Hirschman Index ("HHI"). HHIs range from 0 in markets with no concentration to 10,000 in markets where one firm has 100 percent market share. Courts have found that mergers that increase the HHI by more than 200 and result in an HHI above 2,500 in any relevant market or line of commerce are presumed to be anticompetitive.

Response to Paragraph No. 48:

Denied, except Farelogix admits that the Herfindahl-Hirschman Index is a method that

has been used to measure market concentration.

Paragraph No. 49:

Sabre's acquisition of Farelogix would significantly increase concentration in the already highly concentrated market for booking services for airline tickets sold through online travel agencies in the United States. The proposed acquisition would result in more than a 350-point increase in HHI and a post-transaction HHI of more than 4,000 in this market. Thus, the proposed acquisition is presumptively unlawful.

Response to Paragraph No. 49:

Farelogix denies the allegations in Paragraph No. 49.

Paragraph No. 50:

Sabre's acquisition of Farelogix is also unlawful in the market for booking services for airline tickets sold through traditional travel agencies in the United States. This market is also highly concentrated today, with an HHI of over 3,500. While Farelogix's current share in this market is small, largely due to the GDSs' efforts to freeze it out, Farelogix has been a disruptive and uniquely important constraint on the GDSs in this market. As a result, the elimination of Farelogix as an independent competitor in this highly concentrated market is also likely to substantially lessen competition.

Response to Paragraph No. 50:

Farelogix denies the allegations in Paragraph No. 50.

Paragraph No. 51:

In both relevant markets, Farelogix's market share substantially understates its competitive significance in at least two respects. First, by offering airlines an alternative booking services solution to the GDSs, Farelogix has empowered airlines to negotiate lower prices and more favorable terms, even if the airline ultimately uses the GDS instead of Farelogix for booking services. Farelogix's competitive significance is therefore not fully reflected in its current market share. Second, Farelogix's current market share understates its competitive significance going forward. As the industry transitions from legacy to NDC technology, Farelogix is poised to grow significantly. Defendants' internal projections reflect this. In short, by eliminating a disruptive entrant with significant potential to grow and compete, the acquisition would substantially lessen competition in both relevant markets, to the detriment of airlines and travelers.

Response to Paragraph No. 51:

Farelogix denies the allegations in Paragraph No. 51, except that Farelogix admits that its

internal projections reflect some growth.

## VI.   THE PROPOSED ACQUISITION IS LIKELY TO SUBSTANTIALLY LESSEN COMPETITION IN THE RELEVANT MARKETS

### A.   The Acquisition Would Eliminate Head-to-Head Competition between Sabre and Farelogix and Likely Lead to Higher Prices and Reduced Quality

Paragraph No. 52:

Airlines have successfully used the threat of shifting bookings to Farelogix to obtain better pricing in their GDS contracts on bookings made through traditional and online travel agencies. As Sabre recognized in its 2018 Annual Report, the expansion of "direct connect initiatives" (e.g., Farelogix) enables airlines "to apply pricing pressure on intermediaries [e.g., GDSs] and negotiate travel distribution arrangements that are less favorable to intermediaries."

Response to Paragraph No. 52:

Farelogix denies the allegations in the first sentence of Paragraph No. 52.  To the extent

that the remaining allegations in Paragraph No. 52 concern parties other than Farelogix,

Farelogix is without knowledge or information sufficient to form a belief as to the truth of the

allegations in Paragraph No. 52 and, on that basis, denies them.

Paragraph No. 53:

Senior executives of both Sabre and Farelogix have recognized that the acquisition is likely to result in higher prices. Farelogix's CFO highlighted in August 2018 that if Sabre acquired Farelogix, it would be "taking out a strong competitor vs. continued competition and price pressure in market." He had previously noted that any GDS that acquired Farelogix "would increase control over airlines who are now using FLX [Farelogix] as a negotiation tool during contract renewals." Similarly, a Sabre sales executive, in a text to a colleague after this proposed acquisition was announced, observed that Farelogix's prices for one major U.S. airline would go up "big time" as a result of the deal.

Response to Paragraph No. 53:

Farelogix denies the allegations in the first sentence of Paragraph No. 53.  To the extent

that the second, third and fourth sentences of Paragraph No. 53 purport to quote documents

and/or testimony, Farelogix respectfully refers the Court to the documents and/or testimony cited

therein in their entirety for a complete and accurate description of their contents and otherwise

denies the allegations relating to such documents.

Paragraph No. 54:

The transaction will likely tighten Sabre's grip on the online travel agency market, where airlines have been most successful using competition from Farelogix to erode Sabre's market position. Farelogix has demonstrated that it is a credible alternative to Sabre by enabling major U.S. airlines to connect directly with online travel agencies and helping change the payment model in the online travel agency market. After acquiring Farelogix, Sabre's incentive to continue to offer these options on competitive prices and terms likely would be diminished.

Response to Paragraph No. 54:

Farelogix denies the allegations in Paragraph No. 54.

Paragraph No. 55:

U.S. full-service airlines are particularly likely to be harmed by the transaction. Distribution through traditional and online travel agencies located in the United States represents an especially significant portion of their revenue. These airlines' booking services needs are more complex than those of most other airlines that sell tickets in the United States due to their extensive hub-and-spoke networks, the nature of their business models, and the volume of transactions they process. In addition, these airlines cater to business travelers and hence are especially dependent on distribution through traditional travel agencies. For these reasons, U.S. full-service airlines face a different set of competitive constraints than other airlines. Because Sabre controls most of these airlines' bookings through U.S. travel agencies, Sabre has

significant leverage in negotiating with these airlines. By eliminating Farelogix, Sabre would gain additional negotiating leverage and could target these customers for price increases.

Response to Paragraph No. 55:

Farelogix denies the allegations in Paragraph No. 55.

**B.     The Acquisition Would Lessen Innovation**

Paragraph No. 56:

The proposed acquisition also would likely reduce innovation, to the detriment of airlines, travel agencies, and travelers. Farelogix has been the driving force behind the industry's adoption of the NDC standard and the leader in developing new technology. With Farelogix's technology, airlines can make offers tailored to the needs of individual travelers booking through a travel agency—functionality Sabre's outdated GDS technology lacks.

Response to Paragraph No. 56:

Farelogix denies the allegations in the first sentence of Paragraph No. 56.  Farelogix

denies the allegations in the second sentence of Paragraph No. 56, except that Farelogix admits

that it played a role in the beginning stages of developing the NDC standard.  Farelogix denies

the allegations in the third sentence of Paragraph No. 56, except that Farelogix admits that

airlines can utilize certain Farelogix technology to create individualized offers.  To the extent

that the allegations in the third sentence of Paragraph No. 56 concern parties other than

Farelogix, Farelogix is without knowledge or information sufficient to form a belief as to the

truth of those allegations and, on that basis, denies them.

Paragraph No. 57:

Competition from Farelogix pushed Sabre to finally adopt NDC and develop next-generation booking services solutions. After fighting against the adoption of NDC for years, Sabre began investing in next-generation technology only after Farelogix began gaining traction.

Response to Paragraph No. 57:

To the extent that the allegations in Paragraph No. 57 concern parties other than

Farelogix, Farelogix is without knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph No. 57 and, on that basis, denies them.

Paragraph No. 58:

Competition between Farelogix and Sabre to develop and sell next-generation booking
services is already fierce. As the head of Sabre's deal team warned Farelogix's investment banker,
if Sabre does not acquire Farelogix, Sabre would be "a really tough competitor" to Farelogix.
Indeed, if the acquisition is enjoined, Farelogix would continue to act as a disruptor, developing
new, innovative solutions in competition with Sabre. Farelogix has a strong incentive to innovate
in order to reap the gains of its innovation. In contrast, Sabre's incentive to innovate is tempered
by the threat innovative solutions pose to its traditional business model and aging technology.
Without competition from an independent Farelogix, Sabre's incentive to invest and innovate in
next-generation technology would be diminished.

Response to Paragraph No. 58:

To the extent that the allegations in Paragraph No. 58 concern Farelogix, Farelogix

denies them.  To the extent that the allegations in Paragraph No. 58 concern parties other than

Farelogix, Farelogix is without knowledge or information sufficient to form a belief as to the

truth of those allegations and, on that basis, denies them.

## C.    No Countervailing Factors Would Prevent or Remedy the Acquisition's Likely Anticompetitive Effects

Paragraph No. 59:

New entry or expansion by existing competitors is unlikely to prevent or remedy the
transaction's likely anticompetitive effects in the relevant markets. There are high barriers to
building out a next-generation booking services solution comparable to Farelogix's Open
Connect, including the difficulty and time required to integrate customized NDC connections
into complex, unique IT systems like those of Farelogix's airline customers. Beyond these
technical impediments, the GDSs' contracting practices—particularly provisions that inhibit
airlines' use of alternative booking services providers—further heighten the barriers to entry.
Despite these significant barriers, Farelogix has persisted for over 15 years, investing more than
$100 million in developing its innovative solutions. Through these efforts, Farelogix has
emerged as a significant threat to Sabre. In-house airline solutions, sponsored entrants, and

alternative next-generation booking services providers are unlikely to replace the competitive constraint posed by Farelogix in a timely and sufficient manner.

Response to Paragraph No. 59:

Farelogix denies the allegations in the first, second, third, fifth and sixth sentences of

Paragraph No. 59.  Farelogix denies the allegations in the fourth sentence of Paragraph No. 59,

except that Farelogix admits that it has operated for over 15 years.

Paragraph No. 60:

The proposed transaction will not result in verifiable, transaction-specific efficiencies in the relevant markets sufficient to outweigh the transaction's likely anticompetitive effects.

Response to Paragraph No. 60:

Farelogix denies the allegations in Paragraph No. 60.

## VII.   VIOLATION ALLEGED

Paragraph No. 61:

The United States alleges and incorporates paragraphs 1 through 60 as if set forth fully herein.

Response to Paragraph No. 61:

Farelogix reasserts and incorporates its responses to paragraphs 1 through 60 as if set

forth fully herein.

Paragraph No. 62:

Unless enjoined, Sabre's proposed acquisition of Farelogix is likely to substantially lessen competition in the relevant markets, in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

Response to Paragraph No. 62:

Paragraph No. 62 contains legal conclusions or arguments not subject to admission or

denial.  To the extent a response is deemed required, Farelogix denies the allegations in

Paragraph No. 62.

Paragraph No. 63:

Among other things, the proposed acquisition would:

(a)     eliminate present and future competition between Sabre and Farelogix;
(b)     likely cause prices for booking services to be higher than they would be otherwise; and
(c)     likely reduce quality, service, choice, and innovation.

Response to Paragraph No. 63:

Farelogix denies the allegations in Paragraph No. 63.

## VIII.     REQUEST FOR RELIEF

Paragraph No. 64:

The United States requests that the Court:

(a)     adjudge Sabre's acquisition of Farelogix to violate Section 7 of the Clayton Act, 15 U.S.C. § 18;

(b)     permanently enjoin Defendants from consummating Sabre's proposed acquisition of Farelogix or from entering into or carrying out any other transaction by which control of the assets or businesses of Sabre and Farelogix would be combined;

(c)     award the United States its costs of this action; and

(d)     grant the United States such other relief as the Court deems just and proper.

Response to Paragraph No. 64:

Farelogix denies that any of the requested relief is permitted or appropriate.

## DEFENSES

Farelogix hereby incorporates by reference the affirmative defense identified in Sabre's Answer, without assuming the burden of proof on such defenses that would otherwise rest on Plaintiff. Farelogix reserves the right to asset any other defenses as they become known to Farelogix.

Respectfully submitted,

OF COUNSEL:

Kenneth A. Gallo
Jonathan S. Kanter
Joseph J. Bial
Daniel J. Howley
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
2001 K Street, NW
Washington, DC 20006-1047
Tel.:  (202) 223-7300
Fax:  (202) 223-7420
kgallo@paulweiss.com
jkanter@paulweiss.com
jbial@paulweiss.com
dhowley@paulweiss.com

PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP

By:    */s/ Daniel A. Mason*
     Daniel A. Mason (#5206)
     500 Delaware Avenue, Suite 200
     Post Office Box 32
     Wilmington, DE 19899-0032
     Tel.:  (302) 655-4410
     Fax:  (302) 655-4420
     dmason@paulweiss.com

*Attorney for Defendants Farelogix, Inc. and
Sandler Capital Partners V, L.P.*

Dated:  September 10, 2019