# EXHIBIT 3A

# UNITED STATES' STATEMENT OF ISSUES OF LAW THAT REMAIN TO BE LITIGATED

## <u>UNITED STATES' STATEMENT OF ISSUES OF LAW THAT REMAIN TO BE LITIGATED</u>

Pursuant to Local Rule 16.3(c)(5), the United States submits the following issues of law that the United States believes remain to be litigated:

1. Whether Sabre's proposed acquisition of Farelogix ("proposed transaction") is likely to substantially lessen competition in any line of commerce, in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18, is an issue to be litigated.

    a. Section 7 of the Clayton Act prohibits a merger "where in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition." 15 U.S.C. § 18.

    b. "Congress used the words *may be* substantially to lessen competition . . . to indicate that its concern was with probabilities, not certainties, . . . rendering Section 7's definition of antitrust liability relatively expansive." *Fed. Trade Comm'n v. Penn State Hershey Med. Ctr.*, 838 F.3d 327, 337 (3d Cir. 2016) (internal quotation marks and citations omitted).

    c. A horizontal merger is a merger "between companies performing similar functions in the production or sale of comparable goods or services[.]" *Brown Shoe Co. v. United States*, 370 U.S. 294, 334 (1962). *See also Gen. Foods Corp. v. Fed. Trade Comm'n*, 386 F.2d 936, 944 (3d Cir. 1967) (a horizontal merger is a merger between "direct competitor[s]"); *Horizontal Merger Guidelines* § 1 (a horizontal merger is a merger "involving actual or potential competitors").

        i. Defendants may attempt to argue that this transaction is principally a vertical merger. A vertical merger is a merger "between companies standing in a supplier-customer relationship." *Brown Shoe*, 370 U.S. at 323; *Gen. Foods Corp.*, 386 F.2d at 944 (a vertical merger is a merger between "buyer and seller"). A merger can separately present both horizontal and vertical concerns. *See Brown Shoe*, 370 U.S. at 323–46 (discussing separately "the vertical aspects of the merger" and "the horizontal aspects of the merger"); *see also United Nuclear Corp. v. Combustion Eng'g, Inc.*, 302 F. Supp. 539, 555 (E.D. Pa. 1969) ("Having determined that this acquisition violates Section 7 because of its horizontal effects, I need not, strictly speaking, consider its vertical implications."); *United States v. AT&T, Inc.*, 916 F.3d 1029, 1032 (D.C. Cir. 2019) (extending to vertical mergers the same burden-shifting framework used to analyze Clayton Act challenges to horizontal mergers).

    d. The United States must show a "reasonable probability" that that the merger will result in anticompetitive effects. *United States v. Energy Sol'ns, Inc.*, 265 F. Supp. 3d 415, 435–36 (D. Del. 2017) (quoting *Brown Shoe*, 370 U.S. at 325).

"The government need not prove anticompetitive effects 'with certainty.'" *Energy Sol'ns*, 265 F. Supp. 3d at 436 (quoting *Fed. Trade Comm'n v. H.J. Heinz Co.*, 246 F.3d 708, 709 (D.C. Cir. 2001) (internal quotation marks omitted); citing *United States v. El Paso Nat. Gas. Co.*, 376 U.S. 651, 658 (1964)). "But neither will a 'mere possibility' suffice." *Energy Sol'ns*, 265 F. Supp. 3d at 436 (quoting *Fed. Trade Comm'n v. Consol. Foods Corp.*, 380 U.S. 592, 598 (1965)).

e.   "Section 7 claims are typically assessed under a 'burden-shifting framework.'" *St. Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd*., 778 F.3d 775, 783 (9th Cir. 2015) (quoting *Chi. Bridge & Iron Co. v. Fed. Trade Comm'n*, 534 F.3d 410, 423 (5th Cir. 2008)).  Under that framework, "the Government must establish a prima facie case that the merger is anticompetitive." *Penn State*, 838 F.3d at 337.  "To establish a prima facie case, the Government must (1) propose [a] proper relevant market and (2) show that the effect of the merger in that market is likely to be anticompetitive." *Id.* at 337–38.  "Once the Government has established a prima facie case that the merger may substantially lessen competition, the burden shifts to the [defendants] to rebut the Government's prima facie case." *Id.* at 347.  If the defendants "successfully rebut the Government's prima facie case, 'the burden of production shifts back to the Government and merges with the ultimate burden of persuasion, which is incumbent on the Government at all times.'" *Id.* at 337 (quoting *St. Alphonsus*, 778 F.3d at 783).

f.   A merger is unlawful under Section 7 if it is likely to result in a substantial lessening of competition in "any line of commerce" in "any section of the country."  15 U.S.C. § 18.  Thus, "if anticompetitive effects of a merger are probable in 'any' significant market," the merger violates Section 7.  *Brown Shoe*, 370 U.S. at 337 (quoting 15 U.S.C. § 18).  *See also United States v. Anthem, Inc.*, 855 F.3d 345, 368 (D.C. Cir. 2017) (harm in a single market is "a sufficient basis for enjoining the merger").

g.   To resolve a Section 7 claim, courts regularly consult the Department of Justice and Federal Trade Commission's *Horizontal Merger Guidelines* ("*Guidelines*"). *See, e.g.*, *Penn State*, 838 F.3d at 338 n.2 ("Although the Merger Guidelines are not binding on the courts, they are often used as persuasive authority.") (quoting *St. Alphonsus*, 778 F.3d at 784 n.9); *Energy Sol'ns*, 265 F. Supp. 3d at 446 (citing the *Guidelines* in its analysis); *Chi. Bridge*, 534 F.3d at 431 n.11 ("Merger Guidelines are often used as persuasive authority when deciding if a particular acquisition violates anti-trust laws.").

2.   Whether "booking services for airline tickets sold through traditional travel agencies" and "booking services for airline tickets sold through online travel agencies" are relevant product markets and lines of commerce under Section 7 of the Clayton Act, 15 U.S.C. § 18, are issues to be litigated.

a.  Section 7 of the Clayton Act prohibits a merger "where in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition." 15 U.S.C. § 18.

b.  "'Congress prescribed a pragmatic, factual approach to the definition of the relevant market and not a formal, legalistic one.'" *Penn State*, 838 F.3d at 335 (quoting *Brown Shoe*, 370 U.S. at 336). "[A] market cannot be defined with absolute certainty." *Ansell Inc. v. Schmid Labs., Inc.*, 757 F. Supp. 467, 476 (D.N.J. 1991), *aff'd*, 941 F.2d 1200 (3d Cir. 1991).

c.  A relevant product market "is composed of products that have reasonable interchangeability for the purposes for which they are produced." *United States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 404 (1956); *Allen-Myland, Inc. v. Int'l Bus. Machs. Corp.*, 33 F.3d 194, 206 (3d Cir. 1994).

d.  Courts may determine the interchangeability of products with reference to "practical indicia," or "*Brown Shoe* factors," including "industry or public recognition of the [product market] as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Brown Shoe*, 370 U.S. at 325; *accord Fineman v. Armstrong World Indus., Inc.*, 980 F.2d 171, 199 (3d Cir. 1992). *See also Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 437 (3d Cir. 1997) (Factors for finding reasonable interchangeability "include price, use, and qualities.") (quoting *Tunis Bros. Co., Inc. v. Ford Motor Co.*, 952 F.2d 715, 722 (3d Cir. 1991)). However, *Brown Shoe*'s "practical indicia" are "not necessarily criteria to be rigidly applied." *Fed. Trade Comm'n v. Swedish Match*, 131 F. Supp. 2d 151, 159 (D.D.C. 2000). *See also Int'l Tel. & Tel. Corp. v. Gen. Tel. & Elec. Corp.*, 518 F.2d 913, 932 (9th Cir. 1975) (explaining that *Brown Shoe*'s practical indicia were meant as "practical aids . . . rather than with the view that their presence or absence would dispose, in talismanic fashion, of the submarket issue").

e.  Courts use the hypothetical monopolist test described in § 4.1.1 of the *Guidelines* to assess whether products are reasonably interchangeable. *See, e.g.*, *United States v. Anthem, Inc.*, 236 F. Supp. 3d 171, 194, 198 (D.D.C. 2017), *aff'd*, 855 F.3d 345 (D.C. Cir. 2017); *United States v. H&R Block, Inc.*, 833 F. Supp. 2d 36, 51–52 (D.D.C. 2011). The hypothetical monopolist test asks "whether a hypothetical monopolist who has control over the products in an alleged market could profitably raise prices on those products." *Fed. Trade Comm'n v. Staples, Inc.*, 190 F. Supp. 3d 100, 121 (D.D.C. 2016) (*Staples II*). Specifically, the test asks whether a profit-maximizing hypothetical monopolist over all products in a candidate market would impose a small but significant and non-transitory increase in price ("SSNIP")—typically five or ten percent—on one of or all those products. *Guidelines* §§ 4.1.1–.2. The profitability of a SSNIP turns on the

3

extent to which higher prices "would drive consumers to an alternative product" or to forgo purchases altogether.  *Fed. Trade Comm'n v. Whole Foods*, 548 F.3d 1028, 1038 (D.D.C. 2008).  If not enough customers would switch to an alternative, that set of products constitutes an appropriate product market for antitrust analysis.  *Guidelines* § 4.1.1; s*ee also H&R Block*, 833 F. Supp. 2d at 55 ("The key question for the Court is whether . . . products are sufficiently close substitutes to constrain any anticompetitive . . . pricing after the proposed merger.").

f.  The relevant market does not necessarily include all substitutes; it need include only "reasonable substitutes."  *Fed. Trade Comm'n v. Sysco Corp*., 113 F. Supp. 3d 1, 26 (D.D.C. 2015) (quoting *Fed. Trade Comm'n v. Cardinal Health, Inc.*, 12 F. Supp. 2d 34, 46 (D.D.C. 1998)); *accord Allen-Myland*, 33 F.3d at 207 (considering whether "peripherals and software are reasonable substitutes for mainframes").   As the Supreme Court has explained, "[f]or every product, substitutes exist. But a relevant market cannot meaningfully encompass [an] infinite range [of products]. The circle must be drawn narrowly to exclude any other product to which, within reasonable variations in price, only a limited number of buyers will turn." *Times-Picayune Publ'g Co. v. United States*, 345 U.S. 594, 612 n.31 (1953).  *See also Whole Foods*, 548 F.3d at 1037 (Brown, J.) (internal citations omitted) (The reasonable interchangeability of products "depends not only on the ease and speed with which customers can substitute it and the desirability of doing so, but also on the cost of substitution.").

g.  For firms to compete in the same product market, it is not necessary that the firms have "complete overlap in their product offerings"; the fact that one firm "may offer more comprehensive services" than another does not change the fact that the overlapping services offered by the firms "are reasonable substitutes."  *Energy Sol'ns*, 265 F. Supp. 3d at 438–39 (quoting *Novak v. Somerset Hosp.*, 2014 WL 4925200, at *13 (W.D. Pa. Sept. 30, 2014)); *see also Fed. Trade Comm'n v. Food Town Stores, Inc.*, 539 F.2d 1339, 1345 (4th Cir. 1976 (holding that some overlap, even if it is small, is sufficient).

3.  Whether the United States is a relevant geographic market for each of the product markets identified above under Section 7 of the Clayton Act, 15 U.S.C. § 18, are issues to be litigated.

a.  Section 7 of the Clayton Act prohibits a merger "where in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition."  15 U.S.C. § 18.

b.  "The relevant geographic market 'is that area in which a potential buyer may rationally look for the goods or services he seeks.'"  *Penn State*, 838 F.3d at 338 (quoting *Gordon v. Lewistown Hosp.*, 423 F.3d 184, 212 (3d Cir. 2005)).  In other words, the relevant geographic market is the area "where, within the area of

competitive overlap, the effect of the merger on competition will be direct and immediate." *United States v. Phila. Nat'l Bank*, 374 U.S. 321, 357 (1963).

    c.  "The criteria to be used in determining the appropriate geographic market are essentially similar to those used to determine the relevant product market." *Brown Shoe*, 370 U.S. at 336.  The geographic market must "'correspond to the commercial realities of the industry,'" which are "[d]etermined within the specific context of each case."  *Penn State*, 838 F.3d at 338 (*quoting Brown Shoe*, 370 U.S. at 336).

    d.  As in product markets, the hypothetical monopolist test is another method for defining a relevant geographic market.  *Penn State*, 838 F.3d at 338 ("A common method employed by courts and the [government] to determine the relevant geographic market is the hypothetical monopolist test."); *Guidelines* § 4.2.  Under the test, "if a hypothetical monopolist could impose [a SSNIP] in the proposed market, the market is properly defined.  If, however, consumers would respond to a SSNIP by purchasing the product from outside the proposed market, thereby making the SSNIP unprofitable, the proposed market definition is too narrow." *Penn State*, 838 F.3d at 338 (citing *Guidelines* § 4).

    e.  "An element of 'fuzziness'" is inherent in defining a geographic market.  *United States v. Conn. Nat'l Bank*, 418 U.S. 656, 669 (1974) (quoting *Phila. Nat'l Bank*, 374 U.S. at 360 n.37).  Accordingly, a geographic market need not be defined "with scientific precision."  *Id.*  A geographic market is not defined "by metes and bounds as a surveyor would lay off a plot of ground."  *United States v. Pabst Brewing Co.*, 384 U.S. 546, 549 (1966); *accord Joseph Ciccone & Sons, Inc. v. E. Indus., Inc.*, 559 F. Supp. 671, 674 (E.D. Pa. 1983).  Indeed, nothing requires a plaintiff's relevant geographic market to include all potential customers or participants.  *See, e.g.*, *Penn State*, 838 F.3d at 338–46 (finding a geographic market definition correct even though 43.5% of a hospital's patients came from outside the market).

4.  Whether the United States can establish a prima facie case of anticompetitive effects is an issue to be litigated.

    a.  The United States can establish anticompetitive effects in two ways:  1) by "showing a high market concentration," *Penn State*, 838 F.3d at 347; or 2) by demonstrating that the merger "is likely to encourage one or more firms to raise price, reduce output, diminish innovation, or otherwise harm customers as a result of diminished competitive constraints or incentives."  *Guidelines* § 1.  *See also Chi. Bridge*, 534 F.3d at 431–34 ("Market concentration figures should be examined in the context of the entire prima facie case.").

    b.  Whether the United States can establish anticompetitive effects by showing that the proposed transaction would substantially increase market concentration in either of the two relevant markets is an issue to be litigated.

i. The United States can establish a presumption that the merger will substantially lessen competition by making "a *prima facie* showing that the acquisition in this case will result in a significant market share and an undue increase in concentration" in the relevant market. *Staples II*, 190 F. Supp. 3d at 127 (quoting *Swedish Match*, 131 F. Supp. 2d at 166. "[A] merger which produces a firm controlling an undue percentage of the relevant market, and results in a significant increase in the concentration of firms in that market is so inherently likely to lessen competition substantially that it must be enjoined in the absence of evidence clearly showing that the merger is not likely to have such anticompetitive effects." *Phila. Nat'l Bank*, 374 U.S. at 363.

ii. Courts therefore consider post-transaction market concentration, and the change in concentration caused by the transaction, in an analysis of the competitive effects of a merger under Section 7. "'Market concentration is a function of the number of firms in a market and their respective market shares.'" *Staples II*, 190 F. Supp. 3d at 128 (quoting *Fed. Trade Comm'n v. Arch Coal, Inc.*, 329 F. Supp. 2d 109, 123 (D.D.C. 2004)). While there is no fixed threshold for high market concentration, the Supreme Court has specifically held that a post-merger market share of 30%, and a "significant" increase in market concentration, triggered the presumption of illegality. *Phila. Nat'l Bank*, 374 U.S. at 364 ("Without attempting to specify the smallest [resulting] market share which would still be considered to threaten undue concentration, we are clear that 30% presents that threat."); *see also United States v. Cont'l Can Co.*, 378 U.S. 441, 461 (1964) (finding a merger presumptively anticompetitive where the acquiring firm's market share increased from 21.9% to 25%); *H&R Block*, 833 F. Supp. 2d at 72 (finding a presumption of competitive harm where a merger would cause the acquiring firm's share to increase from 15.6% to 28.4%).

iii. Courts also look to market-concentration thresholds set in the *Guidelines* to determine whether the merger will result in high market concentration. *See, e.g.*, *Penn State*, 838 F.3d at 346–47. The *Guidelines* measure market concentration by the Herfindahl–Hirschmann Index (HHI), which is "calculated by summing the squares of the individual firms' market shares." *Guidelines* § 5.3. "The Government can establish a prima facie case simply by showing a high market concentration based on HHI numbers." *Penn State*, 838 F.3d at 347. Under the *Guidelines*, a merger is presumed to be anticompetitive if it would cause the HHI to increase by more than 200 points, and result in an HHI greater than 2,500, in any relevant market. *Guidelines* § 5.3; s*ee also Penn State*, 838 F.3d at 346–47; *Energy Sol'ns*, 265 F. Supp. 3d at 441.

    iv.  If current market-concentration figures do not accurately reflect the relative strength of firms in a dynamic industry, market share projections may be used. Where "recent or ongoing changes in market conditions may indicate that the current market share of a particular firm either understates or overstates the firm's competitive significance," it is appropriate to "consider reasonably predictable effects of recent or ongoing changes in market conditions when calculating and interpreting market share data." *Guidelines* § 5.2. *See also United States v. Gen. Dynamics Corp.*, 415 U.S. 486, 503 (1974) (a party's "probable future ability to compete" is what matters for Section 7 purposes); *Fed. Trade Comm'n v. PPG Indus., Inc.*, 798 F.2d 1500, 1505 (D.C. Cir. 1986) (relying on a proxy for market shares in the relevant market given "the difficulty of calculating an HHI" for a high technology market that was "growing rapidly" and "major portions" of which depended on future events); *Polypore Int'l, Inc. v. Fed. Trade Comm'n*, 686 F.3d 1208, 1216 n.9 (11th Cir. 2012) (relying on the buyer's projection of seller's revenues to determine the competitive effects of a transaction).

c.  Whether the United States can establish anticompetitive effects by showing that the proposed transaction would harm customers as a result of diminished competitive constraints or incentives is an issue to be litigated.

    i.  Demonstrating high market concentration "does not exhaust the possible ways to prove a § 7 violation on the merits." *Whole Foods*, 548 F.3d at 1036; *Chi. Bridge*, 534 F.3d at 433 ("Even excluding the HHIs, the Government's other evidence independently suffices to establish a *prima facie* case . . . ."); *Penn State*, 838 F.3d at 346 (describing market concentration as a "useful indicator," but not as the only indicator, "of the likely competitive, or anticompetitive, effects of a merger").

    ii.  Regardless of market concentration, "[t]he elimination of competition between two firms that results from their merger may alone constitute a substantial lessening of competition." *Staples II*, 190 F. Supp. 3d at 131 (citing *Guidelines* § 6); *United States v. Aetna, Inc.*, 240 F. Supp. 3d 1, 43 (D.D.C. 2017) (same). Particularly in a "highly concentrated market," the loss of "significant head-to-head competition" is "certainly an important consideration when analyzing possible anti-competitive effects," *Fed. Trade Comm'n v. Staples, Inc.* ("*Staples I*"), 970 F. Supp. 1066, 1083 (D.D.C. 1997), because the loss of such a competitive constraint may allow the merged firm to raise prices, restrict output, or otherwise exercise market power. Accordingly, "[m]ergers that eliminate head-to-head competition between close competitors often result in a lessening of competition." *Staples II*, 190 F. Supp. 3d at 131 (citing *Guidelines* § 6); *accord Heinz*, 246 F.3d at 716–17 (holding that the Government's prima

facie case was "bolstered by the indisputable fact that the merger will eliminate competition between the two merging parties"). This type of anticompetitive effect, known as a "unilateral effect," is likely "if the acquiring firm will have the incentive to raise prices or reduce quality after the acquisition, independent of competitive responses from other firms." *H&R Block*, 833 F. Supp. 2d at 81.

iii.   A merger can substantially lessen competition by increasing the bargaining power of the merged firm.  In industries in which "buyers commonly negotiate with more than one seller, and may play sellers off against one another," the merger of two competing sellers could result in a lessening of competition because "buyers will be prevented from playing the sellers off against one another in negotiations." *Sysco*, 113 F. Supp. 3d at 62 (quoting *Guidelines* § 6.2); *see also Anthem*, 236 F. Supp. 3d at 220–21, *aff'd*, 855 F.3d 345 (D.C. Cir. 2017).  Applying the economics of bargaining to a merger assessment has been uncontroversial.  *See, e.g.*, *Penn State*, 838 F.3d at 346 (finding that "the increase in the Hospitals' bargaining leverage as a result of the merger will allow the post-merger combined Hershey/Pinnacle to profitably impose a SSNIP on payors"); *St. Alphonsus*, 778 F.3d at 786–87 (finding that the merged firm would use its increased bargaining power to raise prices for PCP services); *ProMedica Health Sys., Inc. v. Fed. Trade Comm'n*, 749 F.3d 559, 562, 570 (6th Cir. 2014) (finding that as a firm's dominance in a market increases, so too does its bargaining power, or leverage in demanding higher rates).

   1.   A merger can substantially lessen competition even in markets where one of the merging parties wins bids more frequently than the other.  *See Energy Sol'ns*, 265 F. Supp. 3d at 439 ("Anti-trust law does not distinguish between effective and ineffective competitors."); *see also El Paso Nat. Gas. Co.*, 376 U.S. at 661 ("Unsuccessful bidders are no less competitors than the successful ones.").

iv.   A merger can also substantially lessen competition by "diminish[ing] innovation." *Guidelines* § 1.  "Competition often spurs firms to innovate." *Id.* § 6.4.  "A merger can substantially lessen competition by diminishing innovation if it would 'encourage the merged firm to curtail its innovative efforts below the level that would prevail in the absence of the merger.'" *Anthem*, 236 F. Supp. 3d at 229–30, *aff'd*, 855 F.3d 345 (D.C. Cir. 2017) (quoting *Guidelines* §§ 1, 6.4).  Innovation in a market is particularly at risk if the merger eliminates a "firm that plays a disruptive role in the market to the benefit of customers," typically through "new technology or business model," or some other form of innovation.  *Guidelines* § 2.1.5. Accordingly, in assessing the competitive effects of a merger, courts

consider whether the relevant market would lose an "aggressive competitor" or innovator. *See, e.g.*, *Staples I*, 970 F. Supp. at 1083 (considering whether the merger "would result in the elimination of a particularly aggressive competitor in a highly concentrated market"); *H&R Block*, 833 F. Supp. 2d at 79 (noting TaxACT's "impressive history of innovation" and how its distinctive product offerings pushed the industry towards lower pricing and forced other competitors to innovate as well); *Anthem*, 855 F.3d at 361 (finding "Cigna is a leading innovator in collaborative patient care. That threat to innovation is anticompetitive in its own right.").

v. Moreover, a firm's ability to target particular customers for price increases is also relevant to unilateral effects analysis. "[W]hen the merging sellers are likely to know which buyers they are best and second best placed to serve, any anticompetitive unilateral effects are apt to be targeted at those buyers." *Guidelines* § 6.2. "When price discrimination is feasible, adverse competitive effects on targeted customers can arise, even if such effects will not arise for other customers. A price increase for targeted customers may be profitable even if a price increase for all customers would not be profitable because too many other customers would substitute away." *Guidelines* § 3; *see also Fed. Trade Comm'n v. Wilh. Wilhemsen Holding ASA*, 341 F. Supp. 3d 27, 46–47 (D.D.C. 2018); *Staples II*, 190 F. Supp. 3d at 117–18.

vi. In addition, the elimination of head-to-head competition is particularly likely to lead to unilateral effects if the products of the merging firms are close substitutes for a significant number of consumers. *See Fed. Trade Comm'n v. Libbey, Inc.*, 211 F. Supp. 2d 34, 47–48 (D.D.C. 2002); *Swedish Match*, 131 F. Supp. 2d at 169 ("[T]he weight of the evidence demonstrates that a unilateral price increase by Swedish Match is likely after the acquisition because it will eliminate one of Swedish Match's primary direct competitors.").

vii. Evidence of anticompetitive intent can help to establish the likely anticompetitive effect of a proposed transaction. "[E]vidence indicating the purpose of the merging parties, where available, is an aid in predicting the probable future conduct of the parties and thus the probable effects of the merger." *Brown Shoe*, 370 U.S. at 329 n.48.

viii. When considering the competitive effects of a proposed transaction, courts may disregard or discount evidence of a firm's post-transaction behavior "undertaken with the aim of persuading a court or the government regarding the legality of a merger." *Aetna*, 240 F. Supp. 3d at 80. *See also Hosp. Corp. of Am. v. Fed. Trade Comm'n*, 807 F.2d 1381, 1384 (7th Cir. 1986) (the government "was not required to take account of a post-

acquisition transaction that may have been made to improve [the defendant's] litigating position . . . .  Post-acquisition evidence that is subject to manipulation by the party seeking to use it is entitled to little or no weight.").

5.  Whether the Defendants can prove that any countervailing factors or affirmative defenses exist and are sufficient to counteract the alleged competitive harm in each of the markets is an issue remaining to be litigated.

   a.  "The more compelling the prima facie case, the more evidence the defendant must present to rebut it successfully."  *United States v. Baker Hughes Inc.*, 908 F.2d 981, 991 (D.C. Cir. 1990) (Thomas, J.); *Anthem*, 855 F.3d at 349–50.

   b.  Not only must Defendants show that "'the market-share statistics [give] an inaccurate account of the [merger's] probable effects on competition' in the relevant market," *Heinz*, 246 F.3d at 715 (alternations in original) (quoting *United States v. Citizens & S. Nat'l Bank*, 422 U.S. 86, 120 (1975)), but also Defendants must rebut the unilateral-effects evidence for each market by showing that the evidence does not accurately reflect the likely competitive effects of the merger. *ProMedica Health Sys.*, 749 F.3d at 571–72 ("That the [Government] did not merely rest upon the [market-concentration] presumption, but instead discussed a wide range of evidence that buttresses it, makes [the defendant's] task more difficult still. . . . [The defendant's] task, then, is to overcome not merely the presumption of anticompetitive effects, but also the [buttressing evidence].").

   c.  Defendants may attempt to establish that anticompetitive effects in the relevant markets are unlikely by showing that "new firms can easily enter or existing firms can easily expand into the relevant product market in response to supracompetitive pricing." *Energy Sol'ns*, 265 F. Supp. 3d at 443 (citing *Cardinal Health,* 12 F. Supp. 2d at 54–55 (D.D.C. 1998); *Anthem*, 236 F. Supp. 3d at 221–22), *aff'd*, 855 F.3d 345 (D.C. Cir. 2017).

      i.  Defendants bear the burden of proving that entry by new firms or expansion by existing firms will be "timely, likely and sufficient in its magnitude, character, and scope" to counteract the anticompetitive effects of the merger.  *Energy Sol'ns*, 265 F. Supp. 3d at 443 (quoting *H&R Block*, 833 F. Supp. 2d at 73).

      ii.  Entry or expansion is timely "only if it is rapid enough to deter or render insignificant the anticompetitive effects of the merger." *Energy Sol'ns*, 265 F. Supp. 3d at 443.  S*ee also Anthem*, 236 F. Supp. 3d at 221–22, *aff'd*, 855 F.3d 345 (D.C. Cir. 2017) (to be timely, "'entry must be rapid enough to make unprofitable overall the actions causing those effects and thus leading to entry, even though those actions would be profitable until entry takes effect' and 'rapid enough that customers are not significantly harmed by the merger'") (quoting *Guidelines* § 9.1)*; Staples II*, 190 F.

Supp. 3d at 133 ("The relevant time frame for consideration in this forward looking exercise is two to three years.").

iii. Entry or expansion is likely "only if it would be profitable and feasible, accounting for all the attendant costs and difficulties," and taking into consideration the history of entry into the relevant market. *Energy Sol'ns*, 265 F. Supp. 3d at 443–44; *see also Fed. Trade Comm'n v. CCC Holdings Inc.*, 605 F. Supp. 2d 26, 47–48 (D.D.C. 2009) ("The history of entry into the relevant market is a central factor in assessing the likelihood of entry in the future.") (citing *Cardinal Health*, 12 F. Supp. 2d at 56).

iv. Entry or expansion is sufficient only if it is "significant enough" to "counteract a merger's anticompetitive effects," that is, "'fill the competitive void that will result' if the merger proceeds." *Anthem*, 236 F. Supp. 3d at 222, *aff'd*, 855 F.3d 345 (D.C. Cir. 2017) (quoting *Sysco*, 113 F. Supp. 3d at 80). *See also Energy Sol'ns*, 265 F. Supp. 3d at 443 (for entry or expansion to be sufficient, the new firm(s) must be able to "affect pricing" and "scale to compete on the same playing field" as the merged firm).

v. Simply identifying other firms that participate to some degree in the market is insufficient to rebut the government's prima facie case. For example, in *United States v. H&R Block*, the defendants identified 18 other firms competing in the relevant market; the court, however, concluded that those firms were unlikely to expand sufficiently to be "on the same playing field" as the merged firm. 833 F. Supp. 2d at 73-77 (quoting *Chi. Bridge*, 534 F.3d at 430). In *United States v. Philadelphia National Bank*, the Supreme Court found the merger to be presumptively illegal despite the presence of 40 other banks in the relevant market. 374 U.S. at 331. Even if "new entrants and fringe firms have an intent to compete," that "does not necessarily mean that those firms are significant competitors capable of replacing lost competition." *In re Chi. Bridge & Iron Co.*, 138 F.T.C. 1024, 1071 (2005).

vi. The existence of other competitors in the relevant market does not preclude a finding of competitive harm. *See Aetna*, 240 F. Supp. 3d at 43 (stating that a merger can substantially lessen competition "even where the merging parties are not the only, or the two largest, competitors in the market"); *Fed. Trade Comm'n v. OSF Healthcare Sys.*, 852 F. Supp. 2d 1069, 1083 (N.D. Ill. 2012) ("[T]he continued existence of one competitor following the merger, even a strong competitor, does not necessarily reduce the probability that the proposed merger would substantially lessen competition in the future."); *Heinz*, 246 F.3d at 711 (preliminarily enjoining a merger between companies with market shares of 17.4% and 15.4% even though a third company had 65% of the market); *Anthem*, 236

11

F. Supp. 3d at 216, 209, *aff'd*, 855 F.3d 345 (D.C. Cir. 2017) (enjoining Anthem from acquiring Cigna even though United was arguably a closer competitor and the defendants together would have 50% market share); *H&R Block*, 833 F. Supp. 2d at 72 (enjoining a merger even though the largest remaining competitor held a 62.2% market share, more than double the combined share of the defendants).

    vii.  Anecdotal evidence of potential new entry or expansion "by itself, is not sufficient to show that [the new entry] is an effective constraint on anti-competitive pricing." *Energy Sol'ns*, 265 F. Supp. 3d at 442 (*citing Fed. Trade. Comm'n v. Univ. Health, Inc*., 938 F.2d 1206, 1223 (11th Cir. 1991) (holding that defendants' rebuttal must be grounded in facts and not speculation)).

    viii.  "How easily firms may enter or expand is determined by the barriers to entry." *Energy Sol'ns*, 265 F. Supp. 3d at 443 (citing *Cardinal Health,* 12 F. Supp. 2d at 54–55). Barriers to entry include, among other things, regulatory requirements, high capital costs, or technological obstacles. *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 307 (3d Cir. 2007). *See also Cardinal Health*, 12 F. Supp. 2d at 57 (economies of scale and strength of reputation can give the merging parties an advantage over new entrants, "serv[ing] as barriers to competitors as they attempt to grow significantly in size").

  d.  Defendants may attempt to establish that anticompetitive effects in the relevant market are unlikely by showing that the proposed transaction will result in efficiencies.

    i.  Courts that have entertained the efficiencies defense subject it to "demanding scrutiny." *See Penn State*, 838 F.3d at 349 (reversing a district judge who relied on the efficiencies defense). In cases involving high concentration levels, courts "must undertake a rigorous analysis of the kinds of efficiencies being urged by the parties in order to ensure that those 'efficiencies' represent more than mere speculation and promises about post-merger behavior." *CCC Holdings, Inc.*, 605 F. Supp. 2d at 72 (citing *Heinz*, 246 F.3d at 721).

    ii.  For efficiencies to be cognizable, they must be in the relevant market, be verifiable, be merger-specific, not arise from anticompetitive reductions in output or service, ultimately be passed on to consumers, and must be sufficient to offset the transaction's likely anticompetitive effects. *See Penn State*, 838 F.3d at 348–51; *Heinz*, 246 F.3d at 720–22; *Guidelines* § 10.

   e. Defendants may attempt to establish that anticompetitive effects in the relevant markets would be prevented by a proposed remedy, such as contractual commitments and representations to customers.

      i. Defendants bear the burden of proving both that any proposed remedy "will actually occur" and would "replac[e] the competitive intensity lost as a result of the merger." *Aetna*, 240 F. Supp. 3d at 60 (citing *Sysco*, 113 F. Supp. 3d at 72). *See also Staples II*, 190 F. Supp. 3d at 137 n.15 ("Defendants bear the burden of showing that any proposed remedy would negate any anticompetitive effects of the merger"); *Sysco*, 113 F. Supp. 3d at 72-78 (addressing divestiture as part of Defendants' rebuttal case); *CCC Holdings*, 605 F. Supp. 2d at 56-59 (discussing proposed "fix" in context of Defendants' rebuttal arguments); *United States v. Franklin Elec. Co.*, 130 F. Supp. 2d 1025, 1033 (W.D. Wis. 2000) ("[D]efendants have the burden of proving their contention that because of the proposed licensing and supply agreements with Environ the number of competitors will not change.").

      ii. Behavioral remedies, or commitments to alter a firm's behavior rather than its structure, are disfavored in Section 7 cases because they "risk excessive government entanglement in the market." *St. Alphonsus*, 778 F.3d at 793.

      iii. Contractual commitments and representations to customers may not be effective in preventing price increases. *See H&R Block*, 833 F. Supp. 2d at 82 (finding that defendants' pledge not to raise prices "cannot rebut a likelihood of anticompetitive effects" and that the merged firm "could accomplish what amounts to a price increase through other means," such as limiting the functionality of its offerings).

      iv. Contractual commitments and representations to customers may not allow customers to benefit fully from price competition and innovation competition that would otherwise occur between the merging parties. *See Cardinal Health*, 12 F. Supp .2d at 64-65 (rejecting defendants' promise not to raise prices, as "[i]n the absence of real competition, [the court] is concerned that the prices set today could in effect become the floor tomorrow.").

6. Whether the Court should issue injunctive relief precluding Defendants from consummating the proposed transaction, or from entering into or carrying out any other transaction by which control of the assets of businesses of Sabre and Farelogix would be combined, is an issue to be litigated.

   a. This Court has the authority "to prevent and restrain" violations of Section 7 of the Clayton Act. 15 U.S.C. § 25. Accordingly, Section 7 aims "to arrest incipient threats to competition." *United States v. Penn-Olin Chem. Co.*, 378 U.S. 158,

170–71 (1964).  It is "a prophylactic measure" meant to stop competitive harms before they can occur.  *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 485 (1977).

    b.  Once the government establishes that a merger violates Section 7, "all doubts as to the remedy are to be resolved in its favor."  *E. I. du Pont de Nemours*, 366 U.S. at 334.

    c.  The preferred remedy for a merger violating Section 7 is for the court to issue a "full stop injunction" preventing the parties from completing their unlawful merger.  *PPG Indus.*, 798 F.2d at 1506–07; *see also Phila. Nat'l Bank*, 374 U.S. at 363 (stating that if the government establishes a prima facie case and the defendants fail to clearly rebut that case, the merger "must be enjoined").

7.  Whether the Defendants should reimburse the United States for its costs of litigating this action is an issue to be litigated.

8.  Additional issues to be litigated include:  any evidentiary issues raised by the parties' pending motions, motions *in limine*, or objections to evidence.

14