# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | |
| *Plaintiff*, | |
| v. | Civil Action No. 1:19-cv-01548-LPS |
| SABRE CORP., SABRE GLBL INC., FARELOGIX INC., and SANDLER CAPITAL PARTNERS V, L.P., | |
| *Defendants*. | |

## <u>PLAINTIFF'S PRETRIAL BRIEF</u>

## REDACTED PUBLIC VERSION

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................ 1

II.   LEGAL FRAMEWORK FOR EVALUATING THE PROPOSED ACQUISITION ............ 5

III.  SABRE AND FARELOGIX ARE HORIZONTAL COMPETITORS IN TWO RELEVANT
      ANTITRUST MARKETS ....................................................................................... 7

      A.    Legal Framework for Defining Relevant Antitrust Markets ......................................... 7

      B.    The Proposed Relevant Markets Satisfy the Hypothetical Monopolist Test and Are
            Supported by *Brown Shoe* Factors ................................................................. 9

IV.   THE PROPOSED ACQUISITION IS LIKELY TO HARM COMPETITION IN BOTH
      RELEVANT ANTITRUST MARKETS ..................................................................... 11

      A.    The Proposed Acquisition Is Presumptively Anticompetitive in Both Relevant Markets
            Based on Market Concentration .................................................................... 11

      B.    The Proposed Acquisition Would Eliminate the Strongest Independent Competitor to
            the GDSs, Giving Sabre Greater Power in Negotiations to Insist that Airlines Pay
            Higher Prices ......................................................................................... 13

      C.    The Proposed Acquisition Would Stifle Innovation by Eliminating a Disruptive
            Competitor that Has Spurred Sabre to Catch Up ........................................ 15

V.    DEFENDANTS CANNOT REBUT THE UNITED STATES' PRIMA FACIE CASE ...... 16

      A.    Neither Entry or Expansion of Other Industry Participants, Nor Self-Supply, Would
            Replace the Competition Eliminated by the Proposed Acquisition ............................. 16

      B.    Defendants' Claimed Efficiencies Do Not Outweigh the Merger's Likely
            Anticompetitive Effects ............................................................................ 18

      C.    Defendants' Promises and Representations to Airlines Would Not Mitigate the
            Competitive Harm of the Proposed Acquisition ........................................ 19

VI.   CONCLUSION ................................................................................................ 20

# TABLE OF AUTHORITIES

**Cases**

*Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297 (3d Cir. 2007) .................................................. 17

*Brown Shoe v. United States*, 370 U.S. 294 (1962) ............................................................. 6, 7, 8

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477 (1977). ............................................ 6

*Chi. Bridge & Iron Co. v. Fed. Trade Comm'n*, 534 F.3d 410 (5th Cir. 2008)....................... 6, 13

*Fed. Trade Comm'n v. Cardinal Health*, 12 F. Supp. 2d 34 (D.D.C. 1998) .......................... 17, 20

*Fed. Trade Comm'n v. CCC Holdings, Inc.*, 605 F. Supp. 2d 26 (D.D.C. 2009).................... 17, 19

*Fed. Trade Comm'n v. Penn State Hershey Med. Ctr.*, 838 F.3d 327 (3d Cir. 2016). .......... passim

*Fed. Trade Comm'n v. PPG Indus., Inc.*, 798 F.2d 1500 (D.C. Cir. 1986)............................ 12, 19

*Fed. Trade Comm'n v. Staples, Inc.*, 970 F. Supp. 1066 (D.D.C. 1997) ............................... 11, 14

*Fed. Trade Comm'n v. Sysco Corp.*, 113 F. Supp. 3d 1 (D.D.C. 2015) .................................. 8, 14

*Gen. Foods Corp. v. Fed. Trade Comm'n*, 386 F.2d 936 (3d Cir. 1967) ..................................... 10

*Polypore Int'l., Inc. v. Fed. Trade Comm'n*, 686 F.3d 1208 (11th Cir. 2012) ............................ 12

*Saint Alphonsus Med. Ctr.-Nampa Inc. v. Saint Luke's Health Sys., Ltd.*, 778 F.3d 775 (9th Cir. 2015) ..................................................................................................................... 20

*United States v. Aetna Inc.*, 240 F. Supp. 3d 1 (D.D.C. 2017). ................................... 7, 14, 17, 20

*United States v. Anthem*, 236 F. Supp. 3d 171 (D.D.C. 2017)......................................... 14, 15, 17

*United States v. Anthem, Inc.*, 855 F.3d 345 (D.C. Cir. 2017) ...................................... 6, 7, 15, 19

*United States v. Bazaarvoice*, 2014 U.S. Dist. LEXIS 3284 (N.D. Cal. Jan. 8, 2014)................. 10

*United States v. Conn. Nat'l Bank*, 418 U.S. 656 (1974) ............................................................. 8

*United States v. Energy Solutions*, 265 F. Supp. 3d 415 (D. Del. 2017) .............................. passim

*United States v. General Dynamics Corp.*, 415 U.S. 486 (1974) ................................................ 12

*United States v. H&R Block, Inc.*, 833 F. Supp. 2d 36 (D.D.C. 2011) ................................. passim

*United States v. Phila. Nat'l Bank*, 374 U.S. 321 (1963) ........................................................... 11

**Statutes**

15 U.S.C. § 18...................................................................................................................... 5

**Other Authorities**

Dept. of Justice and Fed. Trade Comm'n Horizontal Merger Guidelines ("Guidelines") (2010)....
.................................................................................................................................. 6, 10

*In re Chi. Bridge & Iron Co.*, 138 F.T.C. 1024, 1071 (2005)....................................................... 17

## I.      INTRODUCTION

This case is about a dominant company stamping out competition by buying up a disruptive rival.  There are only three major global distribution systems ("GDSs") in the United States, and Sabre is by far the largest.  Farelogix is an innovative challenger to the GDSs, and represents a significant and growing threat to Sabre's dominance.  Sabre and Farelogix compete to provide booking services, which enable airlines to sell tickets through travel agencies. Farelogix has injected much-needed price competition and innovation into an industry plagued for decades by high prices and outdated technology.  Its self-proclaimed goal is to "disrupt" this stagnant industry.  The proposed acquisition would extinguish Farelogix as an independent and disruptive force, substantially lessening competition in booking services and harming airlines and American travelers in violation of Section 7 of the Clayton Act.

Nearly half of all airline tickets sold in the United States are purchased through travel agencies, including online travel agencies like Expedia and Priceline, as well as traditional travel agencies, which often cater to business travelers.  To ensure that American travelers can purchase tickets through the travel agency of their choice, airlines require booking services, which are IT services that allow airlines to communicate their fares and seat availability to travel agencies and to process the resulting orders.

For years, Sabre and the other major GDSs were the only viable providers of booking services to airlines.  Sabre and the other GDSs stood as gatekeepers between airlines and the travelers that relied on travel agencies to purchase tickets; airlines had little choice but to purchase booking services from each of the major GDSs if they wanted to sell tickets to all potential travelers booking through a travel agent.  Even today, every full-service U.S. airline, including United, American, and Delta, continues to use Sabre's booking services in order to sell

tickets through travel agents in Sabre's network.  This entrenched position allows Sabre and the other GDSs to charge airlines a high fee on every ticket booked through a travel agency.  With limited competitive threats, the GDSs also have been slow to improve their 1960s-era technology to meet the needs of airlines and travelers.

In the mid-2000s, Sabre and the other GDSs finally began to face a real competitive challenge.  Farelogix emerged with innovative solutions that allowed airlines to connect directly to travel agencies—without using a GDS as an intermediary—and provided more capabilities than the booking services offered by the GDSs.  Farelogix made its objective clear:  it sponsored an annual conference called "Disrupt," and it routinely positioned itself as a disruptor.  Even today, Farelogix explains on its website:  "The global airline industry is experiencing core disruption," and "Farelogix and its technology solutions are at the center of this disruption."[1]  As one airline document summarizes, Farelogix "has been the GDSs' leading competitor/agitator for years."[2]  Because of the presence of this alternative to the GDSs, airlines have been able to negotiate significantly lower prices from Sabre.[3]  Sabre's own economic expert, Professor Murphy, has himself acknowledged that Sabre had to make concessions to ████████████ because of ████████ ability to use "████████████████████████████████████████ ████████████████████████████"[4]  As Farelogix's CEO observed, ████████████████ ████████████████████████████████████████████████████████████████████ ████████████████"[5]

---

[1] *See* Farelogix, Who We Are, https://www.farelogix.com/ (last visited Jan. 9, 2020).
[2] PX-452 at -603.
[3] *See, e.g.,* ████████████████ Lit. Dep. 189:6-10 ("████████████████ ████████████████████████").
[4] PX-426 at -211-12.
[5] PX-87 at -731.

Sabre recognized the threat posed by Farelogix and used contractual restrictions and other tactics to prevent or deter airlines from bypassing the GDSs by using Farelogix's services.  The airlines have consistently complained that these tactics have made it more difficult to avail themselves of cheaper, more advanced booking services alternatives.  In January 2019, one of Sabre's own senior vice presidents acknowledged that airlines view Sabre's contract restrictions as "abusive but there's nothing they can do because they need the distribution and they are tied with a contract."[6]  Farelogix repeatedly complained about the GDSs' anticompetitive tactics. Farelogix's CEO explained to European antitrust authorities as recently as January 2018 that the GDSs are an "███████" that "██████████████████████████████ ██████████████████████."[7]  In a blog post, Farelogix's CEO explained that "The net effect . . . is harm to consumers.  They find themselves having fewer airline product options and paying higher airline ticket prices than they otherwise would, given an open and competitive ticket distribution market."[8]

Notwithstanding Sabre's resistance, Farelogix has become the most successful booking services alternative to the GDSs, and has spurred major innovations.  As a 2015 Farelogix business plan explained to investors, "██████████████████████████████████ ██████████████████████████████████"[9]  Through its Open Connect product, Farelogix offers lower-cost booking services with capabilities that the GDSs' services have historically lacked.  Most significantly, Farelogix's Open Connect product utilizes a next-generation technology standard called New Distribution Capability ("NDC").

---

[6] PX-367 at -277.
[7] PX-96 at -108.
[8] PX-92 at -621.
[9] PX-102 at -964.

Farelogix pioneered the development of the NDC standard, but Sabre and the other GDSs opposed it for years. Unlike the GDSs' outdated technology, NDC provides airlines the flexibility to offer additional services or tailored pricing to travelers when purchasing a ticket through a travel agency, such as providing travelers the ability to request a wheelchair at the gate or to use specially negotiated corporate travel benefits.

As NDC technology gains adoption among major airlines, Farelogix is poised to grow significantly in the next few years. As Farelogix's CEO explained, NDC "████████████████ ████████████████████████████████████████████████████."[10] Farelogix "has been leading the charge in the real-world application of NDC since its inception,"[11] and many of the world's largest airlines have chosen Farelogix as their NDC booking services provider. One internal airline document describes Farelogix as "█████ ████████████████████."[12] Sabre's $360 million purchase price for Farelogix is based on Sabre's conservative projections that an independent Farelogix would continue to grow as a booking services provider over the next few years.[13]

The Defendants' business documents confirm that Sabre views the growth of Farelogix and the technology it has developed as a threat to the traditional GDS business model, and reinforce that the acquisition would eliminate this important competition. One internal Farelogix analysis concluded that Sabre's acquisition of Farelogix "████████████████████████ █████████████████████████████████████████████████."[14]

---

[10] PX-98 at -067; Davidson (Farelogix) Lit. Dep. 122:12-22, 123:5-124:2.
[11] Farelogix Marketing Team, *Real-World Application of NDC*, (Oct. 15, 2018), https://blog.farelogix.com/real-world-application-of-ndc (last visited Jan. 9, 2020).
[12] PX-452 at -603.
[13] Boyle (Sabre) CID Dep. 318:19-319:1.
[14] PX-80 at -971.

In a presentation to Sabre's CEO, a Sabre executive emphasized that buying Farelogix would "Mitigate risk from potential GDS bypass."[15]  In a text message to a colleague on the day the acquisition was announced, a Sabre sales executive predicted that one major U.S. airline would "hate" the acquisition.  The colleague replied, "Why, because it entrenches us more?"  The sales executive responded that the airline's "FLX [Farelogix] bill is going up big time."[16]

Defendants now attempt to walk away from this record, dismissing all their executives' admissions from ordinary course of business documents.  Despite these statements to the contrary, Defendants appear poised to argue that, because Farelogix does not provide *all* of the same services offered by a GDS, Sabre and Farelogix "███████."[17]  These self-serving attempts to explain away their own ordinary course of business documents lack credibility, and are inconsistent with both economic reality and the testimony of the Defendants' own customers.

By eliminating the most successful challenger to the GDSs' dominance in airline booking services, the proposed acquisition would raise booking costs and reduce innovation, harming airlines and American travelers.  The Court should therefore block the proposed acquisition.

## II.   LEGAL FRAMEWORK FOR EVALUATING THE PROPOSED ACQUISITION

Section 7 of the Clayton Act prohibits an acquisition "where in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition."  15 U.S.C. § 18.  The term "may be" in the statute requires only "an appreciable danger" of harm to competition.  *United States v. H&R Block, Inc.*, 833 F. Supp. 2d 36, 49 (D.D.C. 2011) (quotation omitted).  Therefore, the United States need not establish "with certainty" that anticompetitive effects would occur.  *United States v. Energy*

---

[15] PX-220 at -474.
[16] PX-140 at -637-39.
[17] Murphy Report at ¶ 9.

*Solutions*, 265 F. Supp. 3d 415, 436 (D. Del. 2017).  To prevail on a Section 7 claim, the United States must demonstrate only a "reasonable probability" that the merger would produce anticompetitive effects in a single relevant market.  *Id.* at 435-36; *see also United States v. Anthem, Inc.*, 855 F.3d 345, 368 (D.C. Cir. 2017) (harm in single market "a sufficient basis for enjoining the merger").  Section 7 reaches "incipient" harms, *Brown Shoe v. United States*, 370 U.S. 294, 318 n. 32 (1962), and as the Supreme Court "ha[s] observed many times, [is] a prophylactic measure, intended primarily to arrest apprehended consequences of intercorporate relationships before those relationships could work their evil." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc*., 429 U.S. 477, 485 (1977).

Courts evaluate Section 7 claims under a burden-shifting framework.  To establish a prima facie case, the United States must show that the merger is likely to produce anticompetitive effects in a relevant market.  *Fed. Trade Comm'n v. Penn State Hershey Med. Ctr*., 838 F.3d 327, 338 (3d Cir. 2016).  Anticompetitive effects may include increased price, reduced output, diminished innovation, or reduced variety and quality.  *Anthem*, 855 F.3d at 366-67; *see also* Dept. of Justice and Fed. Trade Comm'n Horizontal Merger Guidelines ("Guidelines") §1 (2010).[18]  The United States may establish its prima facie case of likely anticompetitive effects simply by showing that the merger would significantly increase concentration in a highly concentrated market.  *Anthem*, 855 F.3d at 347.  Alternatively, or in addition, the United States may produce other evidence demonstrating that the merger is likely to lead to anticompetitive effects.  *See Chi. Bridge & Iron Co. v. Fed. Trade Comm'n*, 534 F.3d 410, 433 (5th Cir. 2008).  In this case, the United States will establish a prima facie case using

---

[18] The Guidelines are "often used as persuasive authority" by courts assessing the likely competitive impact of a merger.  *Penn State*, 838 F.3d at 338 n.2 (internal citations omitted); *see also Energy Solutions*, 265 F. Supp. 3d at 446 (citing the Guidelines in its analysis).

concentration statistics, and also will independently establish a prima facie case with other direct evidence that the merger is likely to raise prices and reduce innovation.

The merging firms' ordinary course of business documents are key to an analysis of a merger's likely effects on competition. *See H&R Block*, 833 F. Supp. 2d at 81-82. "Ordinary course of business documents reveal the contours of competition from the perspective of the parties, who . . . may be presumed to have accurate perceptions of economic realities." *United States v. Aetna Inc.*, 240 F. Supp. 3d 1, 21 (D.D.C. 2017). Courts discount "a firm's behavior undertaken with the aim of persuading a court or the government regarding the legality of a merger," as such behavior "may not be predictive of how that firm will behave once the court or the government are no longer engaged." *Id.* at 80.

Once the United States establishes its prima facie case, the burden shifts to the defendants to rebut it. *Penn State*, 838 F.3d at 347. To satisfy this burden, the defendants must "sufficiently discredit" the evidence underlying the prima facie case, or prove that the prima facie case "inaccurately predicts" the merger's likely effect on competition. *Anthem*, 855 F.3d at 349. If the defendants meet this burden, "the burden of production shifts back to the Government and merges with the ultimate burden of persuasion, which is incumbent on the Government at all times." *Penn State*, 838 F.3d at 337 (internal citations omitted).

## III.    SABRE AND FARELOGIX ARE HORIZONTAL COMPETITORS IN TWO RELEVANT ANTITRUST MARKETS

### A.    Legal Framework for Defining Relevant Antitrust Markets

A relevant antitrust market has two components:  a product market ("line of commerce") and a geographic market. *Brown Shoe*, 370 U.S. at 324; *accord Penn State*, 838 F.3d at 338. A product market is comprised of a product and its substitutes that have "reasonable interchangeability of use." *Brown Shoe*, 370 U.S. at 325. Products need not be identical to be

included in the same market; they need only be reasonable substitutes. *Energy Solutions*, 265 F. Supp. 3d at 436; *see also United States v. Conn. Nat'l Bank*, 418 U.S. 656, 669-70 (1974) (requiring merely a "rough approximation" of the market). As the Supreme Court has observed, "Congress prescribed a pragmatic, factual approach to the definition of the relevant market and not a formal, legalistic one." *Brown Shoe*, 370 U.S. at 336; *accord Penn State*, 838 F.3d at 335.

Courts look to "practical indicia" in assessing the reasonable interchangeability of products, including "the product's peculiar characteristics and uses." *Brown Shoe*, 370 U.S. at 325. "These 'practical indicia' of market boundaries may be viewed as evidentiary proxies for proof of substitutability." *H&R Block*, 833 F. Supp. 2d at 51. "Complete interindustry competitive overlap need not be shown" in order to establish interchangeability. *Energy Solutions*, 265 F. Supp. 3d at 439 (internal citations omitted).

Courts often use an analytical method called the hypothetical monopolist test to determine whether a given set of products, and a given geography, constitute a relevant market. *See Penn State*, 838 F.3d at 344. The test asks whether "a hypothetical profit-maximizing firm, not subject to price regulation, that was the only present and future seller of those products . . . likely would impose at least a small but significant and non-transitory increase in price ("SSNIP") on at least one product in the market . . . sold by one of the merging firms," with the SSNIP "typically assumed to be five percent or more." *H&R Block*, 833 F. Supp. 2d at 52 (quoting Guidelines §§ 4.1.1-4.1.2). If so, those products constitute a relevant market. "If enough consumers are able to substitute away from the hypothetical monopolist's product to another product and thereby make a price increase unprofitable, then the relevant market cannot include only the monopolist's product and must also include the substitute goods." *Fed. Trade Comm'n v. Sysco Corp.*, 113 F. Supp. 3d 1, 33 (D.D.C. 2015).

### B.   The Proposed Relevant Markets Satisfy the Hypothetical Monopolist Test and Are Supported by *Brown Shoe* Factors

Airlines sell tickets through two distinct kinds of travel agencies:  online travel agencies ("OTAs") and traditional travel agencies ("TTAs").  OTAs include companies like Expedia and Priceline.  TTAs include brick-and-mortar travel agencies and large global travel management companies ("TMCs") that manage the travel needs for corporations and governments.  OTAs tend to attract cost-conscious leisure travelers, while many large TTAs (especially TMCs) cater to corporate travelers.  Unlike OTAs, TMCs offer additional services to their corporate customers, such as reporting and enforcement of travel policies.

Both the hypothetical monopolist test and *Brown Shoe* practical indicia support booking services for tickets sold through OTAs ("OTA booking services") and booking services for tickets sold through TTAs ("TTA booking services") as distinct relevant product markets, and the United States as a relevant geographic market.  There are two distinct product markets for booking services because OTAs and TTAs attract different types of travelers and offer different sets of services.  As a result, airlines cannot easily substitute distribution through an OTA for distribution through a TTA.  Economic analysis performed by the United States' expert, Professor Nevo, will show that a hypothetical monopolist of OTA booking services or TTA booking services in the United States likely would profitably raise prices by five percent or more. Professor Nevo's economic analysis is buttressed by the *Brown Shoe* practical indicia evident in the Defendants' ordinary course of business documents, Defendants' prior statements to courts, and the testimony of fact witnesses.

In the face of a decade of statements and actions to the contrary, Defendants now try to deny that Farelogix and Sabre compete in the same markets because Farelogix offers a less comprehensive range of services than a GDS does.  The purpose of defining a relevant market,

however, is to illuminate the competitive effects of an acquisition.  *See* Guidelines § 4; *cf. also*

*United States v. Bazaarvoice*, 2014 U.S. Dist. LEXIS 3284 at 223 (N.D. Cal. Jan. 8, 2014).

Farelogix may not sell every part of the bundle that GDSs sell, but the evidence shows

significant competition between Sabre and Farelogix for the booking services part of that bundle.

This is not unusual in horizontal merger cases.  As another court in this District recently held, the

fact that one of the merging firms offers more comprehensive services than the other does not

alter the fact that the merging firms' services overlap and are reasonably interchangeable.[19]

*Energy Solutions*, 265 F. Supp. 3d at 439.

Selling tickets through an airline's own sales channels—such as an airline's own website

or call center—is not an adequate substitute for airlines distributing their tickets through travel

agents.  Airlines reach travelers through travel agencies that they cannot reach cost effectively

through their own websites or call centers.[20]  Many business travelers are only permitted to

purchase airline tickets through a TMC due to their employer's policies and business needs.

Many leisure travelers have a strong preference for booking tickets through an OTA rather than

an individual airline website because it enables them to quickly and easily compare prices and

itineraries across airlines.  As a result, Professor Nevo's analysis will show that if a hypothetical

---

[19] Defendants appear to contend, incorrectly, the acquisition is principally a vertical merger. They are wrong, as this case does not involve a merger between "buyer and seller." *See Gen. Foods Corp. v. Fed. Trade Comm'n*, 386 F.2d 936, 944 (3d Cir. 1967).  Instead, the proposed acquisition is a horizontal merger "between companies performing similar functions in the production or sale of comparable goods or services."  *Brown Shoe*, 370 U.S. at 334.  Even if the merger did present some vertical issues, that would not preclude it from also presenting horizontal concerns.  *See id.* at 323-46 (discussing separately "the vertical aspects of the merger" and "the horizontal aspects of the merger").  The United States is challenging the horizontal aspects of Sabre's proposed acquisition of Farelogix.  As Professor Nevo will explain, even if this acquisition were to be viewed (incorrectly) as vertical in nature, the same evidence leads to the same conclusion:  competitive harm would occur in both of the proposed relevant markets.
[20] *See, e.g.*, Larson (Hawaiian Airlines) Dep. 83:13-84:3 (OTAs help Hawaiian Airlines reach customers unaware of the airline or its destinations but who are familiar with Expedia).

– 10 –

monopolist of either OTA booking services or TTA booking services in the United States attempted to raise prices by at least five percent, airlines would not successfully shift enough ticket sales to other sales channels to thwart the price increase.

Importantly, the market definition step of the analysis need not be conducted in a vacuum: "Evidence of competitive effects can inform market definition, just as market definition can be informative regarding competitive effects."  Guidelines § 4.  Here, the evidence will show that the competitive presence of Farelogix has driven down the GDSs' prices for booking services and that Defendants' executives predicted that a merger could reduce pricing pressure, buttressing the conclusion that a hypothetical monopolist of booking services would profitably increase prices.  *Cf. Fed. Trade Comm'n v. Staples, Inc.*, 970 F. Supp. 1066, 1082 (D.D.C. 1997).

## IV.   THE PROPOSED ACQUISITION IS LIKELY TO HARM COMPETITION IN BOTH RELEVANT ANTITRUST MARKETS

### A.   The Proposed Acquisition Is Presumptively Anticompetitive in Both Relevant Markets Based on Market Concentration

One way for the United States to establish a presumption of likely competitive harm is to show that the merger would create a firm with an undue market share in a highly concentrated market.  *See Penn State*, 838 F.3d at 347.  As the Supreme Court has held:

> [A] merger which produces a firm controlling an undue percentage share of the relevant market, and results in a significant increase in the concentration of firms in that market, is so inherently likely to lessen competition substantially that it must be enjoined in the absence of evidence clearly showing that the merger is not likely to have such anticompetitive effects.

*United States v. Phila. Nat'l Bank*, 374 U.S. 321, 363 (1963).  While there is no bright-line rule for what constitutes an "undue percentage share" of a market, courts have held a post-merger share of 30 percent to be more than sufficient to trigger a presumption of competitive harm.

at 364; *see also H&R Block*, 833 F. Supp. 2d at 72.

Courts, agencies, and economists commonly use the Herfindahl-Hirschman Index ("HHI") to assess whether an acquisition would result in harmful market concentration. *Penn State*, 838 F.3d at 346-47.  The HHI is calculated by summing the squares of each competitor's market share.  *Id.*  The Third Circuit has adopted the Guidelines standard, holding that a market with an HHI above 2500 is "highly concentrated," and that a merger that increases the HHI by more than 200 points in a highly concentrated market is presumed to be anticompetitive.  *Id.*

Professor Nevo's analysis will show that the merger is presumptively anticompetitive in the OTA booking services market based on current share data.  Both the OTA and TTA booking services markets are highly concentrated today.  As the Supreme Court has emphasized, "if concentration is already great, the importance of preventing even slight increases in concentration . . . is correspondingly great."  *United States v. General Dynamics Corp.*, 415 U.S. 486, 497 (1974).

Further, because a firm's "probable future ability to compete" is what matters for Section 7 purposes, *General Dynamics*, 415 U.S. at 503, if current market-concentration figures do not accurately reflect the relative strength of firms in a dynamic industry, market share projections may be used.  *See Polypore Int'l., Inc. v. Fed. Trade Comm'n*, 686 F.3d 1208, 1216 n.9 (11th Cir. 2012) (relying on the buyer's projection of seller's revenues to determine the competitive effects of a transaction); *Fed. Trade Comm'n v. PPG Indus., Inc.*, 798 F.2d 1500, 1505 (D.C. Cir. 1986) (relying on a proxy for market shares in the relevant market given "the difficulty of calculating an HHI" for a high technology market that was "growing rapidly").

Here, Defendants' internal documents, confirmed by the testimony of their executives, show that Farelogix is growing significantly in both booking services markets.  In deciding to

pay $360 million for Farelogix, Sabre relied on projections showing that Farelogix would continue to grow over the next several years.[21]  Using these same projections—which are more conservative than Farelogix's own internal projections—Professor Nevo's analysis concludes that the post-merger HHI and increase in HHI significantly exceed the thresholds for the proposed merger to be presumptively harmful in both relevant markets.

These conservative, forward-looking market share statistics understate the competitive significance of Farelogix.  Farelogix provides a unique competitive constraint on Sabre that is not provided by the two other GDSs.  The market share statistics do not account for the leverage that airlines gain from having Farelogix's Open Connect available as an alternative when negotiating contract terms with Sabre.  In particular, the airlines value an alternative to Sabre that does not have similar incentives to preserve the GDS model, and does not insist on the same onerous contractual restrictions as the GDSs.  In order to obtain lower prices from Sabre, many airlines have accepted contract terms that limit the airlines' ability shift bookings to Farelogix, thus limiting Farelogix's growth.[22]  Market shares also do not capture the competitive pressure to innovate that Farelogix puts on Sabre.

> **B.  The Proposed Acquisition Would Eliminate the Strongest Independent Competitor to the GDSs, Giving Sabre Greater Power in Negotiations to Insist that Airlines Pay Higher Prices**

Market concentration is a "useful indicator," but not the only indicator, of competitive harm.  *See Penn State*, 838 F.3d at 346; *Chi. Bridge*, 534 F.3d at 433 ("Even excluding the HHIs, the Government's other evidence independently suffices to establish a *prima facie* case . . . .").  Alternatively, the United States may establish that, once it has eliminated the competition from

---

[21] PX-22 at -842, -845, -848, -873, -877; *see also* PX-15 at -155.

[22] Davidson (Farelogix) Lit. Dep. 69:8-22 (discussing PX-90 at -374); *id.* at 70:1-71:4; *id.* at 82:24-83:13 (discussing PX-92 at -621-22); Webb (Sabre) Lit. Dep. 65:2-15.

Farelogix, Sabre would have the incentive to raise prices, reduce quality, or reduce innovation. *See Aetna*, 240 F. Supp. 3d at 43 (quoting Guidelines § 6) ("The elimination of competition between two firms that results from their merger may alone constitute a substantial lessening of competition."). Lessening of competition is especially likely where, as here, the merger "would result in the elimination of a particularly aggressive competitor in a highly concentrated market." *See Staples*, 970 F. Supp. at 1083.

The proposed acquisition would eliminate an important alternative available to airlines when negotiating with Sabre and the other GDSs, giving Sabre more leverage to demand high fees. One feature of this industry is that airlines individually negotiate contracts with booking services providers. In markets like these, "buyers commonly negotiate with more than one seller, and may play sellers off against one another." *See Sysco*, 113 F. Supp. 3d at 62. If two competing sellers merge, "buyers will be prevented from playing the sellers off against one another in negotiations." *Id.*; *see also United States v. Anthem*, 236 F. Supp. 3d 171, at 220-21 (D.D.C. 2017). This itself amounts to a significant lessening of competition. *See Energy Solutions*, 265 F. Supp. 3d at 439.

The Defendants' own words show that the availability of Farelogix as an independent alternative to the GDSs drives down prices for booking services. In a report on behalf of Sabre in a separate antitrust case, Sabre's economic expert Professor Murphy admitted this effect,

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████"[23] In defending against another antitrust lawsuit in 2016, Sabre represented that airlines told Sabre during negotiations that they could "go to GNEs

---

[23] PX-426 at -211-12.

[GDS New Entrants]" like Farelogix to obtain lower booking fees.[24]  Sabre's 2018 SEC 10-K

warned investors that the availability of "direct connect initiatives" creates "pricing pressure" on

the GDSs.[25]  A 2014 analysis prepared by Farelogix's CFO concluded that by buying Farelogix,

a GDS "████████████████████████████████████" and ███████

███████████████████████████████████████████."[26]

      Evidence from the airlines is fully consistent.  For instance, a ██████████ document

explains, "█████████████████████████████████████████████

███████████████████████████████████████████████

██████████████."[27]  At trial, executives from major airlines will testify that their ability

to use Farelogix's Open Connect product drives Sabre to offer significantly lower prices or other

more favorable terms for its booking services.

     **C.**    **The Proposed Acquisition Would Stifle Innovation by Eliminating a Disruptive Competitor that Has Spurred Sabre to Catch Up**

      Finally, the proposed acquisition would slow the pace of innovation in the relevant

booking services markets.  *See Anthem*, 855 F.3d at 361 (finding that a proposed merger's "threat

to innovation is anticompetitive in its own right.").  "A merger can substantially lessen

competition by diminishing innovation if it would 'encourage the merged firm to curtail its

innovative efforts below the level that would prevail in the absence of the merger.'" *Anthem*,

236 F. Supp. 3d at 229-30 (quoting Guidelines §§ 1, 6.4).

      Farelogix wants to grow, so it has a strong incentive to innovate in order to offer an

attractive alternative to the dominant GDS booking services—as demonstrated by its leadership

---

[24] PX-431 at -775.
[25] PX-251 at -162.
[26] PX-181 at -240.
[27] PX-299 at -770.

role in the development and continued improvement of NDC.  Sabre's incentive, as the largest

GDS in the United States, is the opposite:  to preserve the status quo.[28]  Thus, it is hardly

surprising that Sabre has historically underinvested in innovation.[29]  Sabre began investing in

NDC only after a critical mass of airlines began using Farelogix and the technology it has

pioneered.[30]  Even then, Sabre characterized its investment in NDC as primarily "████."[31]

If Sabre acquires Farelogix, Sabre's incentives would again be to slow innovation that

threatens its traditional GDS business model.  By reducing competitive pressure on Sabre, the

proposed acquisition would give Sabre the power to slow its investment in new technology and

act in accordance with its underlying incentive to preserve the status quo.  This is an independent

reason to enjoin the proposed acquisition.

## V.   DEFENDANTS CANNOT REBUT THE UNITED STATES' PRIMA FACIE CASE

### A.   Neither Entry or Expansion of Other Industry Participants, Nor Self-Supply, Would Replace the Competition Eliminated by the Proposed Acquisition

Defendants bear the burden of proving any claim that entry by new firms or expansion by

existing firms will be "timely, likely and sufficient in its magnitude, character, and scope" to

counteract the anticompetitive effects of the merger.  *Energy Solutions*, 265 F. Supp. 3d at 443.

Entry or expansion is timely only if it is rapid enough to deter or render insignificant the

anticompetitive effects of the merger.  *Id.*  Entry or expansion is likely only if it would be

profitable and feasible, accounting for all the attendant costs and difficulties.  *Id.*  Entry or

---

[28] PX-96 at -105; at -107 ("█████████████"); PX-197 at -914.

[29] *See, e.g.*, PX-96 at -107 ("██████████").

[30] *See, e.g.*, PX-197 at -903, -913.

[31] *See* PX-196 at -658, -673-74.

expansion is sufficient only if it is "significant enough" to "counteract a merger's anticompetitive effects," that is, "fill the competitive void that will result if the merger proceeds." *Anthem*, 236 F. Supp. 3d at 222 (quotation omitted).

Under this standard, simply identifying other firms—even large ones—that participate in the market is insufficient to rebut the government's prima facie case. *Aetna*, 240 F. Supp. 3d at 43 (a merger can violate Section 7 "even where the merging parties are not the only, or the two largest, competitors in the market"). In *United States v. H&R Block*, for example, the defendants identified 18 other firms competing in the relevant market. 833 F. Supp. 2d at 73-74. The court concluded that those firms were unlikely to expand sufficiently to be "on the same playing field" as the merged firm. *Id.* at 73-77. "[T]he mere fact that new entrants and fringe firms have an intent to compete does not necessarily mean that those firms are significant competitors capable of replacing lost competition." *In re Chi. Bridge & Iron Co*., 138 F.T.C. 1024, 1071 (2005); *see also Fed. Trade Comm'n v. CCC Holdings, Inc.*, 605 F. Supp. 2d 26, 48-49 (D.D.C. 2009).

Defendants are particularly unlikely to meet their burden in markets with high barriers to entry, like the markets at issue in this case. *See Energy Solutions*, 265 F. Supp. at 443. Barriers to entry include high capital costs and technological obstacles, *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 307 (3d Cir. 2007), or the economies of scale and strength of reputation that established incumbents have over newer entrants, *see Fed. Trade Comm'n v. Cardinal Health*, 12 F. Supp. 2d 34, 57 (D.D.C. 1998). Here, the evidence will demonstrate that the barriers to entry in both booking services markets are high.[32]

In part because of these high barriers, the entry or expansion of other firms would not replace the competition eliminated by the merger. At trial, major airlines will testify they do not

---

[32] *See* PX-242 at -131.

view alternative technology providers as reasonable substitutes for Farelogix.  Defendants will

not show that there is a single technology company, or combination of technology companies,

that is likely to fully replace Farelogix as a competitor in the relevant markets.

It is not sufficient for Defendants to show that some airlines have built their own

technology to connect directly with travel agencies.  As outlined above, a merger may violate

Section 7 even when other alternatives remain after the merger.  Moreover, self-supply is not a

realistic option for many airlines.  While self-supply may serve some of the needs of some

airlines who have less complex operations or are dominant in their home markets, self-supply

will not prevent the overall anticompetitive impact of the proposed transaction.  Airlines with an

existing reliance on Farelogix would be especially vulnerable to price increases and reductions in

quality until they could build their own alternatives, which would take a minimum of three to

five years.[33]  For these customers, in-house solutions are inadequate—and in some cases,

unachievable—alternatives.

### B.  Defendants' Claimed Efficiencies Do Not Outweigh the Merger's Likely Anticompetitive Effects

Efficiencies cannot be used to offset the harm of an anticompetitive merger unless they

are merger specific, verifiable, passed through to consumers in the relevant market, and do not

arise from reductions in output or service.[34]  *Penn State*, 838 F.3d at 348-51.  Courts "must

---

[33] *See* ▮▮▮▮▮▮▮▮▮▮▮) CID Dep. 20:22-22:17 (explaining that it would take approximately ▮▮▮▮▮ to build an internal solution, and that a "▮▮▮▮▮▮▮▮);
▮▮▮▮▮▮ CID Dep. 16:11-21 (stating that it would take would take at least ▮▮▮▮▮ for ▮▮▮▮▮ to build its own NDC solution).

[34] The Third Circuit has expressed skepticism whether efficiencies constitute a valid defense to an otherwise anticompetitive merger. *Penn State*, 838 F.3d at 347-48.  Other circuits have held that efficiencies can constitute a valid defense, but applying these strict standards, no court has held that an otherwise anticompetitive merger is rendered legal due to claimed efficiencies.

undertake a rigorous analysis of the kinds of efficiencies being urged by the parties in order to ensure that those 'efficiencies' represent more than mere speculation and promises about post-merger behavior." *CCC Holdings*, 605 F. Supp. 2d at 72; *see also Anthem*, 855 F.3d at 359 (noting efficiencies will not be credited "if they are vague, speculative, or otherwise cannot be verified by reasonable means").

Defendants' purported efficiencies fail this rigorous standard. Sabre's executives have testified that the acquisition would not generate significant cost savings. In his report, Defendants' economic expert concedes that any cost savings would be largely offset by the costs of integrating the two firms.[35] Additionally, neither of Defendants' primary efficiencies claims are merger-specific. Sabre does not need the acquisition to develop NDC technology, as it has the resources and personnel to develop and implement NDC technology today.[36] For its part, Farelogix has taken a number of steps on its own to improve its stability and scalability, which its executives admit have had some success.[37] Indeed, before accepting Sabre's acquisition offer, Farelogix turned down another offer that Farelogix's CEO conceded would have enabled Farelogix to accomplish both of these objectives.[38]

### C. Defendants' Promises and Representations to Airlines Would Not Mitigate the Competitive Harm of the Proposed Acquisition

Where Plaintiffs have established that a merger violates Section 7, the preferred remedy is for the court to issue a "full stop injunction" preventing the parties from completing their unlawful merger. *PPG Indus.*, 798 F.2d at 1506-07. Remedies designed to regulate the merged

---

[35] Murphy Report, p. 52, fn. 94.

[36] Menke (Sabre) Lit. Dep. 41:22-42:13; PX-251 at -206.

[37] *See, e.g.*, Carter (Farelogix) Lit. Dep. 137:14-140:6 (discussing Farelogix actions to " ███████████████ ," ███████████ ); PX-37 at -938; Davidson (Farelogix) Lit. Dep. 185:23-186:8 ( ███████████████████████████ ).

[38] Davidson (Farelogix) Lit Dep. 207:23-208:19; Davidson (Farelogix) CID Dep. 646:13-20.

firm's behavior are disfavored in Section 7 cases because they "risk excessive government entanglement in the market." *Saint Alphonsus Med. Ctr.-Nampa Inc. v. Saint Luke's Health Sys., Ltd.*, 778 F.3d 775, 793 (9th Cir. 2015).  Defendants bear the burden of proving both that any proposed remedy "will actually occur" and that it "would negate any anticompetitive effects of the merger."  *Aetna*, 240 F. Supp. 3d at 60; *Staples*, 190 F. Supp. 3d at 137 n.15.

Defendants' offers to extend airlines' contracts, maintain certain Farelogix products, and not raise prices cannot prevent the merger's competitive harm.  *See H&R Block*, 833 F. Supp. 2d at 82 (finding that defendants' pledge not to raise prices "cannot rebut a likelihood of anticompetitive effects" because the merged firm "could accomplish what amounts to a price increase through other means," such as limiting the functionality of its offerings); *Cardinal Health*, 12 F. Supp. 2d at 64-65 (rejecting defendants' promise not to raise prices, as "[i]n the absence of real competition, [the court] is concerned that the prices set today could in effect become the floor tomorrow.").  Moreover, these promises would do nothing to prevent the loss of innovation that would result from the merger.

## VI.    CONCLUSION

Sabre's proposed acquisition of Farelogix likely would substantially lessen competition in the OTA booking services market and the TTA booking services market in the United States. The Court therefore should enjoin Sabre from acquiring Farelogix.

Respectfully submitted,


/s/ Laura D. Hatcher
LAURA D. HATCHER (DE Bar No. 5098)
Assistant United States Attorney
1313 N. Market Street
P.O. Box 2046
Wilmington, Delaware 19899-2046
Tel.: (302) 573-6277
Fax: (302) 573-6220
E-mail: laura.hatcher@usdoj.gov



/s/ Julie S. Elmer
JULIE S. ELMER
VITTORIO E. COTTAFAVI
RACHEL A. FLIPSE

Attorneys for the United States
U.S.  Department of Justice
Antitrust Division
450 5th Street, NW, Suite 8000
Washington, DC 20530
Tel.: (202) 598-8332
Fax: (202) 616-2441
E-mail: julie.elmer@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 10, 2020, a true and correct copy of the foregoing was served on all counsel of record via email.

<u>/s/ Julie S. Elmer</u>
JULIE S. ELMER

U.S.  Department of Justice, Antitrust Division
450 Fifth Street, NW, Suite 8000
Washington, DC 20530
Phone: (202) 598-8332
Email: julie.elmer@usdoj.gov

*Attorney for Plaintiff United States of America*