# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| UNITED STATES OF AMERICA, | : |
| | : |
| *Plaintiff*, | : |
| | : |
| v. | : Civil Action No.: 1:19-cv-01548-LPS |
| | : |
| SABRE CORPORATION, | : |
| SABRE GLBL INC., | : |
| FARELOGIX, INC., and | : |
| SANDLER CAPITAL PARTNERS V, L.P., | : |
| | : |
| *Defendants*. | : |
| | : |

## <u>DEFENDANTS' PRETRIAL BRIEF</u>

## REDACTED PUBLIC VERSION

Joseph O. Larkin (ID No. 4883)
Veronica B. Bartholomew (ID No. 6224)
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
920 North King Street
P.O. Box 636
Wilmington, Delaware 19899
Tel.: (302) 651-3000
Email: joseph.larkin@skadden.com
      veronica.bartholomew@skadden.com

*Attorneys for Defendants Sabre Corporation
and Sabre GLBL Inc.*

DATED: January 15, 2020

Daniel A. Mason (ID No. 5206)
PAUL, WEISS, RIFKIND, WHARTON
  & GARRISON LLP
500 Delaware Avenue
Suite 200
P.O. Box 32
Wilmington, Delaware 19899-0032
Tel: (302) 655-4410
Email: dmason@paulweiss.com

*Attorneys for Defendants Farelogix Inc.
and Sandler Capital Partners V, L.P.*

## TABLE OF CONTENTS

Page

Table of Cases and Authorities .................................................................................. iii

Preliminary Statement ................................................................................................. 1

Statement of Facts ....................................................................................................... 3

I.    The Products and Acquisition at Issue in This Litigation ..................................... 3

    A.    Sabre's GDS Is a Two-Sided Transaction Platform That Provides Services to Travel Suppliers and Travel Agencies ................................ 3

    B.    FLX OC Is an Application Programming Interface Sold to Airlines ...................... 5

    C.    Sabre's Acquisition of Farelogix Will Improve Sabre's Ability to Provide End-to-End NDC-Enabled Retailing, Distribution, and Fulfillment Solutions ................................................................ 5

II.    Air Travel Distribution ........................................................................................ 6

    A.    The Direct Channel ................................................................................ 7

    B.    The Indirect Channel............................................................................. 7

        1.    Sales Through GDSs Comprise the Vast Majority of Indirect Channel Sales, and Competition for Transactions Is Intense ..................... 7

        2.    Direct Connects Have Minimal Volume Because They Are Inefficient and Costly......................................................... 8

III.    Airline IT Services.............................................................................................. 9

    A.    Core and Non-Core PSS Modules ....................................................... 9

    B.    Content Distribution APIs.................................................................... 10

IV.    NDC ................................................................................................................... 10

    A.    NDC Is an Open Source, XML-Based Transmission Standard That Enables Richer and More Dynamic Offers From Airlines .................... 10

    B.    NDC-Based Transactions Require Substantial Investment And Are Expected to Grow Significantly Only Through the GDSs.................... 11

    C.    FLX OC Faces Substantial and Increasing Competition From Other IT Companies and Airlines......................................................... 12

Legal Argument ......................................................................................................13

I.     DOJ Cannot Prove Its Proffered Relevant Markets ..........................................14

        A.     The Purported "Booking Services" Markets Erroneously Include Sabre's GDS and FLX OC in the Same Product Market ....................................................15

        B.     DOJ Fails To Account for the Travel Agency Side of the GDS Platform.............16

        C.     The Purported "Booking Services" Markets Erroneously Omit the Most Significant Constraint on Sabre's GDS Fees, Airline Websites ...........................17

II.    DOJ Cannot Show a Likelihood That Competition Will Be Substantially Lessened in a Relevant Market ..............................................................................................17

        A.     DOJ's Failure to Define a Proper Relevant Market Is Dispositive........................18

        B.     DOJ Cannot Show Competitive Harm By Addressing Only Fees Airlines Pay.....................................................................................................................19

        C.     Even if Sabre's GDS and FLX OC Competed in the Same Market, the Increase in Concentration Would Be Insufficient ....................................................19

        D.     Even if Sabre and FLX OC Competed in the Same Market, FLX OC Is Not a Unique Supplier of Content Distribution APIs ...........................................20

Conclusion ....................................................................................................................20

Glossary of Key Terms ................................................................................................21

# TABLE OF CASES AND AUTHORITIES

**CASES**                                                                      **PAGE(S)**

*AD/SAT, Div. of Skylight, Inc. v. Associated Press,*
    181 F.3d 216 (2d Cir. 1999) ..................................................................15

*Brown Shoe Co. v. United States,*
    370 U.S. 294 (1962) ..............................................................................14

*Crane Co. v. Harsco Corp.,*
    509 F. Supp. 115 (D. Del. 1981) ..........................................................13

*F.T.C. v. Arch Coal, Inc.,*
    329 F. Supp. 2d 109 (D.D.C. 2004) ........................................13, 14, 18

*F.T.C. v. Foster,*
    No. 07-cv-352, 2007 WL 1793441 (D.N.M. May 29, 2007) ...............18

*F.T.C. v. Lab. Corp. of Am.,*
    No. 10-cv-1873, 2011 WL 3100372 (C.D. Cal. Mar. 11, 2011) ..........14

*F.T.C. v. Lundbeck, Inc.,*
    650 F.3d 1236 (8th Cir. 2011) ..............................................................15

*F.T.C. v. Tenet Health Care Corp.,*
    186 F.3d 1045 (8th Cir. 1999) ..............................................................14

*Ohio v. American Express Co.,*
    138 S. Ct. 2274 (2018) .....................................................................16, 17

*United States v. AT & T Inc.,*
    310 F. Supp. 3d 161 (D.D.C. 2018) ................................................14, 18

*United States v. AT&T, Inc.,*
    916 F.3d 1029 (D.C. Cir. 2019) .........................................................2, 18

*United States v. Baker Hughes Inc.,*
    908 F.2d 981 (D.C. Cir. 1990) ..............................................................18

*United States v. Grinnell Corp.,*
    384 U.S. 563 (1966) ..............................................................................14

*United States v. Sungard Data Sys., Inc.,*
    172 F. Supp. 2d 172 (D.D.C. 2001) ................................................14, 18

*US Airways, Inc. v. Sabre Holdings Corp.,*
    938 F.3d 43 (2d Cir. 2019) ...................................................1, 2, 16, 19

**OTHER AUTHORITIES**

15 U.S.C. § 18 (2012) ................................................................................................................13

Defendants Sabre Corporation, Sabre GLBL Inc. (collectively, "Sabre"), Farelogix, Inc. ("Farelogix"), and Sandler Capital Partners V, L.P. respectfully submit this pretrial brief.

## PRELIMINARY STATEMENT

Plaintiff ("DOJ") claims that Sabre is acquiring Farelogix "to eliminate [its] disruptive competitor." (Compl. ¶ 10.) Nothing could be further from the truth. Indeed, DOJ's challenge to this acquisition is based on a misleading portrayal of competition that Sabre's global distribution system ("GDS") faces, the nature of Farelogix's Open Connect product ("FLX OC"), the future of air travel distribution, and Sabre's rationale for acquiring Farelogix. DOJ's claim is also foreclosed by *US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43 (2d Cir. 2019).

Sabre is one of three worldwide GDSs, which support separate extensive platforms connecting travel agencies with travel suppliers (e.g., airlines). Sabre's GDS connects more than 425,000 travel agents to over 400 airlines, 175,000 hotel properties, and 40 car rental brands, and provides a broad set of services to travel agencies and travel suppliers. Sabre's GDS generated over $2.8 billion in revenue in 2018. It competes with other GDSs (Amadeus and Travelport) and travel suppliers to distribute travel products, such as airline tickets and hotel reservations.

In contrast, Farelogix's FLX OC product—the only Farelogix product at issue in this case—consists of software, and is sold only to airlines. FLX OC uses a publicly available, XML-based technology standard called "New Distribution Capability" ("NDC") to build an application programming interface ("API") that connects to an airline's internal systems. An airline can use FLX OC to enable other technology systems or third parties—such as its public-facing website, GDSs, and travel agents—to access its internal systems only to search for and book tickets solely on that particular airline. Among other differences, unlike the GDSs, FLX OC does not aggregate content for multiple airlines or provide commercially practical interlining. And Farelogix has no commercial relationships with travel agencies, so each FLX

1

OC customer must develop its own network of travel agents or other third parties with which to connect using FLX OC. There are only ███ U.S.-based customers of FLX OC, from which Farelogix generated ███████ in revenue in 2018. FLX OC competes with other NDC API providers to sell its software to airlines, which can also develop NDC APIs themselves.

FLX OC does not compete with Sabre's GDS. To avoid this simple fact, which defeats its claim, DOJ posits "booking services" product markets that no industry participant recognizes. DOJ gerrymanders these proposed markets by artificially cherry-picking one small aspect of the many functionalities that Sabre's GDS provides to airlines and agencies. That is, DOJ contends that Sabre and Farelogix compete to provide to airlines "booking services," which allow "airlines to deliver their offers to travel agencies and to process resulting orders." (Compl. ¶ 1.) However, there is no evidence of either party actually selling "booking services." Moreover, DOJ's product markets defy economic reality and precedent because they include just one of many functions that Sabre's GDS supplies to customers on only one side of the GDS platform. *See US Airways*, 938 F.3d at 58 ("[T]he Sabre GDS is a transaction platform, and the relevant market for such a platform must as a matter of law include both sides.").

DOJ seeks to place these different products in the same "relevant market" because if it can transform this *vertical* transaction—i.e., a transaction where the merging parties sell products at different stages in the distribution chain—into a *horizontal* deal between competitors, DOJ can attempt to rely on market concentration figures to establish a presumption of competitive harm. *See United States v. AT&T, Inc.*, 916 F.3d 1029, 1032 (D.C. Cir. 2019). But in vertical mergers, "unlike horizontal mergers, the government cannot use a short cut to establish a presumption of anticompetitive effect through statistics about the change in market concentration, because vertical mergers produce no immediate change in the relevant market share." *Id.* In any event,

to show an increase in market concentration in its fictitious "booking services" markets sufficient to establish a presumption of harm, DOJ ignores actual market shares, misconstrues projections of future sales, and further ignores the most significant constraint on GDS fees—i.e., airlines' ability to withhold fares from the GDS and provide those fares only on their own websites.

DOJ's claim also fails because it relies on a backwards-looking view of the industry. The evidence will show that going forward, the vast majority of transactions that use FLX OC will go through GDSs, further showing that FLX OC complements Sabre's GDS. And although FLX OC might have been unique years ago, there are now many comparable NDC API providers.

Sabre's acquisition of Farelogix is procompetitive. Sabre is dedicated to advancing its own, and the industry's, NDC capabilities. Indeed, Sabre is acquiring Farelogix, in part, to develop its ability to integrate transactions that use FLX OC—or other NDC APIs—into its GDS, thereby making Sabre *more* competitive with its GDS rivals. As evidence of Sabre's procompetitive intent, Sabre's CEO, Sean Menke, has publicly committed to continue to support FLX OC and extend any FLX OC contract for at least three years past its current expiration date.

In sum, the evidence will show that the DOJ's claim fails for multiple independent reasons: FLX OC and Sabre's GDS are not competitors; DOJ's purported booking services markets erroneously disaggregate all of the services Sabre's GDS provides to concoct a "booking services" product and fail to account for the agency side of the GDS platform or airline websites; and DOJ cannot show competitive harm resulting from Sabre's acquisition of Farelogix.

## STATEMENT OF FACTS

I. **The Products and Acquisition at Issue in This Litigation**

A. **Sabre's GDS Is a Two-Sided Transaction Platform That Provides Services to Travel Suppliers and Travel Agencies**

Today, three companies (Sabre, Amadeus, and Travelport) operate worldwide GDSs. A

3

GDS connects very large numbers of travel suppliers (e.g., airlines, hotels, trains, and car rentals) with very large numbers of travel agencies. GDSs are complex undertakings that require immense technological capacity and commercial agreements with customers on each side of the platform. For example, Sabre's GDS processes more than 12 billion shopping requests annually.

Specific to air travel, Sabre's GDS offers numerous services to travel agencies: It facilitates efficient comparison shopping by aggregating scheduling, pricing, and availability data from hundreds of airlines in a consistent manner and in sub-second response times. Sabre's GDS also enables interlining, which allows travel agencies to book a single ticket for an itinerary that includes travel on multiple airlines. In addition, Sabre's GDS automates compliance with corporate travel policies, and provides travel agencies with the ability to transmit an order to airlines and receive the resulting ticketing information. And Sabre's GDS provides numerous services to travel agencies after a ticket is booked, including: (1) integration with mid- and back-office systems (which travel agencies use to, among other things, automate quality control of tickets and invoice customers); (2) assisting with duty of care (which requires agencies to know where travelers are—and to assist them—in the event of a travel interruption or emergency); and (3) global, 24-hour support services.

Sabre's GDS also provides valuable services to airlines, including various distribution services and instant access to its network of over 425,000 travel agencies. And by facilitating shopping and booking by its travel agency customers, Sabre's GDS encourages those travel agents to book flights on airlines that provide Sabre with access to their content.

Sabre typically charges airlines a fee per booking (a "GDS fee") and pays travel agencies an incentive per booking. In 2018, Sabre's average GDS fee for U.S. point of sale bookings was ███ and the average incentive per booking paid by Sabre in North America was ███. (Expert

Report of K. Murphy ("Murphy Rpt.") 29 n.37.)

## B. FLX OC Is an Application Programming Interface Sold to Airlines

FLX OC is software that includes an API that airlines can use to send offers and receive orders using NDC through a one-to-one connection with another party or technology platform, such as a GDS, the airline's own website, or a travel agent.[1] Unlike a GDS, Farelogix contracts only with airlines and has no commercial agreements with travel agents for FLX OC. Rather, Farelogix's airline clients must direct Farelogix to expose the NDC API to any specific third parties with which the individual airlines have contractual agreements.

Farelogix typically charges a fee per booking and a flat annual fee. The average transaction fee for FLX OC is about ████████████ (Rebuttal Report of K. Murphy ("Murphy Rebuttal") ¶ 52), and FLX OC revenues in 2018 were ████████ for tickets sold by U.S. airlines. (Murphy Rpt. Fig. 2.) ████ airlines had tickets booked via FLX OC in 2018, only ████ of which—████████████████████████████—are located in the United States.

## C. Sabre's Acquisition of Farelogix Will Improve Sabre's Ability to Provide End-to-End NDC-Enabled Retailing, Distribution, and Fulfillment Solutions

On November 14, 2018, Sabre announced that it was acquiring Farelogix. Sabre is pursuing this acquisition to fulfill Sean Menke's vision to transform Sabre into a true IT partner of airlines by advancing Sabre's retailing, distribution, and fulfillment capabilities so that airlines can sell what they want, how they want, including by using NDC—and also so that travel agencies can access NDC-enabled content through Sabre's GDS. NDC enables airlines to transmit offers that bundle fares with other products (e.g., upgraded seats and meals) and that are more dynamic than offers that use other standards. As nearly all industry participants

---

[1] An API is a communication protocol between two computer systems that defines how data should be submitted to the API and how a response will be formatted.

acknowledge, for the volume of NDC-enabled transactions to grow significantly, it is imperative for the GDSs to be able to process NDC-enabled content. (*See, e.g.*, DX 52.) This acquisition will move the travel industry closer to that goal, by bringing Farelogix's NDC expertise to Sabre as Sabre continues to re-configure its GDS so it can process NDC-enabled transactions on a broad scale. Moreover, with Sabre's resources, Farelogix will have the ability it previously lacked to scale globally and evolve its technology.

As a sign of Sabre's commitment to continue supporting its airline customers' retailing and distribution strategies, on August 11, 2019, Sean Menke sent a letter to Sabre and Farelogix customers in which he committed to: (1) make FLX OC available at the same prices available today or lower; (2) extend any existing Farelogix and Sabre GDS contracts on the same terms, including pricing, for three years past their expiration date; and (3) provide at least the same level of support for and investment in Farelogix's capabilities. (DX 225.)

## II.    Air Travel Distribution

Airlines sell tickets to consumers through two channels. The direct sales channel ("direct channel") refers to tickets sold directly to consumers, such as through airline websites. The indirect sales channel ("indirect channel") refers to tickets sold through an intermediary, such as a travel agency. Travel agencies include traditional travel agencies ("TTAs"), such as travel management companies ("TMCs"), and online travel agencies ("OTAs"), such as Expedia.

Airline ticket sales are also frequently characterized based on whether the passenger is traveling for business or leisure. Business travelers tend to travel frequently and on short notice, have relatively complicated itineraries, and may be subject to employer-specific travel policies. For these reasons, business travelers often rely on TMCs to purchase tickets on their behalf. Leisure travelers tend to purchase tickets less frequently, have less complicated itineraries, are more price conscious, and have more flexible travel schedules. Thus, leisure travelers typically

6

purchase tickets through an airline's website or an OTA.

## A. The Direct Channel

As airline websites have become more accessible to travelers, ticket sales through the direct channel have increased significantly: In 2005, the direct channel accounted for 47.9% of airline tickets sold in the United States by passenger volume. Today, the direct channel accounts for 59.4% of such tickets. (Murphy Rpt. Fig. 7.)

Generally, airlines prefer that travelers search for fares on the airline's website because—unlike when a traveler uses an aggregated search tool—an airline's website displays only that airline's fares. (*See, e.g.,* ▓▓▓▓▓▓▓▓▓▓▓ Tr. 22:20-23:12.) Searching for airfare on the airline's website can thus diminish price comparison and the incentive to compete on price. When tickets are booked on airlines' own websites, the airlines avoid fees and incentives they would have to pay to third party distributors, such as GDSs and travel agencies. (*Id.* at 23:1-8.)

Airlines can and do encourage travelers to search for and book tickets through the direct channel rather than a travel agency. For example, some airlines make lower price fares available only on their websites. (▓▓▓▓▓▓▓▓▓▓ Tr. 84:19-85:2.) In addition, airlines advertise their websites on search engines, as well as metasearch engines such as Kayak and Google Flights, which have become an increasingly significant option for airlines to steer bookings to their websites. (▓▓▓▓ 17:4-11, 38:19-39:15.) If a traveler selects an airline's fare on a metasearch engine, the airline can require the metasearch engine to send the traveler to the airline's website rather than an OTA to book the ticket. (*Id.* at 17:18-19:6, 41:22-42:6.)

## B. The Indirect Channel

### 1. Sales Through GDSs Comprise the Vast Majority of Indirect Channel Sales, and Competition for Transactions Is Intense

In 2018, in the indirect channel, 95% of airline tickets by passenger volume purchased in

the United States (283 million passengers) were purchased through a GDS. (Murphy Rpt. ¶ 35.)

The GDS fees Sabre charges to airlines and incentives Sabre pays to agencies are aimed to maximize the number of transactions that go through Sabre's GDS. (*Id.* ¶ 46.) Sabre's negotiations with airlines are multi-faceted and complex, and an airline's GDS fee will vary based on numerous factors, including how much of an airline's content it is willing to provide to Sabre's GDS—e.g., whether an airline will withhold lower cost fares from Sabre's GDS and provide those fares only through its website. (*See* █████████ Tr. 87:14-89:7.) Because a key value of Sabre's GDS to travel agencies is its ability to provide all (or nearly all) airfares— otherwise travel agents must expend resources █████████████████████████████ █████████ Tr. 133:12-134:9)—Sabre generally charges lower GDS fees to an airline if it provides the Sabre GDS with all of the airline's publicly available fares. (*See* ██████ Tr. 93:4-12.) Thus, the growth of airline websites and the number of transactions that airlines could shift to those websites significantly constrains Sabre's GDS fees. (Murphy Rpt. ¶¶ 48-51.)

Sabre competes with other GDSs to retain and add travel agencies to its GDS platform and to have agencies book airfare through its GDS based on the amount of content available, the ease of using the platform, the services the GDS provides, and incentives. (██████ Tr. 138:2-139:3.) Competition among GDSs for travel agents is intense: Sabre's average incentive per booking ████████████████ in real terms from 2001 to 2018. (Murphy Rpt. ¶ 50, Fig. 11.)

### 2. Direct Connects Have Minimal Volume Because They Are Inefficient and Costly

Some airlines also choose to make their tickets available through a direct, one-to-one connection with travel agencies (a "direct connect"). However, due to the limitations of these direct connections, only 5% of airline tickets by passenger volume purchased in the United States were booked through a direct connection in 2018. (Murphy Rpt. ¶ 35.) Direct connects

are significantly less efficient and more costly—███████████████████████████

████████████████████ Tr. 143:18-144:17)—for travel agencies than transactions using

the GDSs. (█████████ Tr. 72:21-24; ████████████████ Tr. 55:9-16.)  Unlike GDSs,

direct connects require an airline to build its own travel agent network.  They also require the

travel agency to come to a commercial agreement with each airline with which it has a direct

connect, build and maintain a technical connection to each such airline, and then re-work its

processes so that it can provide the post-ticketing services that are automated by the GDSs.

(███████ Tr. 143:18-144:17.)  Thus, although airlines have been able to establish direct connects

for over a decade, direct connect volumes are minimal and not expected to grow significantly.

## III.  Airline IT Services

### A.    Core and Non-Core PSS Modules

A passenger service system ("PSS") consists of critical IT systems used by airlines,

which are separated into "core" and "non-core" modules.  An airline's core PSS ordinarily

includes three interrelated systems:

> an airline reservation system, which controls the sale of seats, scheduling,
> passenger name records, and the issuance of tickets;
> an airline inventory system, which provides information on available seats; and
> a departure control system, which is used to check-in passengers at the airport.

Airlines typically use third parties to provide and maintain their core PSS modules.  Sabre and

Amadeus are the two largest suppliers of core PSS modules to airlines.  Some airlines, such as

Delta, supply their own core PSS functionality.  Farelogix does not provide a core PSS.

Non-core PSS modules interoperate with the core PSS to help airlines create and manage

their offers.  Non-core PSS modules have become more important to airlines as the share of

airline revenue driven by ancillary products—e.g., upgraded seats and pre-paid bags and meals—

has expanded.  Non-core PSS modules can either be dependent on, and only work with, the core

PSS ("PSS dependent") or they can be interoperable with any core PSS ("PSS agnostic").

Sabre provides non-core PSS modules that are PSS dependent and can, therefore, only be used with the core Sabre PSS. Farelogix, on the other hand, provides PSS agnostic non-core PSS modules. One of these products, FLX Merchandise ("FLX M"), is a merchandising and rules engine that allows airlines to create customized product and service offers, including bundles of ancillary products. FLX M is considered the best merchandizing engine in the industry and has helped drive ██████████████████ in additional revenue to airlines that use the product. (██████Tr. 36:23-37:5.) FLX M can be used in the direct channel (*id.* at 23:16-23; ██████Tr. 43:3-10) and also in the indirect channel if the airline has an NDC API.

**B.    Content Distribution APIs**

A content distribution API enables airlines to communicate offers and orders between an airline's PSS and other airline systems, such as airline websites, or third parties (e.g., GDSs and travel agents). Content distribution APIs are part of the product offering of the Airline Solutions (not GDS) side of Sabre's business. Farelogix is one of several companies and airlines that supply NDC APIs. Sabre does not have a competitive NDC API offering.

**IV.    NDC**

**A.    NDC Is an Open Source, XML-Based Transmission Standard That Enables Richer and More Dynamic Offers From Airlines**

NDC is an XML-based transmission standard launched by an association of airlines—the International Air Transit Association ("IATA")—in 2013. NDC is not patent protected. Instead, the NDC schemas are open source, and are available to any third party company to implement and use. IATA updates the standard twice per year.

For the vast majority of airline tickets issued in the indirect channel today, airlines communicate with third parties in a language called EDIFACT. Although EDIFACT can

10

communicate fare information for large volumes of transactions quickly and reliably, it cannot

communicate a sufficient variety of ancillary products or the type of rich content—such as

pictures and videos—or dynamic offers that NDC enables. (Expert Report of Norm Rose ("Rose

Rpt.") ¶ 30.) This richer and more dynamic content can be used to increase airline revenue

because it allows airlines to present more ancillary products in a more attractive way, including

more personalized offers that bundle fare price with other products. (*Id.* at ¶ 32.)

> **B.** **NDC-Based Transactions Require Substantial Investment
> And Are Expected to Grow Significantly Only Through the GDSs**

Unlike EDIFACT-based transactions, NDC-based transactions require airlines to create a

new fare or bundled product offer for each shopping request. NDC-based transactions require

the airline to: (1) develop a commercial strategy as to what content to distribute using the NDC

standard; (2) develop or purchase non-core PSS modules that can generate NDC-based offers;

(3) develop or purchase an NDC API that can communicate NDC-based offers to third parties;

and (4) upgrade its PSS system to accommodate the increased load of generating individualized

offers and responding to shopping requests. (*See* Rose Rpt. ¶¶ 105-112.)

NDC-based transactions impose significant costs on travel agencies. Travel agencies that

wish to book NDC-based tickets have two choices. They can build NDC direct connects to, and

come to commercial agreements with, NDC-capable airlines. However, NDC-based tickets

booked through direct connects often entail more added expense than other direct connects due

to the complexity of adding NDC content to an agency's workflow outside a GDS. (████ Tr.

143:18-144:17.) Alternatively, travel agencies can receive NDC content through a GDS or third-

party aggregator. But bookings through non-GDS aggregators incur the same added expenses as

NDC direct connects, and the GDSs' NDC capabilities are limited. (*Id.* at 144:18-145:6.)

Due to the added costs and complexity associated with NDC, NDC-based bookings in the

11

indirect channel are expected to increase significantly only after the GDSs develop the ability to integrate NDC content. (*See, e.g.*, DX 52.) However, integrating NDC content into the GDSs is an immense task, which requires the GDSs to re-wire their incredibly complex systems to normalize and display NDC content with other content. (██████████ Tr. 140:23-143:17.) Notwithstanding the expense and complexity of integrating NDC content into Sabre's GDS, Sabre is committed to developing its NDC capabilities to better serve its airline and agency customers. Indeed, so far, Sabre has devoted over ████████ to developing its NDC capabilities, which already makes NDC the second largest program endeavored by Sabre. (*Id.* at 151:18-152:9.)

### C. FLX OC Faces Substantial and Increasing Competition From Other IT Companies and Airlines

Although Farelogix was among the first IT companies to develop an NDC API, its competitive position among NDC API providers has diminished in recent years. Over the last four years, Farelogix has ████████ of the FLX OC opportunities on which it has bid—not ████████████████████████████████████████(Murphy Rpt. ¶¶ 87-90, App'x 4)—
████████████████████████████████████████████████
contracts for FLX OC because ████████████████████ Moreover,
████████████████████████████████████████████

Farelogix's competitive standing as a provider of NDC APIs has diminished for multiple reasons. *First*, the fact that NDC is an open standard has enabled many other IT companies and multiple large airlines (e.g., ████████) to develop their own NDC APIs. These IT providers include large, established companies like Amadeus (which now provides NDC APIs to over ████ customers) and several other companies with many years of experience in the NDC space. (████████████ Tr. 16:21-17:6.) Indeed, as of today, 21 IT companies have achieved

IATA's highest level of certification for offer and order management, and other IT companies have capabilities that are superior to FLX OC's. (*See* DX 165; DX 282.)

*Second,*



*Third*, other technology providers have built solutions that diminish the significance of having an NDC API. For example, ATPCO has developed a product called NDC Exchange, which can translate an airline's non-NDC API into the most recent version of NDC for third parties to consume. (███████████) Tr. 30:14, 32:4-33:16.)

*Fourth,* Farelogix continues to face significant challenges ███████████████.

## LEGAL ARGUMENT

Section 7 of the Clayton Act prohibits acquisitions "where in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition." 15 U.S.C. § 18. The Section 7 inquiry is necessarily "forward-looking," *Crane Co. v. Harsco Corp.*, 509 F. Supp. 115, 125 (D. Del. 1981), meaning the court must assess the impact "to the market and its probable future." *F.T.C. v. Arch Coal, Inc.*, 329 F. Supp. 2d 109, 116-17 (D.D.C. 2004). The "mere possibility" of harm to competition

---

[2] Indeed, ████████████████████████

is not enough; rather, DOJ must prove "'that the challenged transaction is likely to lessen competition substantially.'" *United States v. AT & T Inc.*, 310 F. Supp. 3d 161, 189 (D.D.C. 2018), *aff'd*, 916 F.3d 1029 (D.C. Cir. 2019) (citation omitted).

To prevail on a Section 7 claim, DOJ must (1) define a proper relevant market within which to assess competitive effects[3]; and (2) prove the transaction likely will substantially reduce competition in that relevant market. *Brown Shoe Co. v. United States*, 370 U.S. 294, 324 (1962). Defining the relevant market and proving competitive effects require a rigorous, fact-intensive inquiry grounded in commercial realities. *See, e.g., F.T.C. v. Tenet Health Care Corp.*, 186 F.3d 1045, 1052 (8th Cir. 1999). Here, the evidence will show that DOJ cannot prevail on either element, and its Section 7 claim therefore fails. *See Arch Coal*, 329 F. Supp. 2d at 116.

## I.    DOJ Cannot Prove Its Proffered Relevant Markets

A relevant antitrust market consists of both a product and geographic market. A relevant product market "defines the product boundaries within which competition meaningfully exists." *F.T.C. v. Lab. Corp. of Am.*, No. 10-cv-1873, 2011 WL 3100372, at *17-18 (C.D. Cal. Mar. 11, 2011). Products are in the same product market when they are reasonably interchangeable with one another, meaning that "consumers can substitute the use of one for the other," and when demand between them is "cross-elastic," meaning that "a slight decrease in the price" of one product "causes a considerable number of customers" to switch to that product. *Arch Coal*, 329 F. Supp. 2d at 119-20. In determining whether products are within the same market, courts assess several "practical indicia" of substitutability, such as industry or public recognition, the products' peculiar characteristics and uses, their distinct consumers or prices, and consumers'

---

[3] Courts apply the same principles of market definition to claims brought under Clayton Act § 7 as those brought under Sherman Act §§ 1 and 2. *See United States v. Grinnell Corp.*, 384 U.S. 563, 573 (1966) ("We see no reason to differentiate between 'line' of commerce in the context of the Clayton Act and 'part' of commerce for purposes of the Sherman Act.").

14

sensitivity to price changes. *United States v. Sungard Data Sys., Inc.*, 172 F. Supp. 2d 172, 182

(D.D.C. 2001) (citing *Brown Shoe*, 370 U.S. at 325). A product market must include all

reasonably interchangeable substitutes. *See AD/SAT, Div. of Skylight, Inc. v. Associated Press*,

181 F.3d 216, 228 (2d Cir. 1999). Functional similarity is insufficient to show that two products

are in the same market. *F.T.C. v. Lundbeck, Inc.*, 650 F.3d 1236, 1241-43 (8th Cir. 2011)

(affirming denial of FTC bid to unwind acquisition where products were not in the same relevant

market despite being "functionally similar").

### A. The Purported "Booking Services" Markets Erroneously Include Sabre's GDS and FLX OC in the Same Product Market

Sabre's GDS and FLX OC are not competing products. Sabre sells GDS services;

Farelogix does not. Farelogix sells NDC API software and services; Sabre does not.

Unlike Sabre's GDS, which connects hundreds of thousands of travel agents to hundreds

of thousands of travel suppliers and provides valuable services to and maintains commercial

agreements with travel agencies, FLX OC can only be used by one airline to connect with one

third party at a time. Farelogix has no commercial agreements with travel agencies. Indeed,

FLX OC competes in a market for NDC API solutions solely for airlines. Airlines put out RFPs

for NDC API solutions and receive bids from many potential suppliers. The API can then be

used as an input for the airline's own distribution via the airline's website, via a direct

connection to travel agencies, or via a connection to GDSs or other third-party distributors.

The differences between FLX OC and Sabre's GDS explain why industry participants do

not consider FLX OC to be a GDS. (*See, e.g.,* ███████████ Tr. 164:21-24.) These

differences also explain why DOJ ignores how the industry actually works in order to concoct a

"market" consisting of a portion of one isolated service of Sabre's GDS (fare searching and

ticket processing for a single airline) that allegedly overlaps with a technical function of FLX

OC.[4] These differences further explain why airlines have not shifted transactions in any significant volume from the GDSs to direct connections using FLX OC, even though GDS fees are on average ███████ more expensive than FLX OC fees. If these products were actually interchangeable, airlines would have already interchanged them.

Nor is Farelogix properly characterized as the competitor to Sabre's GDS for transactions in which airlines use FLX OC to connect directly to travel agencies. Rather, Farelogix merely provides IT solutions that its customers—the airlines—use to establish connections with travel agents. In these direct connect transactions, airlines—*not* Farelogix—have commercial relationships with agencies and dictate how Farelogix's NDC API is used. In other words, unlike in transactions using the GDSs, in direct connect transactions, the airlines must develop their own travel agency networks (one travel agency at a time).

Thus, DOJ's "booking services" markets fail because they are inconsistent with the facts.

## B. DOJ Fails To Account for the Travel Agency Side of the GDS Platform

Certain products, like Sabre's GDS, are "two-sided transaction platforms," meaning they connect different sets of customers in simultaneous transactions, and the effects of a challenged practice must be assessed as to each set of customers. *See US Airways*, 938 F.3d at 58 (Sabre's GDS is a two-sided transaction platform "as a matter of law"). In *Ohio v. American Express Co.*, 138 S. Ct. 2274 (2018), the Supreme Court explained that two-sided platforms differ from single-sided products because "the value of the services that a two-sided platform provides increases as the number of participants on both sides of the platform increases." *Id.* at 2281. Thus, two-sided platforms must be sensitive to the prices they charge each side of the platform to avoid "indirect network effects," i.e., "a feedback loop of declining demand" when a price rise

---

[4] Tellingly, "booking services" is also a wholly unfamiliar term to industry participants to describe services provided by either Sabre or Farelogix. (*See, e.g.,* ███ Tr. 163:18-23.)

on side A leads to decreased participation on side A, which risks decreased participation on side B. *Id.* at 2277. And two-sided transaction platforms "exhibit more pronounced indirect network effects" because "they cannot make a sale unless both sides of the platform simultaneously agree to use their services." *Id.* at 2278. Therefore, "[e]valuating *both sides* of a two-sided transaction platform is . . . *necessary* to accurately assess competition." *Id.* at 2286-87 (emphasis added).

"[T]he Sabre GDS is a transaction platform, and the relevant market for such a platform must as a matter of law include both sides." *US Airways*, 938 F.3d at 58. Contrary to this established law, DOJ's purported "booking services" markets wholly ignore services or incentives provided or fees charged to travel agencies—they include only "booking services" provided to airlines. DOJ's purported markets thus also fail as a matter of law.

C.     **The Purported "Booking Services" Markets Erroneously Omit the Most Significant Constraint on Sabre's GDS Fees, Airline Websites**

Even if, contrary to law and industry reality, the relevant markets were limited to airline "booking services," DOJ's purported market definitions would be fatally underinclusive, because they omit the most significant constraint on GDS fees: airlines' ability to withhold content (e.g., certain low-priced fares) from the GDSs and to make it available only on their own websites. The impact of the direct channel on GDS fees is evidenced by the substantial increase in the share of direct channel bookings: direct channel sales, which were 4 percentage points less than GDS airline ticket sales in 2005, have grown to become 21 percentage points greater than GDS sales in 2019. (Murphy Rpt. ¶ 47.) Moreover, because of substantial switching by travelers between agencies—*particularly OTAs*—and the airlines' direct channels, airline websites cannot be excluded from any proffered "booking services" market. (Murphy Rebuttal Rpt. ¶¶ 58-59.)

II.     **DOJ Cannot Show a Likelihood That Competition Will Be Substantially Lessened in a Relevant Market**

After defining a proper relevant market, DOJ must establish that the merger is "likely to

17

*substantially* lessen competition" in that market. *AT&T*, 916 F.3d at 1032. To make that

showing, DOJ must first establish a prima facie case that the merger is "likely to substantially

lessen competition" in the market. *Id.* DOJ may do so by making a statistical showing that the

merger "will lead to undue concentration" in the relevant market, which "establishes a

presumption that the transaction will substantially lessen competition." *United States v. Baker*

*Hughes Inc.*, 908 F.2d 981, 982 (D.C. Cir. 1990). Importantly, there is no presumption in

vertical mergers, such as this one. *See AT&T*, 916 F.3d at 1032. "Instead, the government must

make a 'fact-specific' showing that the proposed merger is 'likely to be anticompetitive.'" *Id.*

If DOJ meets its initial burden, a defendant can "present evidence that the *prima facie*

case 'inaccurately predicts the relevant transaction's probable effect on future competition,'" or

"sufficiently discredit the evidence underlying the *prima facie* case." *Id.* (citations omitted).[5]

For example, the defendant may show that a competitor or other firm could replace a merging

firm, *see F.T.C. v. Foster*, No. 07-cv-352, 2007 WL 1793441, at *56 (D.N.M. May 29, 2007), or

that commitments by the acquiring firm concerning its post-closing conduct mitigate any

possible anticompetitive harm, *see AT & T*, 310 F. Supp. 3d at 241 n.51 (finding "reasons to be

skeptical of DOJ's increased-leverage theory of competitive harm" when, shortly after DOJ filed

suit, AT&T promised to "honor Turner's commitment to arbitrate" with certain counterparties to

mitigate concerns about post-closing conduct).

### A.  DOJ's Failure to Define a Proper Relevant Market Is Dispositive

Having failed to define a proper relevant market, DOJ cannot show that competition is

---

[5] "Certainly less of a showing is required from defendants to rebut a less-than-compelling prima facie case," including when the alleged increase in HHI does not "produce[] an overwhelming statistical case" for anticompetitive effects. *Arch Coal, Inc.*, 329 F. Supp. 2d at 129. After rebuttal, "the burden of producing additional evidence of anticompetitive effect shifts to DOJ . . . ." *Baker Hughes*, 908 F.2d at 983.

likely to be substantially reduced, and its claim fails for this reason alone. *See Sungard*, 172 F. Supp. 2d at 193 (declining to enjoin proposed transaction because of DOJ's "overly narrow and static definition of the product market").

## B. DOJ Cannot Show Competitive Harm By Addressing Only Fees Airlines Pay

As the Supreme Court made clear in *American Express*, the price effect in a two-sided transaction platform must include prices to customers on both sides of the platform. As a matter of law, for Sabre's GDS, that pricing consists of fees charged to travel service providers, like airlines, and incentives and other benefits provided to travel agencies. *US Airways*, 938 F.3d at 58. Unless the effects of challenged conduct are evaluated on both sides of the platform, the court cannot determine how competition has been affected, if at all. *Id.*

Here, DOJ ignores the effects of the challenged transaction on customers on one side of the platform—travel agencies—and has focused entirely on airlines. This failure compels judgment for Defendants, particularly given the substantial cost to travel agencies of processing NDC-enabled transactions outside of the GDSs. *See supra* Parts II.B.2, IV.B

## C. Even if Sabre's GDS and FLX OC Competed in the Same Market, the Increase in Concentration Would Be Insufficient

Even if, contrary to law and fact, the product market were limited to a one-sided "booking services" market and bookings for which airlines use FLX OC were attributed to Farelogix and not the airlines, DOJ's market share analysis still would be fatally flawed. *First*, with regard to the market for tickets purchased through TTAs, DOJ's ability to show that the transaction exceeds the HHI threshold hinges on erroneously attributing to Farelogix projected sales in which airlines connect FLX OC to a GDS. (Murphy Rebuttal ¶¶ 59-60.)

*Second*, with regard to both purported markets, DOJ can only show that the HHIs exceed the thresholds if direct sales are excluded from the calculations. Such an exclusion would be

erroneous for the reasons discussed in Part I.C, *supra*.

### D. Even if Sabre and FLX OC Competed in the Same Market, FLX OC Is Not a Unique Supplier of Content Distribution APIs

DOJ also looks only to the past to assess competitive conditions concerning the supply of NDC APIs. In doing so, DOJ wrongly ignores the numerous companies—including airlines themselves—that successfully compete with Farelogix to provide content distribution APIs or otherwise supply NDC distribution capability to airlines. Indeed, over the last four years, ███ ███████████████████████████████████████████████████████ have chosen an entity other than Farelogix, and Farelogix has ███████████████████████████████████ Even an airline as large as ██████ can build its own NDC API for ████████ Finally, NDC Exchange has now made it possible for airlines to distribute NDC offers and receive NDC orders without an NDC API. Given these alternatives to FLX OC, losing Farelogix as an independent competitor would not impact the availability or the price of NDC APIs in the future.

Significantly, the industry will not lose FLX OC as an independent product after Sabre's acquisition of Farelogix closes. To the contrary, Sabre has publicly committed to extend any existing FLX OC contract for three years past its current expiration date, to provide at least the same level of support for FLX OC customers, and to make FLX OC available at the same prices available today or lower. These commitments ensure, at minimum, that FLX OC will continue to be available to airlines at today's prices, and that current FLX OC customers will have at least three years to replace FLX OC with one of the multiple other NDC API providers (as █████████ is expected to do independent of this transaction) if they perceive any disadvantage resulting from the acquisition.

## CONCLUSION

For the foregoing reasons, the evidence will show that DOJ's claim fails.

# GLOSSARY OF KEY TERMS

**Airline Retailing or Airline Merchandising** – Efforts by airlines to personalize the airline's offerings so that they are tailored to the individual traveler to enhance the overall shopping experience and increase airline revenues.

**Ancillaries** – Any airline non-ticket item that can be bundled with an airline ticket, including paid seats, fast-track boarding, on-board meals, extra legroom, WiFi, checked luggage etc.

**API** – Application Program Interface. API is computer code that allows two or more software programs to communicate with each other. NDC APIs communicate using IATA's XML-based communication standard; there are many APIs in use that are not NDC-compliant.

**Direct Channel Distribution** – Airlines' distribution of airline tickets directly to travelers, such as through an airline's website, airline kiosks, call centers, and mobile apps.

**Direct Connect** – A one-to-one connection between an airline and a third party, such as a travel agency, via some type of API (either NDC or some other schema) that allows the computer systems of the airline and third party to communicate with each other.

**Fulfillment** – Services provided by a GDS after travel has been booked, including departure control (i.e. actually making sure the traveler obtains the purchased fare and any ancillaries), reporting, settlement and corporate policy management, that allow a traveler to complete a trip and be made whole if the trip is altered along the way.

**GDS** – Global Distribution System. GDSs, among other things, are two-sided transaction platforms that connect very large numbers of travel suppliers with very large numbers of travel agencies.

**Indirect Channel Distribution** – Airlines' distribution of airline tickets through a third party, such as a travel agency. In 2018, in the indirect channel, 95% of airline tickets by passenger volume purchased in the United States (283 million passengers) were purchased through a GDS.

**NDC** – New Distribution Capability. NDC is an open-sourced, XML-based data transmission programming standard.

**OTA** – Online Travel Agency. OTAs mostly cater to leisure travelers.

**PSS** – Passenger Service System. A series of critical systems used by airlines. The core PSS modules are typically comprised of an airline reservations system, airline inventory system, and a departure control system. Non-core PSS modules interoperate with the core PSS to help airlines create and manage their offers. Examples of non-core PSS modules include Sabre's Dynamic Retailer or Farelogix's FLX Merchandising, FLX Availability Calculator, or FLX Shop & Price.

**TMC** – Travel Management Company. TMCs mostly cater to corporate travelers.

DATED: January 10, 2020

Respectfully submitted,

OF COUNSEL:

/s/ Joseph O. Larkin
Joseph O. Larkin (ID No. 4883)
Veronica B. Bartholomew (ID No. 6224)
SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
920 N. King Street
P.O. Box 636
Wilmington, Delaware 19899
Tel.: (302) 651-3000
Email: joseph.larkin@skadden.com
            veronica.bartholomew@skadden.com

*Attorneys for Defendants Sabre Corporation
and Sabre GLBL Inc.*

Tara L. Reinhart
Steven C. Sunshine
SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
1440 New York Avenue, N.W.
Washington, D.C. 20005
Tel.: (202) 371-7000
Email: tara.reinhart@skadden.com
            steve.sunshine@skadden.com

Matthew M. Martino
Michael H. Menitove
Evan R. Kreiner
SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
4 Times Square
New York, NY 10036
Tel.: (212) 735-3000
Email: matthew.martino@skadden.com
            michael.menitove@skadden.com
            evan.kreiner@skadden.com

/s/ Daniel A. Mason
Daniel A. Mason (ID No. 5206)
PAUL, WEISS, RIFKIND, WHARTON
   & GARRISON LLP
500 Delaware Avenue
Suite 200
P.O. Box 32
Wilmington, Delaware 19899-0032
Tel: (302) 655-4410
Email: dmason@paulweiss.com

Kenneth A. Gallo
Jonathan S. Kanter
Joseph J. Bial
Daniel J. Howley
PAUL, WEISS, RIFKIND, WHARTON
   & GARRISON LLP
2001 K Street, NW
Washington, DC 20006
Tel.: (202) 223-7300
Email: kgallo@paulweiss.com
            jkanter@paulweiss.com
            jbial@paulweiss.com
            dhowley@paulweiss.com

*Attorneys for Defendants Farelogix Inc.
and Sandler Capital Partners V, L.P.*