**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| UNITED STATES OF AMERICA, | : |
| | : |
| *Plaintiff,* | : |
| | : |
| v. | : Civil Action No.: 1:19-cv-01548-LPS |
| | : |
| SABRE CORPORATION, | : |
| SABRE GLBL INC., | : |
| FARELOGIX, INC., and | : |
| SANDLER CAPITAL PARTNERS V, L.P., | : |
| | : |
| *Defendants.* | : |
| | : |

## DEFENDANTS' POST TRIAL BRIEF

### REDACTED PUBLIC VERSION

Joseph O. Larkin (ID No. 4883)
Veronica B. Bartholomew (ID No. 6224)
SKADDEN, ARPS, SLATE,
 MEAGHER & FLOM LLP
920 North King Street
P.O. Box 636
Wilmington, Delaware 19899
Tel.: (302) 651-3000
Email: joseph.larkin@skadden.com
  veronica.bartholomew@skadden.com

*Attorneys for Defendants Sabre Corporation
and Sabre GLBL Inc.*

DATED: February 20, 2020

Daniel A. Mason (ID No. 5206)
PAUL, WEISS, RIFKIND, WHARTON
 & GARRISON LLP
500 Delaware Avenue
Suite 200
P.O. Box 32
Wilmington, Delaware 19899-0032
Tel: (302) 655-4410
Email: dmason@paulweiss.com

*Attorneys for Defendants Farelogix Inc.
and Sandler Capital Partners V, L.P.*

## TABLE OF CONTENTS

Page

TABLE OF CASES AND AUTHORITIES ............................................................................... ii

PRELIMINARY STATEMENT ............................................................................................... 1

LEGAL FRAMEWORK .......................................................................................................... 4

ARGUMENT ............................................................................................................................ 6

I.      DOJ's Failure to Define a Cognizable Relevant Market Dooms Its Claim ....................... 6

        A.      DOJ's Proffered Product Markets Are Fatally Flawed ............................................ 7

                1.      Supreme Court Precedent Dictates That Sabre's GDS and FLX OC
                        Do Not Compete in a Relevant Market ......................................................... 9

                2.      "Booking Services" Is Not a Cognizable Product Market ........................... 12

                3.      DOJ's "Markets" Arbitrarily Exclude Airline Direct Sales ....................... 15

                4.      DOJ's SSNIP Analyses Are Inherently Flawed .......................................... 17

                5.      DOJ Cannot Rely on the Court to Resuscitate Its Case ............................. 17

        B.      DOJ Has Failed to Prove Its Proffered Geographic Market ................................. 20

II.     DOJ Has Not Established Undue Concentration in Any Relevant Market And Is
        Not Entitled to a Presumption of Harm .......................................................................... 21

        A.      DOJ Ignores Farelogix Competitors in its Market Concentrations ....................... 22

        B.      DOJ's Proposed Market of Booking Services for Airline Tickets Sold
                Through OTAs Is Impermissibly Narrow ............................................................. 24

        C.      DOJ Miscalculates Market Shares in Its Proposed Market of Booking
                Services for Airline Tickets Sold Through TTAs .................................................. 25

III.    The Court Should Permit the Merger Because DOJ Has Not Proven Any Likely
        Substantial Lessening of Competition .............................................................................. 26

        A.      DOJ Fails to Prove Anticompetitive Effects ........................................................ 26

                1.      FLX OC Is Not Unique and Airlines Have Many Other Options to
                        Facilitate Direct Connections ..................................................................... 27

2.     FLX OC Does Not Constrain GDS Fees ..................................................29

3.     The Primary Competitive Constraints on the GDS Remain ......................31

4.     Sabre's Commitments Undermine DOJ's Allegations of Harm................31

5.     The Merger Results in Significant Benefits................................................32

     (a)     Development of NDC Capabilities ................................................33

     (b)     Core PSS and Non-Core PSS Modules.........................................34

B.     DOJ's Bargaining Leverage Theory Likewise Fails.............................................35

1.     DOJ's "Increased-Leverage" Theory Does Not Reflect Reality ..............35

2.     DOJ Relies on the Same Flawed Evidence that Failed in *AT&T*...............37

CONCLUSION..............................................................................................................................39

# TABLE OF CASES AND AUTHORITIES

## CASES

*AD/SAT, a division of Skylight, Inc. v. Associated Press*,
181 F.3d 216 (2d Cir. 1999).................................................................8

*Amoco Production Co. v. Village of Gambell, AK*,
480 U.S. 531 (1987).................................................................4, 6

*Brown Shoe Co. v. United States*,
370 U.S. 294 (1962).................................................................6, 7, 8, 18

*Collins v. Associated Pathologists, Ltd.*,
844 F.2d 473 (7th Cir. 1988) .................................................................12

*Continental Trend Resources, Inc. v. OXY USA Inc.*,
44 F.3d 1465 (10th Cir. 1995) .................................................................18

*FTC v. Arch Coal, Inc.*,
329 F. Supp. 2d 109 (D.D.C. 2004).................................................5, 7, 9, 14, 16, 18, 21, 32

*FTC v. Foster*,
No. 07 C 352 JABCT, 2007 WL 1793441 (D.N.M. May 29, 2007) ..............................4, 6

*FTC v. Freeman Hospital*,
69 F.3d 260 (8th Cir. 1995) .................................................................6, 8, 18

*FTC v. Laboratory Corp. of America*,
No. 10 C 1873, 2011 WL 3100372 (C.D. Cal. Mar. 11, 2011) .........................7, 20, 22, 32

*FTC v. Lundbeck, Inc.*,
650 F.3d 1236 (8th Cir. 2011) .................................................................8

*FTC v. Penn State Hershey Medical Center*,
838 F.3d 327 (3d Cir. 2016).................................................................6, 20, 35

*FTC v. Tenet Health Care Corp.*,
186 F.3d 1045 (8th Cir. 1999) .................................................................7

*Geneva Pharmaceuticals Technology Corp. v. Barr Laboratories Inc.*,
386 F.3d 485 (2d Cir. 2004).................................................................8

*Hornsby Oil Co. v. Champion Spark Plug Co.*,
714 F.2d 1384 (5th Cir. 1983) .................................................................6

*It's My Party, Inc. v. Live Nation, Inc.*,
811 F.3d 676 (4th Cir. 2016) .................................................................12

ii

*Kaiser Aluminum & Chemical Corp. v. FTC,*
    652 F.2d 1324 (7th Cir. 1981) ......................................................................26

*Kellam Energy, Inc. v. Duncan,*
    616 F. Supp. 215 (D. Del. 1985)......................................................................6

*Malaney v. UAL Corp.,*
    No. C 10-02858 RS, 2011 WL 6845773 (N.D. Cal. Dec. 29, 2011) ................16

*Monsanto Co. v. Scruggs,*
    342 F. Supp. 2d 568 (N.D. Miss. 2004), *aff'd and remanded by*
    459 F.3d 1328 (Fed. Cir. 2006)......................................................................18

*New York v. Deutsche Telekom AG,*
    No. 19-cv-5434, slip op. (S.D.N.Y Feb. 11, 2020)....................................32, 38

*Ohio v. American Express Co.,*
    138 S. Ct. 2274 (2018)..........................................................3, 5, 9, 10, 11, 12

*Pastore v. Bell Tel. Co. of Pennsylvania,,*
    24 F.3d 508 (3d Cir. 1994)..............................................................................18

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.,*
    124 F.3d 430 (3d Cir. 1997)..........................................................................7, 9

*Rebel Oil Co. v. Atlantic Richfield Co.,*
    51 F.3d 1421 (9th Cir. 1995) ..........................................................................21

*Siva v. American Board of Radiology,*
    No. 19 C 1407, 2019 WL 6130818 (N.D. Ill. Nov. 19, 2019) ..........................12

*U.S. Airways, Inc. v. Sabre Holdings Corp.,*
    938 F.3d 43 (2d Cir. 2019)....................................................3, 5, 10, 11, 12

*United States v. Amsted Industries Inc.,*
    No. 71 C 3124, 1974 WL 914 (N.D. Ill. July 19, 1974) ................................22

*United States v. AT&T Inc.,*
    310 F. Supp. 3d 161 (D.D.C. 2018), *aff'd* 916 F.3d 1029 (D.C. Cir. 2019).............. passim

*United States v. AT&T, Inc.,*
    916 F.3d 1029 (D.C. Cir. 2019) ..................................................................5, 6

*United States v. Baker Hughes, Inc.,*
    908 F.2d 981 (D.C. Cir. 1990) ................................................................4, 5, 26

*United States v. Energy Solutions, Inc.,*
    265 F. Supp. 3d 415 (D. Del. 2017)..........................................................18, 19

*United States v. General Dynamics Corp.*,
    415 U.S. 486 (1974)................................................................................................26

*United States v. Grinnell Corp.*,
    384 U.S. 563 (1966)..................................................................................................6

*United States v. International Harvester Co.*,
    564 F.2d 769 (7th Cir. 1977) ................................................................................27

*United States v. M.P.M., Inc.*,
    397 F. Supp. 78 (D. Colo. 1975)...........................................................................32

*United States v. Marine Bancorp.*,
    418 U.S. 602 (1974)..................................................................................................5

*United States v. Oracle Corp.*,
    331 F. Supp. 2d 1098 (N.D. Cal. 2004) .........................................7, 9, 13, 14, 26

*United States v. SunGard Data Systems, Inc.*,
    172 F. Supp. 2d 172 (D.D.C. 2001) .............................................................6, 8, 22

*West Parcel Express v. United Parcel Service of America, Inc.*,
    65 F. Supp. 2d 1052 (N.D. Cal. 1998), *aff'd*, 190 F.3d 974 (9th Cir. 1999) .....................18

## RULES

Fed. R. Civ. P. 8 ................................................................................................................19

Defendants Sabre Corporation, Sabre GLBL Inc. (collectively, "Sabre"), Farelogix Inc. ("Farelogix"), and Sandler Capital Partners V, L.P. respectfully submit this post-trial brief.

## PRELIMINARY STATEMENT

Sabre's acquisition of Farelogix combines two complementary entities that, once merged, will drive adoption of New Distribution Capability ("NDC"), facilitate development of an end-to-end retailing, distribution and fulfillment platform, and increase competition in the travel industry, particularly between Sabre and its rival global distribution systems ("GDSs"). The integration of Farelogix's technology into Sabre's GDS platform and further development of NDC-based technology will enable the creation of more complex fares with a larger variety of options. The transaction will also allow Sabre to catch up to its main competitor, Amadeus, which is ahead of Sabre in integrating NDC content. As a result of this transaction, on one side of the Sabre GDS platform, airlines will be able to offer travel agencies a complex suite of fare and ancillary options without having to shoulder the immense cost of building commercial networks to market them or internal technology to process them. On the other side of the platform, travel agencies will be able to consume this next-generation retailing efficiently while still being able to provide travelers with the added services, such as comparison shopping, application of corporate rules, and duty of care, that the GDS offers.

Ignoring these benefits, the Department of Justice ("DOJ") presented a case that fails legally and economically, suffers from fundamental theoretical and practical flaws, and is unsupported by the record. Rather than provide a forward-looking view of the likely future state of the marketplace—as Section 7 of the Clayton Act ("Section 7") requires—DOJ presents a backwards-looking case based on a distortion of marketplace realities and a misconception of the products at issue. DOJ ignores that the competitive landscape unalterably changed by mid-2018 with the implementation of a commercially-practicable International Air Transport Association

("IATA") NDC standard and clear movement by industry participants towards GDS integration. In addition, after months of investigation and discovery, followed by two weeks of trial, DOJ is still unable to articulate—much less prove—its alleged relevant product and geographic markets. That is unsurprising, because DOJ's entire case is a classic "made-for-litigation" theory.

In order to create the impression of horizontal competition between vertical complements, DOJ proffers a product market based on slices of technical functionalities of two distinct products that have no industry recognition. To overcome the fact that Farelogix's actual FLX Open Connect ("FLX OC") revenues are minimal, DOJ relies on inaccurate "projections" that merely inflate Farelogix's revenues and disregards record evidence about the current industry dynamics. To inflate market concentration statistics to gain a presumption, DOJ posits a totally incomprehensible geographic market, and cannot explain who competes there or which customers they serve.

Further, DOJ ignores the many companies that actually sell products competing with FLX OC, despite the fact that both U.S. and international airlines are using those alternative products today. In an effort to concoct competitive effects, DOJ cites imagined price increases in a relevant market that it has not pled, and focuses on the market preferences of two airlines, while disregarding testimony from other airlines and ignoring travel agency testimony unanimously in support of the transaction. In response to questions from the Court at closing argument, the DOJ suggested the Court could unilaterally change the defective market allegations if necessary to save its case.[1] This is wrong as a matter of law, would make a mockery of the burden of proof that DOJ bears here, and the Court should decline this invitation.

The Court need not plow any new ground to conclude that DOJ's artificial and incorrect

---

[1] (Tr. 1917:4-7.)

market definition cannot stand.  The Supreme Court has instructed that in the case of a two-sided transaction platform—such as Sabre's GDS— "[o]nly other two-sided platforms can compete with a two-sided platform for transactions."  *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2287 (2018) ("*AmEx*"); *see also U.S. Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 58 (2d Cir. 2019) (concluding that Sabre's GDS "is a transaction platform," meaning that "the relevant market for such a platform must as a matter of law include both sides").  Thus, as a matter of law, FLX OC—which DOJ concedes is a technology input for an airline that is not a platform and does not compete in a two-sided market—cannot be included in the two-sided GDS transaction platform market.[2]  (FOF ¶ 39.)

In an attempt to avoid this limiting principle, DOJ argues that Sabre's GDS platform is nothing more than a "bundle" of different services that can be broken apart (despite acknowledging that the GDS is never "sold" except as a unitary transaction platform), and that one small piece of the GDS platform—so called "booking services"—can be extracted and isolated into a relevant market in which Sabre and Farelogix are horizontal competitors.  (FOF ¶ 39.)  But the law demands that relevant antitrust markets reflect economic reality, based on practical indicia and the history of the industry, and here the trial record does not support DOJ's gerrymandering.  The evidence adduced at trial was clear that the travel industry does not view "booking services" as a cognizable product and that DOJ has deliberately drawn its artificial market definition to exclude important competitors—not least the airlines themselves—to inflate the merging parties' market shares.  (FOF ¶¶ 111-19.)  But when the markets are properly defined, it is plain that DOJ cannot obtain a presumption of harm in its artificial "booking

---

[2]   FLX OC contrasts with airline.com channels, which do connect the airline to a customer or customer's agent and act as a significant competitive constraint on GDS pricing.  *See infra* Section I.A.3.

services" markets. (FOF ¶¶ 125-34.) Indeed, regardless of whether the merger is characterized as horizontal or vertical, DOJ cannot meet its burden of showing competitive effects flowing from the transaction, nor can it overcome the record evidence establishing that the competitive effects of this transaction are positive and beneficial to the industry. Moreover, to the extent DOJ is now pivoting to a bargaining leverage theory of harm relating to airlines' ability to constrain GDS prices, this theory also fails on multiple grounds because DOJ has not pled a GDS market or a vertical theory of harm; and the only airlines affected by DOJ's bargaining leverage theory are American Airlines ("American") and United Airlines ("United"), both of which have various levers they can use in negotiations with Sabre.[3]

Because DOJ cannot carry its burden of proving a violation of Section 7, the Court should deny DOJ's request for a permanent injunction.

## LEGAL FRAMEWORK

DOJ cannot secure an injunction under Section 7 unless it carries its heavy burden to prove that the transaction is "*likely* to lessen competition *substantially*." *United States v. Baker Hughes, Inc.*, 908 F.2d 981, 985 (D.C. Cir. 1990) (Thomas, J.) (emphasis added); *see also FTC v. Foster*, No. 07-352 JABCT, 2007 WL 1793441, at *51 (D.N.M. May 29, 2007) ("[T]he granting of *any* injunction by a federal court" is an "extraordinary and drastic remedy" that cannot issue unless the government meets a "heavy" burden) (emphasis added and citation omitted).[4]  Courts take a "totality-of-the-circumstances approach" to Section 7 challenges,

---

[3]   Of course, the desire to shoehorn this merger into a horizontal mold is understandable, for the vertical-merger standard is far less favorable to DOJ.

[4]   The standards for a permanent injunction and a preliminary injunction are "essentially the same," except that the plaintiff seeking a permanent injunction must meet a higher burden to show actual success on the merits, rather than a mere likelihood thereof. *Amoco Prod. Co. v. Vill. of Gambell, AK*, 480 U.S. 531, 546 n.12 (1987).

"weighing a variety of factors to determine the effects of particular transactions on competition."

*Baker Hughes*, 908 F.2d at 984. This demanding standard requires DOJ to prove that a

substantial lessening of competition is "sufficiently probable and imminent." *United States v.*

*Marine Bancorp.*, 418 U.S. 602, 623 n.22 (1974). The "mere possibility of harm" is insufficient.

*United States v. AT&T Inc.*, 310 F. Supp. 3d 161, 190 (D.D.C. 2018), aff'd 916 F.3d 1029 (D.C.

Cir. 2019). DOJ bears "the burden on every element of [its] Section 7 challenge, and a failure of

proof in any respect will mean the transaction should not be enjoined." *FTC v. Arch Coal, Inc.*,

329 F. Supp. 2d 109, 116 (D.D.C. 2004).

    A burden-shifting framework applies to merger challenges under Section 7, regardless of

whether the merger is horizontal or vertical. *AT&T*, 310 F. Supp. 3d at 190-91. DOJ must

establish a *prima facie* case by proving (1) a relevant market; and (2) a substantial lessening of

competition in that market. *Id.* at 191. In the case of a horizontal merger, DOJ's *prima facie*

case requires proof that the merger will result in both an "undue concentration" in the relevant

market and a "significant increase in the concentration of firms in that market." *Baker Hughes*,

908 F.2d at 982, 990 (quoting *United States v. Phila. Nat'l Bank*, 374 U.S. 321, 363 (1963)). In

the case of a vertical merger, by contrast, DOJ *cannot* rely on concentration measures to

establish its *prima facie* case:

> [U]nlike horizontal mergers, [for vertical mergers] the government cannot use a
> short cut to establish a presumption of anticompetitive effect through statistics
> about the change in market concentration, because vertical mergers produce no
> immediate change in the relevant market share.

*United States v. AT&T, Inc.*, 916 F.3d 1029, 1032 (D.C. Cir. 2019) (citation omitted); *see also*

U.S. Dept. of Justice & Fed. Trade Comm'n, Draft Vertical Merger Guidelines § 3 (January 10,

2020) ("Draft Vertical Merger Guidelines") (in a vertical merger the agencies "do not rely on

changes in concentration as a screen for or indicator of competitive effects from vertical theories

of harm."). Instead, DOJ must make a "fact-specific" showing that the proposed vertical merger

is "likely to be anticompetitive." *AT&T*, 916 F.3d at 1032.

In either circumstance, if a *prima facie* case is established, the burden of production

"shifts to defendants to provide sufficient evidence that the prima facie case inaccurately predicts

the relevant transaction's probable effect on future competition.'" *AT&T*, 310 F. Supp. 3d at 191

(internal quotations omitted). "If the defendants put forward sufficient evidence to rebut

plaintiff's prima facie case, the burden of producing additional evidence of anticompetitive effect

shifts to the [government], and merges with the ultimate burden of persuasion, which remains

with the [government] at all times." *Id.* (alterations in original).

## ARGUMENT

### I.   DOJ's Failure to Define a Cognizable Relevant Market Dooms Its Claim

Market definition is an essential element of any Section 7 case. *See, e.g.*, *Brown Shoe*

*Co. v. United States*, 370 U.S. 294, 324 (1962) ("[D]etermination of the relevant market is a

*necessary predicate* to a finding of a violation of the Clayton Act." (emphasis added)).[5]  Not only

is proper market definition "the first step in this [merger] case, it is also the key to the ultimate

resolution of this type of case, since the scope of the market will necessarily impact any analysis

of the anticompetitive effects of the transaction." *United States v. SunGard Data Sys., Inc.*, 172

F. Supp. 2d 172, 181 (D.D.C. 2001); *see also FTC v. Penn State Hershey Med. Ctr.*, 838 F.3d

327, 338 (3d Cir. 2016) ("Without a well-defined relevant market, 'an examination of the

---

[5]   The same principles apply in defining relevant antitrust markets regardless of whether a suit
is brought under the Sherman Act or Section 7 of the Clayton Act. *See, e.g.*, *United States v.
Grinnell Corp.*, 384 U.S. 563, 573 (1966) ("We see no reason to differentiate between 'line'
of commerce in the context of the Clayton Act and 'part' of commerce for purposes of the
Sherman Act."); *Hornsby Oil Co. v. Champion Spark Plug Co.*, 714 F.2d 1384, 1393 n.9 (5th
Cir. 1983); *Kellam Energy, Inc. v. Duncan*, 616 F. Supp. 215, 218 n.3 (D. Del. 1985).

merger's competitive effects would be without context or meaning.'"); *FTC v. Freeman Hosp.*, 69 F.3d 260, 268 (8th Cir. 1995) (it is "essential" that the government satisfy its burden to define a relevant market before an injunction may issue).

A relevant market consists of two components: a product market and a geographic market. *See Brown Shoe*, 370 U.S. at 324. A failure to properly define either component requires judgment for defendants. *See, e.g., Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436-42 (3d Cir. 1997) (affirming dismissal for failure to properly define a relevant product market (collecting cases)); *see also FTC v. Tenet Health Care Corp.*, 186 F.3d 1045, 1053 (8th Cir. 1999) ("The FTC's failure to prove its relevant geographic market is fatal to its motion for injunctive relief."); *FTC v. Lab. Corp. of Am.*, No. 10-1873, 2011 WL 3100372, at *20 (C.D. Cal. Mar. 11, 2011) (denying government's motion to enjoin merger due to rejection of relevant market definition); *United States v. Oracle Corp.*, 331 F. Supp. 2d 1098, 1175 (N.D. Cal. 2004) (rejecting merger challenge because DOJ "failed to meet [its] predicative burden" of "proving the relevant market for section 7 analysis.").

## A.   DOJ's Proffered Product Markets Are Fatally Flawed

DOJ's case falls at the first hurdle because its "booking services" product markets are fatally flawed. In seeking to pull two concocted "products" at different levels of two supply chains into the same relevant product market, DOJ not only ignores clear guidance from the Supreme Court and the Second Circuit, but also the entire trial record. As the trial testimony showed, *and as DOJ conceded*, Sabre's GDS platform competes in a two-sided market, and FLX OC does not compete in that market. (FOF ¶¶ 23, 36, 38-39.) While the trial record is unclear as to what products exactly are in DOJ's alleged product market, (FOF ¶ 107), and even accepting the fiction of DOJ's proposed markets, any product market that includes so-called booking services in the indirect channel must also include those same "booking services" used in the

7

airline's direct sales, particularly when FLX OC is used in that channel as well.[6]  (FOF ¶¶ 42, 111-114.)  Simply put, DOJ's product markets are untethered from reality and should therefore be rejected.

A properly-defined product market must include all products that (1) are "reasonably interchangeable"—meaning that consumers can substitute the use of one product for the other— and (2) demonstrate cross-elasticity of demand, meaning that consumers will substitute those products in response to changes in their prices. *SunGard*, 172 F. Supp. 2d at 182.  A market cannot satisfy these principles unless it is defined in terms of "business reality—how the market is perceived by those who strive for profit in it." *Id.*  Business realities must be determined by "practical indicia," including industry or public recognition, the products' particular characteristics and uses, their distinct consumers or prices, and consumers' sensitivity to price changes. *Brown Shoe*, 370 U.S. at 325.

The boundaries of a plaintiff's proffered relevant product market must be drawn broadly enough to include all products that could constrain the merged entity's pricing. *AD/SAT, Div. of Skylight, Inc. v. Associated Press*, 181 F.3d 216, 228 (2d Cir. 1999).  Contrary to DOJ's argument in this case, mere functional similarity between products is not enough to mandate inclusion of both products in a relevant product market. *See FTC v. Lundbeck, Inc.*, 650 F.3d 1236, 1241 (8th Cir. 2011) (rejecting notion that functionally similar products must be in the same product market); *see also Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 496 (2d Cir. 2004).  Nor can the bounds of the relevant product market be defined by anecdotal

---

[6]    As explained at trial, Defendants refer to an airline's direct sales channel through its website, call centers or kiosks, as the "direct channel" or "airline.com."  The one-to-one connection between an airline and a travel agent, which is facilitated by FLX OC or other NDC API suppliers, is a "direct connection." Integration of the NDC API into the GDS, sometimes called "GDS passthrough" is referred to as "GDS integration."

preferences of two customers, for "the issue is not what solutions the customers would *like* or *prefer*," but rather "what they *could do*" in the event of a post-merger price increase. *Oracle Corp.*, 331 F. Supp. 2d at 1131-32 (emphasis in original); *see also Queen City Pizza*, 124 F.3d at 438 ("The test for a relevant market is not commodities reasonably interchangeable by *a particular plaintiff*, but 'commodities reasonably interchangeable by consumers for the same purposes.'" (emphasis added)).  In fact, customers' subjective views do not receive great weight in the product market definition analysis at all, because customers "do not . . . have the expertise to state what *will* happen" to competition as a result of a transaction. *Arch Coal*, 329 F. Supp. at 145-46 (emphasis in original); *Oracle Corp.*, 331 F. Supp. 2d at 1131-32 (finding DOJ's customer witnesses "largely unhelpful" to its effort to define a narrow product market because they merely testified to their "preferences toward one product over another").  Healthy skepticism is particularly warranted in a "vertical merger case where . . . upstream customers are downstream competitors," which carries the "threat" that the testimony "reflects self-interest rather than genuine concerns about harm to competition." *AT&T*, 310 F. Supp. 3d at 214 (finding that competitor testimony "f[e]ll[] far short" of establishing harm to competition).

1.    **Supreme Court Precedent Dictates That Sabre's GDS and FLX OC Do Not Compete in a Relevant Market**

The Supreme Court has provided guidance on the legal framework for market definition in the case of two-sided transaction platforms.  In *AmEx*—an antitrust challenge to American Express' anti-steering provisions—the Supreme Court explained that the key characteristic of a two-sided transaction platform is that the platform "cannot make a sale to one side of the platform without simultaneously making a sale to the other."  138 S. Ct. at 2280.  The Court further observed that because two-sided transaction platforms "exhibit more pronounced indirect network effects" than other two-sided platforms and show "interconnected pricing and demand,"

9

a two-sided transaction platform should be understood as supplying only one product—the

transaction itself. *Id.* at 2286. Accordingly, "[o]nly other two-sided platforms can compete with

a two-sided platform for transactions," and competitive effects must be analyzed on both sides of

the platform. *Id.* at 2287. The Second Circuit recently applied *AmEx* in an antitrust case

involving one of the products at issue in this case, Sabre's GDS platform. In *U.S. Airways*, the

Second Circuit vacated a jury verdict finding that the relevant market was one-sided, concluding

that "the Sabre GDS is a transaction platform, . . . and the relevant market for such platforms

must *as a matter of law* include both sides." 938 F.3d at 58 (emphasis in original).

    Here, the trial evidence confirms that DOJ's "booking services" market must fail because

Sabre's GDS is a two-sided transaction platform that provides separate but interrelated services

to both travel agencies and travel suppliers (including airlines), and FLX OC is a one-sided input

for airlines. (FOF ¶¶ 23, 38-39.) As DOJ concedes, Sabre's GDS is a two-sided platform that

connects more than 400,000 travel agents to over 400 airlines, 175,000 hotel properties, and 40

car rental providers and provides a broad set of services to travel agencies and travel suppliers.

(FOF ¶¶ 13, 17-19, 21.) A transaction cannot occur through Sabre's GDS platform unless both

the airline and the travel agency simultaneously and independently agree to use it. Thus, the

value of the services—including the so-called "booking services"—that Sabre's GDS provides to

travel agents depends on how many airlines participate on the platform, and vice versa.[7] (FOF ¶

23.)

---

[7]    Even if the Court were to accept that DOJ can divine a "booking services" product within the
    GDS platform, those functionalities must necessarily be two-sided. Indeed, DOJ implicitly
    concedes the two-sided nature of the "booking services" that the GDS platform provides
    because it purports to define the geographic scope of its relevant markets based on where
    *travel agencies use* those "booking services." *See* Part I.B, *infra.*

By contrast, and as DOJ concedes, FLX OC is not a two-sided transaction platform. (FOF ¶ 39.) Rather, it is a one-sided software input that Farelogix sells directly to upstream airline customers. (FOF ¶¶ 38, 99.) FLX OC uses a publicly available, XML-based technology standard called NDC to build an application programming interface ("API") that connects to an airline's internal systems (together, called an "NDC API"). (FOF ¶¶ 33-36.) Once connected, an airline can use FLX OC to establish direct, one-to-one connections with third parties or other technology systems—such as travel agencies, GDSs, or the airline's own public-facing website—to enable these third parties to communicate with the airline's internal systems to shop and book tickets solely on that particular airline. (FOF ¶¶ 41-45.) Unlike a GDS, Farelogix contracts only with airlines and has no commercial relationships with travel agencies. (FOF ¶ 38.) Thus, an airline using FLX OC must establish any and all commercial relationships with travel agencies through other means, as it cannot rely on FLX OC to do so. Accordingly, FLX OC does not facilitate or intermediate any transactions between other parties or provide any distribution services. Instead, it is an upstream software input that, once installed, enables an airline to self-distribute its own air travel supply. (FOF ¶¶ 33, 39.) Given these characteristics, in light of the Supreme Court's guidance, FLX OC cannot as a legal matter compete directly with Sabre's GDS platform in any properly defined relevant market. If the parties' products are not in the same relevant product market, there can be no increase in concentration in that any relevant market, and DOJ's horizontal framework for analyzing competitive effects must be rejected.

In an effort to avoid this conclusion, DOJ suggested at closing arguments that the Court should ignore *AmEx* and *U.S. Airways* because they were Sherman Act, and not Clayton Act, cases. (Tr. 1836:2-23.) Contrary to DOJ's suggestion, the product market inquiry is the same

whether a suit is brought under the Sherman Act or the Clayton Act. *See supra* n. 4.  Nor, as

DOJ suggested, did the Supreme Court confine its *AmEx* rationale to the specific context of the

credit card industry (and the Second Circuit certainly did not read *AmEx* that way). *AmEx* and

*U.S. Airways* are thus entirely applicable here.

### 2.      "Booking Services" Is Not a Cognizable Product Market

Ignoring *AmEx* and *U.S. Airways*, DOJ claims that Sabre and Farelogix are head-to-head

horizontal competitors in two "product" markets for so-called "booking services" sold to (1)

traditional travel agencies ("TTAs") and (2) online travel agencies ("OTAs").  (Compl. ¶ 44.)  To

manufacture these "product" markets, DOJ contends that a single technical functionality of

Sabre's unitary GDS transaction platform, which is sold in a two-sided market, can be extracted

from the GDS and placed in competition against a slice of FLX OC, which is sold in a different,

one-sided market.  (FOF ¶ 107.)  But DOJ's defiance of reality in seeking to dissect Sabre's GDS

platform comes at DOJ's own peril, for "[n]o party can expect to gerrymander its way to an

antitrust victory without due regard for market realities."  *It's My Party, Inc. v. Live Nation, Inc.*,

811 F.3d 676, 683 (4th Cir. 2016) (observing that district court was "not required to accept

uncritically two market definitions . . . that coincidentally fit plaintiff's precise circumstances").

Courts routinely reject attempts by plaintiffs to disaggregate components of one product

and call it a separate "product"—as DOJ does here—when there is no separate economic demand

for the extracted component.  For example, in *Collins v. Associated Pathologists, Ltd.*, the

Seventh Circuit rejected a claim that pathology services were a distinct product from hospital

services because "pathology services," like ticket functionality here, were "just one of the many

services provided by the hospital for its patients."  844 F.2d 473, 477 (7th Cir. 1988).  Because

customers did not "make specific requests" for pathology services, "no separate demand

exist[ed] for pathological services . . . sufficient to create a separate market," let alone "a distinct

product market." *Id.*; *see also Siva v. Am. Bd. of Radiology*, No. 19-1407, 2019 WL 6130818, at *3-6 (N.D. Ill. Nov. 19, 2019) (rejecting plaintiff's "attempt[] to isolate components"—i.e., the initial and maintenance certifications for certain radiologists—when demand existed only "for the single product of certification").

Similar reasoning factored into the court's rejection of DOJ's proffered product market in *Oracle Corp.*, where DOJ had proposed a product market of certain "high function" FMS and HRM software. 331 F. Supp. 2d at 1102. The merging parties objected to this artificially narrow market in part because it "'d[id] not address the market reality' of the way software is actually sold," *id.* at 1154-55; rather, defendants argued, "FMS and HRM are not products in and of themselves," but were purchased as *part* of broader software bundles that included FMS and HRM along with multiple other functionalities. *Id.* Agreeing with defendants, the court found that "the reality of th[e] industry" was that consumers "purchase[d] software 'bundles' containing several pillars"—including FMS and HRM pillars—rather than *individual* pillars by themselves. *Id.* at 1106. Indeed, witness testimony at that trial had established that "'[h]igh function software,'" as DOJ defined it, "ha[d] no recognized meaning in the industry," and was "simply a label [that DOJ] created." *Id.* at 1102, 1108.

The same holds true here. DOJ seeks to define its "booking services" product markets around an isolated functionality that is not offered on a standalone basis. (FOF ¶ 105.) That there is no independent economic significance to the "booking services" "product" is perhaps best illustrated by the fact that not even DOJ's expert Dr. Aviv Nevo has placed a price or commercial value on either party's "booking services." (FOF ¶ 107.) Nor can he, because demand lies only in what the parties actually sell.

In fact, the testimony and documentary evidence belies DOJ's claim and proves that industry participants *do not* view Sabre's GDS and FLX OC as viable "booking services" substitutes.  (FOF ¶ 106.)  Travel agencies would lose the normalization and aggregation services, as well as the extensive duty of care and mid- and back-office functionality that GDSs enable.  (FOF ¶ 66.)  Perhaps the clearest proof of the complementary nature of the merging parties' products is that travel agencies create "passive segments" in the GDS system—even when airline offers are booked through direct connections enabled by FLX OC—to enable the agent to track the booking through the GDS.  (FOF ¶ 188, 192.)  A review of recent RFPs that the FLX OC product competed in shows that there is no competition between Sabre's GDS and FLX OC.  (FOF ¶ 137.)  In short, the "practical indicia" of business reality weigh decidedly against DOJ's proposed "booking services" product.

These market realities cannot be overcome with testimony from DOJ's two self-interested airline witnesses about their individual preferences.  Such customer preferences are insufficient to support a properly defined product market, particularly given the "threat" that such testimony "reflects self-interest rather than genuine concerns about harm to competition." *AT&T*, 310 F. Supp. 3d at 211, 214; *see also Oracle Corp.*, 331 F. Supp. 2d at 1131; *Arch Coal*, 329 F. Supp. at 145-46.  United and American have tried to purchase Farelogix in the past and ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ (FOF ¶¶ 177, 181-183.).  In short, these airlines are strategically motivated to oppose a vertical merger that improves Sabre's product offering and allows Sabre to better compete.

Finally, the economic evidence confirms FLX OC's inability to constrain GDS pricing.  As Defendants' expert Professor Kevin Murphy testified, airlines have not shifted transactions in any significant volume from GDSs to direct connections using FLX OC, even though GDS fees

are on average many times more expensive than FLX OC fees.  (FOF ¶ 110.)  If these products were interchangeable, at such a price disparity one would expect the data to reflect much more significant switching.

### 3.     DOJ's "Markets" Arbitrarily Exclude Airline Direct Sales

Even if accepting DOJ's proposed markets for purposes of argument, those markets are too narrowly drawn as they arbitrarily exclude airlines' use of "booking services" in their direct sales channels.  DOJ included airlines' direct connect distribution in its alleged relevant markets (in the process misidentifying Farelogix, and not the airline, as the competitor), but arbitrarily excluded airlines' direct channel "booking" sales from the market, despite Dr. Nevo's admission that "booking services" are required for the sale of tickets in the direct channel, and Farelogix executives testiony that FLX OC is used by airlines in the direct channel. (FOF ¶ 42.)

The exclusion of direct channel sales from the analysis is also inappropriate, because airline direct sales have exerted significant competitive pressure on GDS fees.  (FOF ¶¶ 6,  30, 113.)  Professor Murphy explained that airline.com, as well as Sabre's rival GDSs, are a far greater constraint on Sabre's GDS fees than direct connections.  (FOF ¶ 113.)  Indeed, both the ordinary-course documents and economic evidence show that in negotiations between a GDS and an airline, airlines' websites are a significant constraint on GDS fees because airlines have the ability to—and do—induce switching to their direct channels by removing content from the GDSs and providing it only through the direct channel.  (FOF ¶ 27.)  That threat has served to lower GDS fees because as the amount of content (like certain low-priced fares) available through a GDS decreases, the GDS's value to both travel agencies and OTAs also decreases.  (FOF ¶¶ 24, 102.)  Similarly, airlines themselves have testified that they would like to, and do, shift bookings to their direct channels. (FOF ¶ 112.)  As confirmed by the Sabre executive who negotiates GDS agreements with airlines, airline websites are "one of the primary competitors

that we face as a GDS," and Sabre continues to see "a point of share shift from the GDS channel

to the dot com." (FOF ¶ 111.) In fact, airline direct channel sales (which account for nearly 60%

of all bookings) dwarf direct connections (which account for only about 2% of all bookings, and

the decline of GDS fees over the last 20 years has coincided with the shift of volume to the direct

sales channel. (FOF ¶¶ 6-7, 26, 30.)

DOJ's attempt to segregate OTAs from the airlines direct sales channel is yet another

error. Trial evidence showed that consumers, in particular leisure travelers, can—and do—easily

search for travel options using an OTA (or a metasearch engine like Kayak) only to book their

ticket directly from an airline's website. (FOF ¶¶ 9, 117.) Both airlines and OTAs themselves

recognize this competition with one another. (FOF ¶¶ 115-118.) Professor Murphy explained

that for the airline, the "closest alternative" to distribution through an OTA is distribution

through its own website, testifying that "if you are in OTA, a mouse click away is Airline.com,

and that clearly has been the alternative that has been relevant." (FOF ¶ 119.) Given the

particularly close competition between distribution through OTAs and through an airline's

website, any properly defined relevant product market that includes OTAs must also include

airlines' websites. *See AT&T*, 310 F. Supp. 3d at 176 (rejecting claim that certain video services

were not in the market because it "def[ied] reality").

While DOJ may quibble that airlines cannot shift *all* of their volume from sales through

OTAs to direct sales, this is irrelevant because products "need not be perfect substitutes" in order

to occupy the same relevant product market. *Malaney v. UAL Corp.*, No. C 10-02858 RS, 2011

WL 6845773, at *4 (N.D. Cal. Dec. 29, 2011), *aff'd*, 552 F. App'x 698 (9th Cir. 2014). Rather,

products in a relevant market need only be "sufficiently interchangeable that a potential price

increase in one product would be defeated by the threat of a sufficient number of customers

16

switching to the alternate product." *Id.* (citation omitted); *see also Arch Coal, Inc.*, 329 F. Supp. at 122 ("In determining interchangeability, . . . the Court must consider the degree to which buyers treat the products as interchangeable, but need not find that *all* buyers will substitute one commodity for another.").

### 4.     DOJ's SSNIP Analyses Are Inherently Flawed

DOJ puts forward SSNIP tests conducted by Dr. Nevo in support of DOJ's markets that suffers from a number of fundamental flaws. *First*, to set up each of his SSNIP analyses, Dr. Nevo selected FLX OC and the limited functionality from the GDS for inclusion in the "booking services" market and simply *assumed* competition between them. *Second*, Dr. Nevo assumed that the *airlines'* downstream use of direct connections were in the market but then excluded sales through airline.com, even though Dr. Nevo (1) conceded that airline.com exerts competitive pressure on GDS fees and (2) conducted no analysis to refute Professor Murphy's testimony that airline.com is a much more significant constraint on GDS fees than direct connections. (FOF ¶¶ 30, 120.) *Third*, despite Dr. Nevo's admitted inability to price or value the alleged "booking services" slices of the Sabre GDS or FLX OC, he nevertheless purported to conduct a SSNIP using the concededly "apples-and-oranges" prices of the Sabre GDS platform per-segment fee and the FLX OC per-ticket fee, which are orders of magnitude apart. (FOF ¶ 110.) Dr. Nevo also contravened DOJ's own Horizontal Merger Guidelines[8] by ignoring real-world responses to potential GDS fee increases, such as the airlines' withholding content and shifting volume. (FOF ¶ 121.)

### 5.     DOJ Cannot Rely on the Court to Resuscitate Its Case

---

[8]     U.S. Dep't of Justice & Fed. Trade Comm'n, *Horizontal Merger Guidelines* § 4.1.3

As DOJ initially conceded at closing arguments, its failure to properly define a relevant market (even under its own horizontal framework) is dispositive. (Tr. 1856:4-1857:2.) To the extent that DOJ now contends that the Court can rectify DOJ's failures of pleading and proof by finding its own relevant market, such a position is contrary to law.

DOJ bears the burden on every element of its Section 7 challenge, and the Supreme Court has instructed that determination of the relevant market is a "necessary predicate" to finding a violation of the Clayton Act. *Brown Shoe*, 370 U.S. at 423; *see also Freeman Hosp.*, 69 F.3d at 268; *Arch Coal*, 329 F. Supp. 2d at 116. In an effort to bail out its sinking ship, DOJ took a new approach at closing arguments—suggesting that the Court could simply define whatever relevant market the Court deemed had been proven. (Tr. 1856:4-1857:2 (arguing that the Court could still find for DOJ on the basis of a "relevant market different from the one . . . set out in [DOJ's] complaint.").) But DOJ must be held to what it has alleged, as courts routinely forbid plaintiffs from establishing claims based on new, unpled markets. *See, e.g.*, *Cont'l Trend Res., Inc. v. OXY USA Inc.*, 44 F.3d 1465, 1481 n.19 (10th Cir. 1995) (affirming rejection of antitrust claims on market definition grounds where district court had held plaintiffs to be "saddled with their Complaint as filed in this Court" when they "later attempted to redefine the relevant market"), *vacated on other grounds*, 517 U.S. 1216 (1996); *Pastore v. Bell Tel. Co. of Pennsylvania*, 24 F.3d 508, 512-13, n.5 (3d Cir. 1994) ("hold[ing] plaintiffs to their own contention" regarding relevant market); *Monsanto Co. v. Scruggs*, 342 F. Supp. 2d 568, 582, 584 (N.D. Miss. 2004) (granting summary judgment and "refus[ing] to countenance" claimants' attempt to "alter their proposed market definitions" when they had "[n]ever sought leave to amend their pleadings"); *W. Parcel Exp. v. United Parcel Serv. of Am., Inc.*, 65 F. Supp. 2d 1052, 1059 (N.D. Cal. 1998)

(raising procedural impropriety regarding plaintiff's "efforts to redefine and narrow its alleged relevant market" from the market alleged).

Nor does *United States v. Energy Solutions, Inc.*, 265 F. Supp. 3d 415 (D. Del. 2017), which DOJ cited at closing arguments, support DOJ's sweeping suggestion that courts may simply create a new market definition from whole cloth. In *Energy Solutions,* DOJ had alleged four product markets relating to low-level radioactive waste ("LLRW"): two were operational markets (higher-activity and lower-activity operational LLRW) and two were decommissioning markings (higher-activity and lower-activity decommissioning LLRW). 265 F. Supp. 3d at 436. In reviewing the evidence, however, Judge Robinson determined that the distinctions between "operational" LLRW and "decommissioning" LLRW were not sufficient to treat them as separate markets. *Id.* at 436-37. Accordingly, while Judge Robinson agreed with the general outlines of the markets pled by DOJ, she rejected DOJ's proposed sub-segmentation of them, finding the evidence to have established two broader markets rather than four smaller ones. *Id.* at 436 ("[T]he court finds no useful purpose in further dividing the market between operational and decommissioning waste."). The *Energy Solutions* defendants were therefore fully on notice of the participants in and competitive dynamics of the relevant product markets at issue; Judge Robinson did not *sua sponte* invent a brand-new product market that had not been pled and on which no evidence had been presented at trial, as DOJ seems to suggest the Court should do.

Moreover, an eleventh-hour adoption of an unpled market would unfairly prejudice Defendants. DOJ waited until the close of trial to suggest the Court could enter judgment in its favor on the basis of a new, unpled market to which DOJ had not assigned any contours and as to which it had elicited no evidence. DOJ's effort to retreat from the deficient markets it pled in favor of some new, unidentified market, of which defendants had no notice, and had no ability to

rebut, is precisely the sort of litigation-by-ambush that the Federal Rules condemn. *See* Fed. R. Civ. P. 8.

*     *     *

In short, DOJ has failed to carry its burden to establish an economically meaningful product market based on the principles of reasonable interchangeability of use and cross-elasticity of demand. Without a relevant product market, DOJ's "examination of the merger's competitive effects [is] 'without context or meaning.'" *Penn State Hershey Med. Ctr.*, 838 F.3d at 338. The Court need go no further and should render judgment for Defendants.

### B.      DOJ Has Failed to Prove Its Proffered Geographic Market

DOJ's case fails for the independent reason that the geographic scope of the purported "booking services" markets is indisputably global, and not, as DOJ contends, limited to the United States.

A properly-defined relevant geographic market must also "correspond to the commercial realities of the industry." *Lab. Corp. of Am.*, 2011 WL 3100372, at \*19 (citing *Brown Shoe*, 370 U.S. at 336). Courts thus examine "'the area in which the goods or services at issue are marketed to a significant degree by the acquired firm.'" *Id.* (citing *Marine Bancorporation*, 418 U.S. at 621). The geographic market must accurately "define the region 'in which the seller operates, and to which the purchaser can practicably turn for supplies.'" *Id.* (citing *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961)).

Here, DOJ's geographic market reflects multiple inconsistencies that once again defy commercial reality. *First*, DOJ on the one hand points to evidence of FLX OC's overseas activities, but on the other hand, looks only to the United States in defining its geographic market. (FOF ¶ 122.) DOJ cannot have it both ways: if such ex-U.S. evidence is relevant to competitive effects, then DOJ must prove undue concentration and competitive effects in a

20

*global* geographic market, as its own Guidelines instruct. *See* Horizontal Merger Guidelines § 4.
*Second*, DOJ attempts to limit its "booking services" markets to the United States by claiming
that Sabre's GDS fees vary by geography. (FOF ¶ 122.) But that is not the case for Farelogix, as
Farelogix sells FLX OC ████████████████████████████████████ (FOF ¶
123.)

Nor can DOJ explain why its geographic market analysis is premised on the location of
travel agencies, when in reality FLX OC has no travel agency customers and sells products only
to airlines. (FOF ¶ 38.) According to Dr. Nevo, his geographic market is based on "who the
customer for the product is." (FOF ¶ 123.) Here, FLX OC's customers are airlines, and of the
fifteen airlines that are FLX OC customers, only two of them—American and United—are
located in the United States. (FOF ¶ 124.) Indeed, Farelogix has not ███████████████
for FLX OC in the last five years. (FOF ¶ 137.) The market reality is that FLX OC is sold
globally, and Farelogix responds to RFPs from airlines globally in competition with global IT
providers, such as Amadeus, Datalex and Open Jaw. (FOF ¶ 137.) Yet contrary to this
commercial reality, DOJ urges a geographic market drawn around the travel agents' point of
sale—in other words, around the location of FLX OC's customers' customers.

## II.      DOJ Has Not Established Undue Concentration in Any Relevant Market And Is Not Entitled to a Presumption of Harm

Even accepting DOJ's flawed market definition, DOJ cannot show a concentration
increase sufficient to carry its burden. In calculating market shares for the purposes of assessing
market concentration, courts require that the relevant market include all "sellers or producers
who have the . . . 'ability to deprive each other of significant levels of business.'" *Rebel Oil Co.
v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995) (citation omitted). The Horizontal
Merger Guidelines, which guide DOJ's own analysis, likewise require all sellers earning

revenues in the market to be included in calculations of concentration. *See* Horizontal Merger

Guidelines, § 5.1 ("All firms that currently earn revenues in the relevant market are considered

market participants . . . ."). In addition, where a company is able to replace the products or

services of the merging defendants with internal solutions, that captive output must be included

in the relevant market as well. *See SunGard*, 172 F. Supp. 2d at 186 ("As a matter of law,

'[c]ourts have generally recognized that when a customer can replace the services of [an external

product] with an internally-created [] system, this "captive output" (i.e., the self-production of all

or part of the relevant product) should be included in the same market.'" (quoting *FTC v.*

*Cardinal Health*, 12 F. Supp. 2d 34, 48 (D.D.C. 1998)).

  DOJ's statistical analysis inaccurately measures market concentrations because DOJ:  (1)

ignores competitors in the marketplace today, including airline self-builds; (2) improperly

excludes direct sales by airlines from the alleged OTA market, resulting in a massive inflation of

market shares for the remaining participants in that market; and (3) misattributes GDS

integration sales to FLX OC in the market for "booking services" sold through TTAs—again

inflating Farelogix's share.  Correcting for the identified errors in DOJ's OTA and TTA market

analyses means that DOJ cannot show a significant increase in market concentration, sufficient

to establish any *prima facie* case. *See United States v. Amsted Indus. Inc.*, No. 71-cv-3124, 1974

WL 914, at *14 (N.D. Ill. July 19, 1974) (refusing to prohibit a merger when "[t]he

Government's statistics d[id] not realistically reflect the state of competition in any relevant

market," including because "the market share and concentration statistics ignore[d] the

competition afforded by other [competitors]").

### A.    DOJ Ignores Farelogix Competitors in its Market Concentrations

  DOJ's market concentration analysis is fundamentally flawed because DOJ arbitrarily

limits its "booking services" market to just five players: the three GDSs, Farelogix, and "airline

APIs" (a stand-in for Southwest Airlines).  DOJ ignores several API suppliers competing today, despite a dynamic market in which they are poised to grow.  Indeed, DOJ's future market concentration figures exclude numerous competitors already in existence and project no future growth from non-Farelogix suppliers.

DOJ's selective focus is again at odds with market realities.  Today, in the United States alone, Southwest, Jet Blue, Spirit and Delta all use APIs provided by a competitor of Farelogix not counted in DOJ's market.  (FOF ¶¶ 126, 127, 143.)  Farelogix has only won ▇▇▇▇ of its NDC API bids in the last four years and faces continued competition from both third-party suppliers and airline self-supply.  (FOF ¶46-47.)  Farelogix has lost bids to provide NDC API services to several companies, including Open Jaw, Datalex, Amadeus, and TP Connects, and it has competed against others, such as DXC, IBS, SAP and JR Technologies.  (FOF ¶ 139.) Additionally, Farelogix has also lost two large airlines—Delta and Air Canada—that had been FLX OC customers.  (FOF ¶ 138.)

Today FLX OC competes with numerous IT providers and airline self-supply.  (FOF ¶¶ 135, 138-140, 157-58, 169, 176.)  Airlines can create their own NDC APIs; in fact, some already have, and others have indicated they may soon switch to self-supply.  United, for example, has said that it can build its own NDC API for as little as ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇ (FOF ¶¶ 158, 210.)  American has also considered self-supply and ▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ (FOF ¶ 157, 176.)  Further, the Airline Tariff Publishing Company ("ATPCO") has developed a product called NDC Exchange, which enables airlines to distribute NDC offers and receive NDC orders even without an NDC API.  (FOF ¶ 145.)  As of December 2019, about 60 companies worldwide have obtained a level 3 or 4 NDC certification from IATA, publisher of the NDC open-source standard, meaning that

these firms stand as potential suppliers of NDC API services to compete with FLX OC. (FOF ¶ 71.)

Despite these market dynamics, DOJ's future market concentration calculations are based on engineered growth projections that improperly assume growth by Farelogix while these other competitors remain stagnant. DOJ applied Sabre's projections for FLX OC's growth to 2018 market share figures, without analyzing growth from other API providers or airline self-supply, resulting in wholly fictitious 2020 "projections." (FOF ¶ 125.) The skewed and unreliable nature of these "projections" is evidenced by the fact that Dr. Nevo's market share calculations for 2020 do not show any growth from any other API provider, including airline self-supply, even though only two airlines in the United States use FLX OC, while others use alternative NDC API suppliers or self-supply. (FOF ¶¶ 125-126.)

### B.   DOJ's Proposed Market of Booking Services for Airline Tickets Sold Through OTAs Is Impermissibly Narrow

DOJ's artificial line-drawing also renders unreliable the share calculations in its purported market for "booking services for airline tickets sold through OTAs" market. As discussed in Section I.A.3 *supra*, the trial record demonstrates that competition from airlines' direct sales channel must be included in this market. Properly adding airline direct channel sales to DOJ's OTA market results in Sabre having only ▬ market share in 2018 and Farelogix direct connections having ▬ market share.[9] (Murphy Demonstrative at 7.) If Dr. Nevo's HHI calculations are revised to include airline direct channel sales, the result is a post-merger HHI change in HHI of 19 for 2018 and 53 for 2020, far below the thresholds set forth in DOJ's own

---

[9]   Note that including direct channel sales may increase Farelogix market share slightly because two of Farelogix's current customers use FLX OC for airline.com. (FOF ¶ 42.) However, the increase makes no difference to the ultimate analysis.

24

Horizontal Merger Guidelines. (FOF ¶¶ 134.) Simply put, enjoining a merger of two companies that account for less than ███ of a market is inconceivable and wildly inconsistent with the purposes of the antitrust laws; neither the post-merger market concentration nor the increase in concentration due to the merger is sufficient to establish DOJ's *prima facie* case.

### C.   DOJ Miscalculates Market Shares in Its Proposed Market of Booking Services for Airline Tickets Sold Through TTAs

DOJ is not entitled to any presumption of harm in its alleged TTA "booking services" market because it improperly and contrary to market realities attributes GDS integration bookings to Farelogix rather than to the GDS making the sale. This attribution of NDC-enabled GDS sales to FLX OC rather than to the GDS reflects DOJ's misunderstanding of how those transactions work. As proven at trial, when an NDC-enabled sale is made through a GDS, the GDS continues to maintain the connection and commercial relationships with travel agencies and airlines; the NDC provider (such as Farelogix) does not replace the GDS, but acts as an upstream, vertical complement to the GDS sale. (FOF ¶¶ 129-130.) Thus, the sale should properly be understood as a sale by the *GDS*, not by *Farelogix*.

A proper calculation of market shares that accounts for these commercial realities shows that the merger will result in little change in concentration in DOJ's proposed TTA booking services market. If only sales through direct connections using FLX OC are attributed to Farelogix, this leaves Farelogix with a ███ market share, while Sabre would have a ███ share. (Murphy Demonstrative at 7.) DOJ is unable to find a presumption in 2018 in this market, so it relies on the flawed 2020 projections. Even there, however, if Dr. Nevo's calculations using Sabre's 2020 projections are modified so that GDS integration sales are properly assigned to the GDS, not to the NDC API supplier, the result is an HHI change of 19. (FOF ¶¶ 132.) DOJ cannot make out a presumption of harm in this alleged market.

25

III.    **The Court Should Permit the Merger Because DOJ Has Not Proven Any Likely Substantial Lessening of Competition**

The record amply demonstrates that even if Sabre and Farelogix were (inaccurately) considered to be horizontal competitors in a cognizable relevant market, DOJ cannot prove that the transaction would likely result in substantial anticompetitive effects. Similarly, when the transaction is (correctly) analyzed as a vertical merger, the record demonstrates that DOJ again is unable to carry its burden. These failures require judgment in favor of Defendants.

A.    **DOJ Fails to Prove Anticompetitive Effects**

Even after a relevant market is defined and market concentration is established, the Court must consider the "transaction's probable effect on competition in the product and geographic markets." *Oracle*, 331 F. Supp. 2d at 1111; *see also Baker Hughes*, 908 F.2d at 992 ("The Herfindahl-Hirschman Index cannot guarantee litigation victories.").[10] Any evidence of such effects must then be weighed against defendants' rebuttal evidence, which can include a "variety of factors," *Baker Hughes*, 908 F.2d at 984, such as "the continuation of active price competition," *Kaiser Aluminum & Chem. Corp. v. FTC*, 652 F.2d 1324, 1341 (7th Cir. 1981), and post-closing conduct that mitigates potential anticompetitive harm. *See AT&T*, 310 F. Supp. 3d at 241 n.51.

Here, in light of the industry's "structure, history and probable future," DOJ's evidence fails to show that the merger will result in anticompetitive effects. *United States v. Gen. Dynamics Corp.*, 415 U.S. 486, 498 (1974) (citation omitted). DOJ's attempt to show anticompetitive effects chiefly rests on mischaracterizing the level of head-to-head competition

---

[10]    Despite the burden-shifting framework of *Baker Hughes*, courts typically follow a "flexible approach" in assessing competitive effects, viewing "statistical and non-statistical factors as an integrated whole." *Oracle*, 331 F. Supp. 2d at 1111.

between the merging parties, misleadingly citing documents referring to competition for merchandising as if referring to the GDS and FLX OC, and referring to outdated documents that are inconsistent with the likely future trajectory of the industry. DOJ ignores the primary competitive constraints on Sabre's GDS, overstates the competitive significance of airlines' direct connections, and disregards alternatives to FLX OC. DOJ also completely ignores that the alleged anticompetitive effects are undermined by Sabre's public commitments to continue supporting NDC-based technologies, and that the merger will incentivize continued innovation by Sabre and increased competition against other GDSs.

### 1.   FLX OC Is Not Unique and Airlines Have Many Other Options to Facilitate Direct Connections

Contrary to DOJ's assertions, FLX OC is not "unique" because numerous competitors already exist and successfully compete with Farelogix for airlines' NDC API business. (FOF ¶¶ 46-47, 135-142.) This fact alone supports a decision in Defendants' favor.

Any incumbency advantage that Farelogix may once have held has long evaporated. The standardization of NDC, particularly the introduction of the highly scalable and workable schema version 17.2, has enabled many other IT companies—including several new entrants—to compete for and win NDC API bids in the past five years. (FOF ¶ 135.) New entry is expected to continue because NDC is an open-source technology that is not patent-protected; in other words, there is no intellectual property barrier to entry. (FOF ¶¶ 35, 135.) Consistent with the expected effects of standardization, and as explained in Section II.A.1, *supra*, Farelogix has only won ▮▮ of its NDC API bids in the last four years and faces continued competition from both third-party suppliers and airline self-supply. (FOF ¶¶ 46-47.) Such robust competition as is provided by current market participants and competition from the other identified NDC API developers overrides DOJ's claimed anticompetitive effects. *See, e.g., United States v. Int'l*

27

*Harvester Co.*, 564 F.2d 769, 778, 780 (7th Cir. 1977) (affirming that evidence was "sufficient to overcome the Government's prima facie case" when the district court found "every indication that the high level of competition will continue" in the market "with two other firms already entering the industry and five more planning to do so").

Nevertheless, despite overwhelming evidence to the contrary, DOJ argues that competition will be harmed because no other IT provider could facilitate direct connection sales for airlines as large as United or American. (FOF ¶ 166.) This argument falls flat. Though American and United witnesses claimed that Farelogix was "unique," (FOF ¶¶ 171-175), their testimony is rebutted by the trial record, which shows that there are many NDC API providers that are equivalent to FLX OC. (FOF ¶¶ 135-165.) In fact, both admitted that they had not issued an RFP or actually even considered any of the many alternative NDC API suppliers in the market today. (FOF ¶¶ 166-168.) The record shows that both United and American have ████████████████████████████████████████████████ (FOF ¶ 176.) ████████████████████████████████████████████████ ██████████████████████ (FOF ¶ 168.) Both of these airlines are also highly motivated to oppose this transaction for reasons having nothing to do with the purpose of the antitrust laws: both airlines sought to purchase Farelogix in the past, and United ██████████████████ ████████████████████████████████████████████████ ████████████████████████ (FOF ¶¶ 177-183.) American's professed concerns about Farelogix are also highly suspect: ██████████████████████ ████████████████████████████████████████████████ ██████████████ (FOF ¶ 212.) ████████████████████ ████████████████████████████

### 2.  FLX OC Does Not Constrain GDS Fees

*First, airlines* use direct connections—with FLX OC as an input—as another distribution pathway. (FOF ¶¶ 42, 99.)  Thus, it is not FLX OC competing with the GDS channel—it is the airline, which must establish the connection and commercial relationship with a third party, that competes with the GDS channel.  (FOF ¶¶ 100, 130.)

*Second*, in an effort to inflate the importance of direct connections in the competitive effects analysis, DOJ looks to the past to conjure some "threat" from an airline's use of FLX OC as a constraint on GDSs.  But rather than face industry reality and changing market dynamics, DOJ's backward-looking analysis improperly disregards the likely future trajectory of the industry, and must therefore be rejected.  *See AT&T*, 310 F. Supp. 3d at 176 n.6 (finding lack of "persuasiveness" where DOJ relied on a document and similar statements from a past year because "the industry ha[d] undergone significant changes since [that time]").

Direct connections have limited effect as a constraint on the GDS, and the merger will do little to impact the competitive balance.  Indeed, the evidence reflects that GDS bypass through direct connections is stagnant.  (FOF ¶¶ 184, 193.)  And direct connections have been shown to have a minimal competitive effect on Sabre's GDS fees, particularly when compared to rival GDSs or airline direct channel sales.  (FOF ¶¶ 184-194, 226.)

Direct connections have been in the travel industry since at least the 1980s.  (FOF ¶ 184.)  Nearly 30 years later, about 2% of bookings made in the United States were through direct connections, most of which are attributable to Southwest.  (FOF ¶ 184.)  In fact, Farelogix has been providing an XML solution for direct connections for over ten years, (FOF ¶ 204), yet FLX OC has not been widely adopted by U.S. airlines.  Direct connections have failed to grow because travel agents do not want them:  they increase costs, reduce efficiency and degrade customer experience.  (FOF ¶¶ 185-194.)

The reality is that the industry is now moving towards greater adoption of GDS integration of NDC capabilities. (FOF ¶¶ 184-194.) Today, Farelogix's focus is on working with the GDS to bring NDC to the industry. (FOF ¶ 75.) After the release of IATA's NDC 17.2, Farelogix saw a significant uptick in requests to integrate with the GDS. (FOF ¶¶ 73-74.) These GDS passthrough integrations were the "Holy Grail" for Farelogix. (FOF ¶ 75.) While airlines were once interested in using FLX OC for direct connections, today "the number one thing that we hear from airlines . . . is about plugging into a GDS." (FOF ¶ 75.) Farelogix currently has over 26 different GDS integration projects, compared to just six such implementations in the beginning of 2018). (FOF ¶ 74.) The company views these GDS passthrough integrations as the future of NDC, and it is why Farelogix expects "pretty much all" future growth in FLX OC volumes to "come from GDS passthrough." (FOF ¶¶ 75-76.)

Other industry participants agree with Farelogix that GDS integration is where the market is heading. Delta's Jeffrey Lobl expects the "overwhelming majority" of Delta's API consumption to be done by the GDS. (FOF ¶ 193.) ████████████████████████████ ████████████ Travel agency representatives believe that GDS integration is necessary to bring NDC to scale. (FOF ¶ 97.)

Importantly, GDS integration does not displace the GDS as DOJ posits, but rather, it raises the value of the GDS platform as a whole. (FOF ¶¶ 129-130.) As Sabre CEO Sean Menke explained, GDS integration increases the complexity of the offers within the GDS. (FOF ¶ 129.) Faced with increasingly complex offers, travel agents need the ability to comparison shop offers. (FOF ¶ 129.) To do that comparison shopping, agents need the normalization and aggregation functions provided by the GDS to compare various types of offers, or what CWT CEO Kurt Ekert described as making offers "apples-to-apples" comparisons. (FOF ¶ 129.)

### 3.    The Primary Competitive Constraints on the GDS Remain

DOJ's competitive effects arguments are further undercut by the fact that the primary

constraints on the GDS—rival GDSs and airline direct channel distribution—will remain post-

transaction.  Sabre will continue to face competition from Amadeus and Travelport, and will

continue to risk losing travel agency customers to those GDS rivals.  (FOF ¶¶ 24-25, 96.)  As

Professor Murphy explained, "[i]f [Sabre] do[es]n't provide [the airline content that] customers

want[], they'll lose travel agencies to Amadeus and Travelport, and if they don't provide what

the airlines want and they don't get the airline content, that will cause them to lose on the travel

agency side as well."  (FOF ¶ 24.)  This merger has no impact on the continued incentives for

Sabre, Amadeus and Travelport to compete for travel agency customers.  Similarly, this merger

will also have no impact on the competition Sabre faces from airlines' websites and their ability

to threaten to withhold content.  Thus, Sabre will face the same primary competitive pressures it

faced pre-merger.

### 4.    Sabre's Commitments Undermine DOJ's Allegations of Harm

DOJ's assertion that this transaction will result in anticompetitive harm is further

undermined by Sabre's public commitments regarding FLX OC.  Specifically, Sabre has

committed to continue offering any existing FLX OC or Sabre GDS contract for three years past

its current expiration date, to provide at least the same level of support for FLX OC customers,

and to make FLX OC available at the same prices available today or lower.  (FOF ¶ 200.)  These

commitments ensure, at minimum, that FLX OC will continue to be available to airlines, that

there will not be a price increase as a result of the merger, and that current FLX OC customers

will have at least three years to replace FLX OC with one of the multiple other NDC API

providers if they perceive any disadvantage resulting from the transaction.  *See AT&T*, 310 F.

Supp. 3d at 241 n.51.  DOJ witnesses acknowledged that these commitments would provide time

31

to replace Farelogix.  (FOF ¶ 202.)  Sabre also has additional incentive to honor these

commitments it has made to "a marketplace with repeat players," given that the "reputational

costs" of deviating from them "would imperil future negotiations" with airlines.  *Id.*  Similar

self-enforcing mechanisms were persuasive mitigating evidence before the court in *AT&T*.  *Id.*

They are equally (if not more) significant here.  *See Arch Coal, Inc.*, 329 F. Supp. 2d at 159

(citing defendants' post-merger commitments in finding that "defendants have successfully

rebutted" the government's *prima facie* case).

### 5.    The Merger Results in Significant Benefits

Finally, DOJ ignores the significant procompetitive benefits that will result from the

unique combination of Sabre's vast commercial network and Farelogix's technical know-

how.  Indeed, the procompetitive benefits of a transaction are relevant to a court's analysis of

competitive effects, and can undercut a *prima facie* case and serve "as evidence that a merger

would not actually be illegal."  *New York v. Deutsche Telekom AG*, 19-cv-5434, slip op. at p. 57-

59 (S.D.N.Y. Feb. 11, 2020), ECF No. 409 (explaining the "trend" among courts is to recognize

that a transaction's procompetitive effects "may rebut the presumption that a merger's effects

will be anticompetitive"); *AT&T*, 310 F. Supp. 3d at 191, 194 (assessing whether DOJ "met its

burden of proof of establishing . . . that the merger . . . is likely to substantially lessen

competition" notwithstanding the merger's "procompetitive effects").[11]  Mergers can "enhance

competition by combining complementary assets . . . or achieving scale economies," which may

directly benefit consumers by "improving quality, increasing innovation, and lowering prices."

*Lab. Corp. of Am.*, 2011 WL 3100372, at *10, *20; *see also United States v. M.P.M., Inc.*, 397 F.

---

[11]  Despite DOJ's assertions to the contrary, this is not an efficiencies defense, and therefore, the
cases cited by DOJ in their closing argument are inapposite. .

Supp. 78, 93 (D. Colo. 1975) (permitting merger when evidence of "procompetitive effects" showed that the "[s]ervice offered" by new firm "was superior to that offered by either of the previously independent companies alone"). Vertical transactions are especially likely to generate procompetitive effects, which in turn inure to the benefit of competition and consumers alike. *See AT&T*, 310 F. Supp. 3d at 197.

### (a)    Development of NDC Capabilities

This transaction will spur innovation by accelerating the implementation of GDS integration, increasing competition among Sabre, Amadeus, and Travelport, as well as promoting price transparency and inter-brand competition among airlines. Sabre has substantial scale and expertise as a GDS provider, but has struggled to develop competitive NDC-enabled retailing capabilities to integrate with its GDS offering. (FOF ¶¶ 84-86.) Farelogix, in contrast, has NDC retailing capabilities but no GDS, and has struggled to achieve scale due to financial and technical constraints. (FOF ¶¶ 84-86.) By combining Farelogix's expertise in NDC API development and implementation with Sabre's GDS business, this transaction will enable the combined firm to deliver an integrated end-to-end GDS integration solution that ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ This will benefit consumers because it will enable the combined firm to compete more effectively with Amadeus and will increase inter-brand competition for airline tickets by allowing price comparison among all airlines' NDC and non-NDC content—i.e., more content. (FOF ¶ 96.)

Airlines and travel agents agree that this transaction will drive NDC growth. (FOF ¶ 97.) Fareportal testified that the merger "will likely help innovation and allow Sabre to provide better content in ways that airlines wish to see that content displayed." (FOF ¶ 205.)   Spirit Airlines' Rocky Wiggins similarly testified that the transaction will "accelerate Sabre's capability in the NDC area." (FOF ¶ 97.).

33

### (b)    Core PSS and Non-Core PSS Modules

Not only does this merger increase innovation by accelerating integration of NDC content into the Sabre GDS, but it will also spur innovation more broadly across the air travel distribution industry.  For example, this transaction also combines Sabre's and Farelogix's complementary PSS offerings and expertise—critical IT systems used by airlines to market their inventory of seats and auxiliary products—enabling the combined firm to improve its merchandising solutions and broaden sales opportunities.  (FOF ¶¶ 48-49, 50, 52-54.)  Sabre offers both core and non-core PSS modules, but its non-core module is PSS-dependent, which means that it can be used only with the core Sabre PSS.  (FOF ¶¶ 50, 52.)  Farelogix, in contrast, offers PSS-agnostic non-core PSS modules, but it does not have a core PSS offering.  Farelogix's flagship non-core PSS product, FLX Merchandise ("FLX M"), is the market leader, and allows airlines to create customized offers and bundles of ancillary products.  (FOF ¶ 53-54, 80.)  The addition of FLX M to Sabre's PSS portfolio will improve the quality of the bundled offering of core and non-core PSS modules that Sabre currently sells to airlines.  (FOF ¶ 80-82.)  Because Farelogix does not offer a core PSS, it is currently unable to sell FLX M to airlines that find it advantageous to purchase core and non-core PSS modules from the same supplier.  (FOF ¶ 53-55.)  ███████████████████████████████████████████████████████████

███████████ (FOF ¶ 52.)  A merged firm will fill these gaps in the parties' existing PSS portfolios, creating more overall sales opportunities for the merged firm.  The foregoing evidence completely undercuts DOJ's unsupported fear-mongering about the diminution of

industry-wide innovation following the loss of Farelogix as an independent competitor, and to the contrary reinforces that Sabre has ample incentives to continue to innovate.[12]

**B.     DOJ's Bargaining Leverage Theory Likewise Fails**

**1.     DOJ's "Increased-Leverage" Theory Does Not Reflect Reality**

DOJ appears to contend that post-acquisition, Sabre will enjoy increased bargaining leverage in negotiations with its airline competitors.  (*See* Compl. ¶¶ 4, 32, 37, 51, 52, 53, 55.) As an initial matter, DOJ never pled any harm to competition under such a vertical merger theory, meaning any such claim must fail as a matter of law.  In any event, any vertical claim here fails, just as DOJ's claims failed in *United States v. AT&T, Inc.*, where DOJ also (unsuccessfully) posited a similar "increased-leverage" theory.  *See AT&T*, 310 F. Supp. 3d at 199.[13]

In its challenge of AT&T's acquisition of Time-Warner, DOJ's increased-leverage theory claimed that the combination of AT&T's video distribution services (like DirectTV) and Time Warner's video content would provide Time Warner with increased bargaining leverage when negotiating with AT&T's video distributor competitors.  *Id.* at 201.  Here, DOJ argues that post-merger, Sabre's ownership of FLX OC will increase its bargaining leverage over airlines, which will inhibit airlines' abilities to obtain GDS fee concessions from Sabre.  This theory is fundamentally flawed.

---

[12]   To the extent DOJ suggests that the Court can only consider procompetitive effects within its alleged booking services markets, DOJ cannot have it both ways:  if DOJ is urging the Court to consider post-merger anticompetitive effects affecting "innovation in the industry," it cannot also simultaneously preclude the Court from crediting procompetitive effects outside the "booking services market[s]."  Trial Tr. 1770:3-4; 1864:5-9.)

[13]   Unsurprisingly, two years after *AT&T*, it is still true that there is no federal district court ruling in which DOJ has "successfully used this increased-leverage theory to block a proposed vertical merger as violative of Section 7."  *AT&T*, 310 F. Supp. 3d at 199.

*First*, DOJ's focus of alleged harm through GDS fees is untethered from DOJ's own alleged product markets, which do not include a GDS market. *See, e.g., Penn State Hershey Med. Ctr.*, 838 F.3d at 337-38 (stating that the government must "propose the proper relevant market" and "show that the effect of the merger *in that market* is likely to be anticompetitive" (emphasis added)).

*Second*, as explained at trial, GDS fees are set by contract, so the alleged harm of supposedly increased bargaining leverage could only emerge in the next contract negotiation. However, DOJ completely failed to present any credible evidence demonstrating that Sabre would gain bargaining leverage from the merger such that it could force the airlines to acquiesce to higher prices. DOJ presented testimony from only two airlines, both of which are FLX OC customers, and neglected to consider the many airlines—including Delta, Southwest, JetBlue, Spirit and others—that do not use Farelogix. For those customers, the merger will have no impact on Sabre's bargaining leverage. (FOF ¶ 195.)

Even American and United—whose preferred outcome should in no way be confused with "competition"—have other levers that they can assert in GDS negotiations with the post-merger Sabre. They could build, or even just threaten to build, their own NDC API, which is something that they have in fact both contemplated. (FOF ¶¶ 210, 212.) Both airlines could also switch, or threaten to switch, to an alternative NDC API supplier to replace Farelogix, which they have also considered. (FOF ¶ 165.) ███████████████████████ ███████████████████████████████████ (FOF ¶ 166.) Simply put, neither airline provided a credible justification for why it would be unable to replace Farelogix, when other sophisticated airlines have used alternative NDC API suppliers. There are other levers that American and United can turn to as well. In negotiations with Sabre, they can use Sabre's rival

GDSs to constrain Sabre's prices and can also use their direct sales channels and the threat of withholding content or implementing surcharges. (FOF ¶ 113.)

### 2.    DOJ Relies on the Same Flawed Evidence that Failed in *AT&T*

DOJ seeks to support the bargaining leverage theory of harm by claiming that competitive effects are evident from (1) ordinary-course business documents or (2) competitor testimony from American and United.  These are the same types of evidence that DOJ unsuccessfully invoked in *AT&T* and this Court should reject them.

*First*, out-of-context passages in documents from individuals not involved in the merger negotiations are unpersuasive here, just as they were in *AT&T*.  There the court was not persuaded by DOJ's reliance on "random statements from defendants' 'ordinary course' business documents, including employees' emails and internal slide decks." 310 F. Supp. 3d at 208. Statements that DOJ had pulled from slide decks were found to have been drafted by lower-level AT&T employees who had nothing to do with the substance of the decision to acquire Time Warner, and were in preliminary drafts, only to be subsequently removed or changed. *Id.* Likewise, here, here DOJ's "trial by slide deck leaves much to be desired[.]" *Id.*  DOJ has seized on and overemphasized isolated bullets in slide decks, including drafts or discussion decks, erroneously contending they are representative of the company's views on GDS competition. For example, DOJ repeatedly pointed to the "mitigate the risk of bypass" bullet, but Sabre's head of Corporate Development explained that the bullet was not in his February 2018 analysis of the transaction, was put in by a subordinate on a tight deadline, existed for only a few days, did not reflect his views of the transaction or the industry, and was therefore deleted before being

formally presented to the board of directors.[14]   (FOF ¶ 224.)  Sabre's CEO Sean Menke likewise

said that the bullet did not represent his views of the transaction (FOF ¶ 95), and his testimony

regarding the deal rationale stands unrebutted.  DOJ also cherry-picked quotes from off-site

meeting decks for next-generation merchandising products held long ago and misleadingly

contended these were indicative of GDS competition.[15]  (FOF ¶ 214-227.)

        In *AT&T*, as here, DOJ's selective excerpts from ordinary course materials also failed to

persuade the court: DOJ had "'overemphasized the importance and relevance' of the excerpts

from defendants' documents, given that many of them, the testimony revealed, contained

'informal speculation' about 'rationales for the merger' or were generated by individuals 'who

had no decision-making role or authority in relation to the merger.'"  *Id.* at 209 (quoting *United*

*States v. H & R Block, Inc.*, 833 F. Supp. 2d 36, 77 n.30 (D.D.C. 2011)).  This "informal

speculation" was unsupported by any direct, probative evidence of anticompetitive intent on the

part of high-level executives within the merging company.  *Id.* at 210 (citing *FTC v. Whole*

*Foods Mkt. Inc.*, 548 F.3d 1028, 1044-45 (D.D.C. 2008) (Tatel, J., concurring in the

judgment)).[16]  The same is true here.  For instance, DOJ seeks to rely on casual text messages

---

[14]   DOJ appeared to suggest that the bullet was removed after Mr. Boyle received legal advice,
but Mr. Boyle testified that he did not recall having such a communication.  (FOF ¶ 223.)

[15]   Throughout the trial, but particularly in its opening and closing demonstratives, DOJ
consistently misconstrued Sabre and Farelogix documents to support DOJ's theories of
competitive harm.  (FOF Part V.G) (demonstrating examples of mischaracterizations of
Defendants' documents at trial)

[16]   As another federal court recently explained in rejecting a merger challenge, documents
drafted by individuals who have no input on how the merged entity will behave "lack
significant probative value" for assessing whether a merger will substantially lessen
competition. *See New York v. Deutsche Telekom AG*, 19-cv-5434, slip. op. at 134-35
(S.D.N.Y. Feb. 11, 2020) (finding that government's reliance on emails and messages sent by
the target firm's chief marketing officer, who merely expressed his personal views and had

*(cont'd)*

from Greg Gilchrest, but Mr. Gilchrest explained that the text messages reflected his speculation as to the reception the transaction would receive from an American Airlines employee, and Mr. Gilchrest had no decision-making role in relation to the merger. (FOF ¶ 214.)

*Second*, the *AT&T* court rejected DOJ's reliance on competitor testimony. *AT&T*, 310 F. Supp. 3d at 211. The court found it difficult to weigh the "speculative concerns" about the merger voiced by the proffered third-party competitor witnesses because "the central issue. . . is whether the Government has proffered sufficient support for the anticompetitive effects it asserts" and not "protecting . . . rivals from any and all competitive pressures they would experience[.]" *Id.* at 211-12. Here, DOJ relied on the testimony of just two airlines—United and American. DOJ elicited nothing more than "speculative concerns" from those witnesses, neither of whom credibly articulated how his company would be harmed by the acquisition and neither of whom had considered or evaluated alternatives to Farelogix.

In sum, DOJ has utterly failed to prove that this merger will have an anticompetitive effect by providing Sabre with undue bargaining leverage. Instead, the trial record demonstrates that the merger will provide Sabre with the end-to-end retailing, distribution and fulfillment platform to drive the travel industry forward into the next generation retailing and distribution. The merger will allow Sabre to better compete with Amadeus and drive the growth of NDC and other next-generation capabilities, all to the benefit of customers and competition.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court enter judgment for Defendants and deny DOJ's request for a permanent injunction.

---

no input on the buyer's pricing practices, did not provide "a sufficiently credible or plausible basis to conclude that the Proposed Merger will substantially lessen competition").

DATED: February 13, 2020

OF COUNSEL:

Tara L. Reinhart
Steven C. Sunshine
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
1440 New York Avenue, N.W.
Washington, D.C.  20005
Tel.: (202) 371-7000
Email:  tara.reinhart@skadden.com
          steve.sunshine@skadden.com

Matthew M. Martino
Michael H. Menitove
Evan R. Kreiner
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
4 Times Square
New York, NY 10036
Tel.: (212) 735-3000
Email: matthew.martino@skadden.com
          michael.menitove@skadden.com
          evan.kreiner@skadden.com

Kenneth A. Gallo
Jonathan S. Kanter
Joseph J. Bial
Daniel J. Howley
PAUL, WEISS, RIFKIND, WHARTON
  & GARRISON LLP
2001 K Street, NW
Washington, DC 20006
Tel.: (202) 223-7300
Email:  kgallo@paulweiss.com
          jkanter@paulweiss.com
          jbial@paulweiss.com
          dhowley@paulweiss.com

Respectfully submitted,

/s/ Joseph O. Larkin
Joseph O. Larkin (ID No. 4883)
Veronica B. Bartholomew (ID No. 6224)
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
920 N. King Street
P.O. Box 636
Wilmington, Delaware  19899
Tel.: (302) 651-3000
Email:  joseph.larkin@skadden.com
          veronica.bartholomew@skadden.com

*Attorneys for Defendants Sabre Corporation
and Sabre GLBL Inc.*

/s/ Daniel A. Mason
Daniel A. Mason (ID No. 5206)
PAUL, WEISS, RIFKIND, WHARTON
  & GARRISON LLP
500 Delaware Avenue
Suite 200
P.O. Box 32
Wilmington, Delaware  19899-0032
Tel: (302) 655-4410
Email:  dmason@paulweiss.com

*Attorneys for Defendants Farelogix Inc.
and Sandler Capital Partners V, L.P.*

40

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>       *Plaintiff,*<br><br>       v.<br><br>SABRE CORPORATION,<br>SABRE GLBL INC.,<br>FARELOGIX, INC., and<br>SANDLER CAPITAL PARTNERS V, L.P.,<br><br>       *Defendants.* | :<br>:<br>:<br>:<br>:<br>:   Civil Action No.: 1:19-cv-01548-LPS<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: |

## CERTIFICATE OF SERVICE

PLEASE TAKE NOTICE that on February 13, 2020, Defendants, by their undersigned

attorneys, caused a copy of Defendants' Post Trial Brief to be served on the following counsel of

record via electronic mail:

Counsel for Plaintiff United States of America:

Laura Hatcher
Chief, Civil Division
United States Attorney's Office
District of Delaware
1313 N. Market Street, Suite 400
Wilmington, DE 19801
Tel: (302) 573-6205
Email: Laura.Hatcher@usdoj.gov

Julie S. Elmer
Vittorio E. Cottafavi
Erin L. Craig
United States Department of Justice
Antitrust Division
450 Fifth Street, NW, Suite 8000
Washington, DC 20530
Tel: (202) 532-4791
Email: Julie.Elmer@usdoj.gov
Email: Vittorio.Cottafavi@usdoj.gov
Email: Erin.Craig@usdoj.gov

OF COUNSEL:

Tara L. Reinhart
Steven C. Sunshine
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
1440 New York Avenue, N.W.
Washington, D.C.  20005
Tel.: (202) 371-7000
Email:  tara.reinhart@skadden.com
            steve.sunshine@skadden.com

Respectfully submitted,

*/s/ Joseph O. Larkin*
Joseph O. Larkin (ID No. 4883)
Veronica B. Bartholomew (ID No. 6224)
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
920 N. King Street
P.O. Box 636
Wilmington, Delaware  19899
Tel.: (302) 651-3000
Email:  joseph.larkin@skadden.com
            veronica.bartholomew@skadden.com

*Attorneys for Defendants Sabre Corporation
and Sabre GLBL Inc.*

Jonathan S. Kanter
Joseph J. Bial
Daniel J. Howley
Paul, Weiss, Rifkind, Wharton
  & Garrison LLP
2001 K Street, NW
Washington, DC 20006
Tel.: (202) 223-7300
Email:  kgallo@paulweiss.com
Email:  jkanter@paulweiss.com
Email:  jbial@paulweiss.com
Email:  dhowley@paulweiss.com

*/s/ Daniel A. Mason*
Daniel A. Mason (ID No. 5206)
PAUL, WEISS, RIFKIND, WHARTON
  & GARRISON LLP
500 Delaware Avenue
Suite 200
P.O. Box 32
Wilmington, Delaware  19899-0032
Tel: (302) 655-4410
Email:  dmason@paulweiss.com

*Attorneys for Defendants Farelogix Inc.
and Sandler Capital Partners V, L.P.*

DATED: February 13, 2020